UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEMAN DATA SYSTEMS,
LLC, ET AL.,

       Plaintiffs,

v.                                   Case No.  8:12-cv-2580-T-24 EAJ

MARC S. SCHESSEL, ET AL.,

       Defendants.

_____/

**ORDER**

    This cause comes before the Court on Defendants' Motion to Dismiss.  (Doc. No. 38).

Plaintiffs oppose the motion.  (Doc. No. 39, 44).  As explained below, the motion is granted in

part and denied in part.

**I.  Background**

    On November 14, 2012, Plaintiffs Deman Data Systems, LLC ("DDS"), Florida Software

Systems Corporation ("FSS"), Florida Software Systems, Inc. ("FSS-FL"), and Norman Dobiesz

filed this lawsuit.  They allege the following in their amended complaint.  (Doc. No. 28).

    **A.  Proprietary Software and Confidential Information**

    FSS has been the owner of certain proprietary software ("Software") created for use in

the healthcare industry.  FSS-FL has been the developer of the Software under a license from

FSS, which allows FSS-FL to possess, utilize, and further license the Software to DDS.  DDS

has been the exclusive provider of certain data services utilizing the Software, and DDS is

authorized to and has granted limited, non-exclusive, non-transferable licenses to certain

specifically identified healthcare facilities, hospitals, and healthcare providers throughout the

United States ("DDS Customers") to utilize the Software.

The Software has undergone enhancements, improvements and modifications by FSS, FSS-FL, and DDS on a regular basis since it was introduced in 2003, and it is part of a comprehensive system offered to DDS Customers as part of a totally integrated clinical solution for supply chain management and optimization in the healthcare industry. **There are four applications within the Software that provide unique and specialized features and functionality:** (1) *CAdRe* (Contract Administration Repository System), which provides spend analysis for DDS Customers by comparing supply chain spend data; (2) *DemanIQ,* a point-and-click application that facilitates transparent pricing comparisons between DDS Customer data and industry data; (3) *DDS IQ Center,* an advanced communications center that provides DDS Customers with market share analysis, collaboration with DDS, and market research; and (4) *ColoursIQ,* which provides visual mapping of billions of bits of healthcare data into a simplified medium that provides analytics and utilization measurements. **Plaintiffs contend that the Software and the applications within it constitute FSS, FSS-FL, and DDS's trade secrets.**

The data services that DDS provides to DDS Customers through the Software are based, in part, upon access to highly confidential and unique data and information from DDS Customers ("Customer Data"). The Customer Data undergoes DDS's proprietary enrichment process and includes the following steps: The Customer Data is first deposited into the *DDS Data Warehouse* where it is cleansed, mapped, normalized, aliased, clinically classified and equivalenced, cross-referenced, blinded, aggregated, and commingled with the billions of bits of all other DDS Customers' data, resulting in the data being "enriched." The "enriched" data is re-identified, at which point the data becomes owned by DDS and deposited into the *DDS Global Catalogue,*

where it is maintained.  Once in the *DDS Global Catalogue,* DDS can present customer-to-industry price comparisons, as well as further analytics, which creates substantial value and benefits for DDS Customers.  Plaintiffs contend that the enrichment process constitutes confidential information and is a protected trade secret.

### B.  Defendants' Alleged Misconduct

Defendant Marc Schessel joined DDS and FSS-FL as an employee in 2003.  As a condition of employment with DDS, Schessel executed a Non-Competition, Non-Solicitation, and Non-Disclosure Agreement ("Restrictive Covenants Agreement") on January 6, 2003 and again on September 1, 2009.  The Restrictive Covenants Agreement contains three main provisions.  First, it provides that for a period of 36 months after termination of Schessel's employment with DDS, "neither [Schessel] or any affiliate of [Schessel] . . . will not . . . directly or indirectly, own, manage, operate, control, invest or acquire an interest in, or otherwise engage or participate in . . . any business which competes with [DDS's business]."  (Doc. No. 28, Ex. D & E).  Second, it provides that for a period of 36 months after termination of Schessel's employment with DDS, Schessel "will not, directly or indirectly disclose to anyone, or use or otherwise exploit for [Schessel's] own benefit . . . any confidential information . . . that is valuable and not generally known to the competitors of [DDS]."  (Doc. No. 28, Ex. D & E).  Third, it provides that for a period of 60 months after termination of Schessel's employment with DDS, Schessel "will not directly or indirectly . . . solicit or divert[1] or attempt to solicit or divert the Business of any clients or customers or accounts, or potential clients, customers or accounts,

---

[1]In the 2009 version of the Restrictive Covenants Agreement, this first instance of the word "divert" is changed to "direct."  (Doc. No. 28, Ex. E).

of [DDS]."  (Doc. No. 28, Ex. D & E).

On or around July 30, 2012, DDS terminated Schessel's employment for cause based on the following: (1) Schessel's resignation due to failure and refusal to report to work and perform the substantial duties and responsibilities of his employment; (2) failure and refusal to carry out the directions of DDS's chairman; (3) failure and refusal to follow the policies and directives established by DDS; and (4) the revelation that Schessel had been convicted of criminal acts for filing fraudulent or false tax returns.  However, prior to and after his employment was terminated, Schessel allegedly engaged in a pattern of misconduct, including: (1) accessing the DDS servers to transfer and/or delete certain confidential information; (2) contacting DDS Customers and partners to solicit their business on behalf of a company that Schessel was going to form; (3) storing confidential information that he removed from the *DDS Global Catalogue* and then permanently misappropriating and converting that information to his own use and for the use and benefit of the company that he was going to form; (4) forming Defendant Primrose Solutions LLC ("Primrose") on October 4, 2012 for the purpose of targeting and soliciting DDS Customers and employees and utilizing DDS's trade secrets and confidential information; (5) actively targeting and soliciting DDS Customers; and (6) making multiple attempts, without authorization, to access and actually accessing the computer systems of DDS and obtaining confidential information.  Additionally, Plaintiffs contend that Schessel withheld material information from DDS and Plaintiff Norman Dobiesz[2] regarding: (1) the termination of Schessel's prior employment, (2) a fraud investigation and Schessel's guilty plea, (3) Schessel's unpaid income tax obligations and IRS levies, and (4) a lawsuit commenced against Schessel by

---

[2]Plaintiffs do not fully explain who Dobiesz is and his relationship to the other plaintiffs.

his former employer.

As a result, Plaintiffs filed suit against Schessel and Primrose.  In their amended complaint, Plaintiffs assert ten claims.  In Count I, FSS-FL and DDS assert a claim for violation of the Computer Fraud and Abuse Act against both defendants.  In Count II, DDS, FSS, and FSS-FL assert a misappropriation of trade secrets claim against both defendants.  In Count III, DDS asserts a claim against Schessel to enforce the restrictive covenants imposed by the Restrictive Covenants Agreements.  In Count IV, DDS, FSS, and FSS-FL assert a civil theft claim against both defendants.  In Count V, DDS asserts a tortious interference claim against both defendants.  In Count VI, DDS asserts a civil conspiracy claim against both defendants.  In Count VII, DDS and Dobiesz assert a breach of fiduciary duty claim against Schessel.  In Count VIII, DDS and Dobiesz assert a fraud claim against Schessel.  In Count IX, DDS asserts a breach of employment agreement claim against Schessel.  In Count X, DDS asserts a claim against Schessel for his failure to pay certain promissory notes that he executed.  In response, Defendants filed the instant motion to dismiss.

## II.  Standard of Review

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff.  See Murphy v. Federal Deposit Ins. Corp., 208 F.3d 959, 962 (11th Cir. 2000)(citing Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999)).  The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim.  Instead, Rule 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.  See Bell Atlantic Corp. v. Twombly, 127 S. Ct.

1955, 1964 (2007)(citation omitted).  As such, a plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1965 (citation omitted).  While the Court must assume that all of the allegations in the complaint are true, dismissal is appropriate if the allegations do not "raise [the plaintiff's] right to relief above the speculative level." Id. (citation omitted).  The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations.  See Jackam v. Hospital Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir. 1986).

**III.  Motion to Dismiss**

Defendants move to dismiss all ten claims.  Accordingly, the Court will analyze the motion as it relates to each claim.

**A.  Computer Fraud and Abuse Act**

In Count I, FSS-FL and DDS assert a claim for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, against both defendants.  Pursuant to § 1030(a), it is unlawful when a person:

> (**2**) intentionally accesses a computer without authorization or exceeds authorized access,[3] and thereby obtains . . . (**C**) information from any protected computer;
>
>       \*       \*       \*
>
> (**4**) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains

_____

[3]"[T]he term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).

anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

**(5)**    **(A)** knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

**(B)** intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

**(C)** intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.[4]

18 U.S.C. § 1030(a).  A "protected computer" includes any computer "which is used in or affecting interstate or foreign commerce or communication."  18 U.S.C. § 1030(e)(2)(B).

"'[D]amage' means any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).

Defendants raise various arguments to support their contention that this claim must be dismissed.  However, as explained below, the Court rejects these arguments and denies Defendants' motion as to this claim.

Defendants' arguments related to this count primarily center around FSS-FL's ability to state a claim, because the allegations in the "General Allegations" section of the amended complaint describe only DDS's computers.  However, within Count I, Plaintiffs allege that the computer system Schessel accessed belonged to both DDS and FSS-FL.  Defendants ask the

---

[4]"[T]he term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).

Court to disregard Plaintiffs' allegations within Count I regarding joint ownership, which this Court declines to do.

Next, Defendants argue that FSS-FL cannot state a claim, because FSS-FL has not suffered any "damage" or "loss" due to the fact that the confidential information that was accessed belonged to DSS. However, Plaintiffs allege within Count I that Schessel's actions caused damage to FSS-FL's protected computers and specifies the types of damage within paragraph 41.

Next, Defendants argue that FSS-FL and DDS fail to state a claim for a violation of § 1030(a)(4), because such a claim sounds in fraud and must be pled with particularity. Section 1030(a)(4) prohibits a person from knowingly and with intent to defraud, accessing a protected computer without authorization, or exceeding authorized access, and by means of such conduct furthering the intended fraud and obtaining anything of value. The case law is not clear regarding whether the particularity requirement set forth in Federal Rule of Civil Procedure 9(b) applies to a § 1030(a)(4) claim. However, this Court concludes that a review of the amended complaint reveals that the § 1030(a)(4) claim is sufficiently pled.

Next, Defendants argue that FSS-FL and DDS fail to state a claim against Primrose for a violation of § 1030(a)(5)(A)—which makes it unlawful to knowingly cause the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer—because Primrose did not exist until October of 2012 and Plaintiffs allege that Schessel deleted certain information from the servers two years earlier in November of 2010. However, Plaintiffs also allege that Schessel accessed and obtained information from the servers as recently as November of 2012—after Primrose was

formed.

Finally, Defendants argue that DDS's claim must be dismissed, because DDS has not properly pled its damages.  The CFAA defines damage as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  DDS has alleged that Schessel deleted and misappropriated confidential information from DDS's computers.  Therefore, the Court rejects Defendants' argument on this issue.

### B.  Misappropriation of Trade Secrets

In Count II, DDS, FSS, and FSS-FL assert a misappropriation of trade secrets claim (a violation of Chapter 688 of the Florida Statutes) against both defendants.[5]  Plaintiffs allege in their amended complaint that their trade secrets consist of two things—the Software and the confidential information.

Defendants raise various arguments to support their contention that this claim must be dismissed.  However, as explained below, the Court rejects these arguments and denies Defendants' motion as to this claim.

First, Defendants argue that this claim must be dismissed as to FSS-FL, because FSS-FL does not have standing to assert the claim because it is alleged to be the developer of the Software, not the owner of the Software.  Furthermore, Defendants point out that FSS-FL is not alleged to be the owner of the confidential information.  Therefore, Defendants argue that FSS-FL cannot assert a claim for misappropriation of trade secrets.  The Court, however, rejects this argument, because FSS-FL not only is alleged to be the developer of the Software, but it is also

---

[5]Misappropriation of a trade secret includes use of a trade secret of another without express or implied consent.  Fla. Stat. § 688.002(2)(b).

alleged to have the right to possess the Software pursuant to its license agreement with FSS. Because FSS-FL is alleged to have the right to possess the Software, FSS-FL has standing to pursue a misappropriation of trade secrets claim related to the Software.  See Treco International S.A. v. Kromka, 706 F. Supp.2d 1283, 1290 (S.D. Fla. 2010).

Next, Defendants argue that this claim must be dismissed as to FSS, because FSS is not alleged to own the confidential information and Plaintiffs have not sufficiently alleged that the Software that FSS owns is a trade secret.  The Court, however, rejects this argument, because FSS is the owner of the Software and has sufficiently alleged a misappropriation of trade secrets claim with respect to the Software.  Chapter 688 of the Florida Statutes provides the following definition of a trade secret:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).  Plaintiffs have sufficiently alleged in the amended complaint that the Software provides unique and specialized features and functionality, which is confidential and proprietary and which derives independent economic value from not being generally known.

Next, Defendants argue that this claim must be dismissed as to DDS, because the data enrichment process, which is alleged to be confidential information, does not constitute a trade secret.  Defendants argue that the data enrichment process described in the amended complaint

consists of obvious steps rather than a process that could be considered a trade secret.[6]  The

Court rejects Defendants' invitation to reach that conclusion as a matter of law.  Instead, the

Court concludes that Plaintiffs have sufficiently alleged a proprietary data enrichment process

that could constitute a trade secret.  Whether the proprietary data enrichment process does, in

fact, constitute a trade secret is a question of fact.  See True Title, Inc. v. Blanchard, 2007 WL

430659, at *2 n.1 (M.D. Fla. Feb. 5, 2007).

Next, Defendants argue that this claim must be dismissed, because Plaintiffs fail to allege

any steps taken to keep the trade secrets a secret.  However, Plaintiffs allege in paragraph 16 of

the amended complaint that they have made efforts to maintain the secrecy of the trade secrets.

Furthermore, Plaintiffs allege that Schessel was required to sign a non-disclosure agreement

relating to DDS's confidential information and trade secrets.

### C.  Enforcement of Restrictive Covenants

In Count III, DDS asserts a claim against Schessel to enforce the restrictive covenants

imposed by the Restrictive Covenants Agreements.  Specifically, Plaintiffs contend that Schessel

improperly competed with DDS, disclosed and exploited DDS's confidential information, and

solicited DDS's customers.  Defendants argue that to the extent that this claim is based on

---

[6]According to the allegations in the amended complaint, DDS's proprietary data
enrichment process includes the following steps: The Customer Data is first deposited into the
DDS Data Warehouse where it is cleansed, mapped, normalized, aliased, clinically classified and
equivalenced, cross-referenced, blinded, aggregated, and commingled with the billions of bits of
all other DDS Customers' data, resulting in the data being "enriched."  The "enriched" data is re-
identified, at which point the data becomes owned by DDS and deposited into the DDS Global
Catalogue, where it is maintained.  Once in the DDS Global Catalogue, DDS can present
customer-to-industry price comparisons, as well as further analytics, which creates substantial
value and benefits for DDS Customers.

Plaintiffs' contention that Schessel improperly competed with DDS and solicited DDS's customers, the claim must fail.  As explained below, the Court finds that due to the poor drafting of the restrictive covenants at issue, Defendants' arguments have merit.

Plaintiffs contend that Schessel violated the restrictive covenants by improperly competing with DDS.  Defendants argue that this portion of the claim must be dismissed, and the Court agrees, but for a different reason than that suggested by Defendants.  The provision at issue states that for a period of 36 months after termination of Schessel's employment with DDS, "neither [Schessel] or any affiliate of [Schessel] . . . will not . . . directly or indirectly, own, manage, operate, control, invest or acquire an interest in, or otherwise engage or participate in . . . any business which competes with [DDS's business]."[7]  (Doc. No. 28, Ex. D & E).  Because this provision contains a double negative—stating that ***neither*** Schessel or Schessel's affiliate ***will not*** compete with DDS—this provision does not prohibit Schessel from competing with DDS.  Therefore, the Court dismisses DDS's claim in Count III to the extent that it is based on Plaintiffs' contention that Schessel improperly competed with DDS.

Plaintiffs also contend that Schessel improperly solicited DDS's customers based on the following restrictive covenant—that for a period of 60 months after termination of Schessel's employment with DDS, Schessel "will not directly or indirectly . . . solicit or divert or attempt to solicit or divert the Business of any clients or customers or accounts, or potential clients, customers or accounts, of [DDS]."  (Doc. No. 28, Ex. D & E).  Defendants argue that DDS cannot state a claim for a violation of this restrictive covenant due to the way the term

---

[7]The parties appear to overlook the fact that this provision contains a double negative and actually states the opposite of what they probably intended.

"Business" is defined within the agreement.  The Restrictive Covenants Agreement states that

DDS "is engaged in the marketing, sale and support of certain proprietary software for supply

chain management and optimization in the medical and hospital industry[,] hereafter referred to

as the 'Business.'"  (Doc. No. 28, Ex. D & E).  Thus, the term, "Business," is defined in the

Restrictive Covenants Agreement in such a way that it actually describes ***DDS's*** business, not

the business of DDS's customers.  Therefore, Defendants contend that when read in the manner

defined under the agreement, this restrictive covenant provides that Schessel will not attempt to

solicit or divert the "marketing, sale and support of certain proprietary software" of any of

DDS's customers.  Since there is no allegation that DDS's customers engage in the "marketing,

sale and support of certain proprietary software," Schessel could not violate this restrictive

covenant.  The Court agrees with Defendants and dismisses DDS's claim in Count III to the

extent that it is based on Plaintiffs' contention that Schessel improperly solicited DDS's

customers.[8]

### D.  Civil Theft

In Count IV, DDS, FSS, and FSS-FL assert a civil theft claim against both Defendants

Schessel and Primrose.  Specifically, Plaintiffs allege that Defendants stole their trade secrets, in

violation of Florida Statute § 772.11.[9]  As previously noted, the trade secrets at issue are alleged

to consist of (1) the Software, and (2) DDS's confidential information.

---

[8]Count III remains to the extent that it is based on the contention that Schessel improperly
disclosed and exploited DDS's confidential information.

[9]Pursuant to § 772.11, a civil theft claim can be based on a violation of the criminal theft
statute set forth in §  812.014.

Defendants move to dismiss this claim to the extent that it is asserted by FSS and FSS-FL and to the extent that it relates to the Software.  Specifically, Defendants argue that there is no allegation that Defendants stole the Software.  Instead, the allegations in the amended complaint relate to the theft of confidential information; there are no direct allegations regarding the theft of the Software.  While the confidential information that was allegedly stolen may have been derived from the Software, the theft of the confidential information is not equivalent to theft of the Software.  Therefore, the only trade secret that was alleged to have been stolen is the confidential information, which was owned by DDS.  Therefore, the Court grants Defendants' motion to dismiss this claim as to FSS and FSS-FL, because this claim cannot be based on theft of the Software itself.

### E.  Tortious Interference

In Count V, DDS asserts a tortious interference claim against both defendants.  The Florida Supreme Court has stated the following regarding the elements of this claim:

> The elements of tortious interference with a business relationship are (1) the existence of a business relationship . . . (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. A protected business relationship need not be evidenced by an enforceable contract.  However, the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights.
>
> *        *        *
>
> In Florida, a plaintiff may properly bring a cause of action alleging tortious interference with present or prospective customers but no cause of action exists for tortious interference with a business's relationship to the community at large.  As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable

14

> understanding or agreement which in all probability would have been
> completed if the defendant had not interfered.

Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814, 815 (Fla. 1995)(internal

citations and quotation marks omitted).

Defendants argue that this claim must be dismissed because it is not sufficiently pled.  As

explained below, the Court rejects this argument.

First, Defendants argue that Plaintiffs fail to allege that the relationships that were

interfered with afforded DDS any legal rights, nor have Plaintiffs identified specific relationships

(as opposed to the community at large).  However, Plaintiffs allege that DDS has granted

licenses to its customers and that the license agreements afford DDS with legal rights.

Additionally, Plaintiffs allege that DDS is a party to other advantageous business relationships

with specific customers that are not evidenced by contracts, in which DDS has rights.

Furthermore, Plaintiffs have alleged interference with DDS's existing customers, which are

defined in the amended complaint as specifically identified healthcare facilities, hospitals, and

healthcare providers.  The Court concludes that Plaintiffs' allegations are sufficient.

Next, Defendants argue that Plaintiffs have not sufficiently alleged that Defendants

procured a breach of DDS's business relationships.  However, Plaintiffs have alleged that

Defendants have procured and are attempting to procure the termination or breach of some or all

of the contractual and advantageous business relationships that DDS has with its customers due

to Defendants' intentional soliciting of DDS's customers.[10]  Plaintiffs further allege that Schessel

_____

[10]Defendants argue that it is insufficient for Plaintiffs to allege that Defendants procured
and are attempting to procure the termination or breach of the business relationships, because

formed Primrose for the purpose of targeting and soliciting DDS's customers.  As such, the

Court concludes that Plaintiffs' allegations are sufficient.

### F.  Civil Conspiracy

In Count VI, DDS asserts a civil conspiracy claim against both defendants.[11]

Specifically, Plaintiffs allege that Defendants conspired to tortiously interfere with DDS's

business relationships with its existing customers.

Defendants argue that this claim must be dismissed, because it is not sufficiently pled.  In

order to state a claim for civil conspiracy, the following must be alleged: (1) a conspiracy

between two or more parties, (2) to do an unlawful act, (3) the doing of some overt act in

pursuance of the conspiracy, and (4) damage to the plaintiff as a result of the acts done pursuant

to the conspiracy.  See Lobo Capital Partners, LLC v. Forte, 2013 WL 1279009, at *2 (M.D. Fla.

Mar. 28, 2013)(citations omitted).

Defendants first argue that Plaintiffs fail to allege the existence of any agreement.

However, Plaintiffs allege that Schessel, together with and on behalf of Primrose, did the

following: (1) through the complicity of former DDS employee Darlene Keller, accessed DDS

servers to transfer and/or delete confidential information; (2) with the assistance and active

participation of one or more DDS employees, stored confidential information that had been

removed from DDS; and (3) with the assistance and active participation of one or more DDS

---

only breaches are sufficient to support such a claim.  The Court rejects this argument.  See
Martinez v. Pavex Corp., 422 F. Supp.2d 1284, 1297 (M.D. Fla. 2006)(stating that interference
can be established by either a termination or breach of a business relationship).

[11]While Plaintiffs make reference to FSS's damages in this claim, Plaintiffs clarify that
this claim is only brought by DDS.

employees, retrieved and misappropriated customer lists, key contacts, and other customer information from DDS's servers.  The Court concludes that these allegations support the inference of the existence of an agreement between Defendants and one or more DDS employees.

Next, Defendants argue that there is no allegation that Defendants conspired with each other to commit the tortious interference.  This argument has no merit, as Plaintiffs allege that Schessel acted together with, and on behalf of, Primrose to target and solicit DDS's customers by using the wrongfully acquired customer information.

### G.  Breach of Fiduciary Duty

In Count VII, DDS and Dobiesz assert a breach of fiduciary duty claim against Schessel.  As previously noted, Plaintiffs do not fully explain in the amended complaint who Dobiesz is and his relationship to the other plaintiffs.[12]  Defendants move to dismiss this claim to the extent that it is asserted by Dobiesz due to the lack of allegations supporting a fiduciary relationship.  Given the complete lack of allegations regarding Dobiesz in the amended complaint, there is really no basis for finding that Plaintiffs have adequately pled that Schessel owed or breached a fiduciary duty to Dobiesz.  As such, the Court dismisses this claim without prejudice to the extent that it is asserted by Dobiesz.

DDS also asserts this claim against Schessel based on the following conduct by Schessel:

---

[12]However, it appears through Plaintiffs' response brief that Dobiesz is the president of FSS-FL and is also a member of DDS.  (Doc. No. 39, p. 14-15).  Additionally, based on the exhibits attached to the amended complaint, it appears that FSS-FL may be the a managing member of DDS.  The exhibits attached to the amended complaint show that several of the documents were executed by DDS via the signature of Dobiesz, as president of FSS-FL (and indicating that FSS-FL is the manager of DDS).

17

(1) withholding material information from DDS regarding Schessel's prior employment with Continuum Health Services ("Continuum") having been terminated, because Schessel was involved with the fraudulent activities of fellow employee, Donald Modzelewski, who was convicted in New York after entering a guilty plea to fraud involving the theft of millions of dollars from Continuum, based upon Modzelewski's involvement with Continuum's vendor, Thomas Colucci; (2) withholding material information from DDS regarding Schessel's fraud investigation by the New York State Attorney General's Office and guilty plea to the felony charge of filing a false or fraudulent tax return, which arose out of Schessel's receipt and acceptance of unreported funds from Colucci and/or Modzelewski; (3) falsely representing at his sentencing that he was the sole owner of DDS's confidential information; (4) lying to DDS about his unpaid income tax obligations that have resulted in IRS levies; (5) withholding information regarding a lawsuit commenced against Schessel by his former employer, Global Healthcare Exchange, for improper use of a company credit card, which resulted in a judgment rendered against Schessel in the amount of approximately $16,000; and (6) refusing to perform the duties assigned to him as president and as an employee of DDS, including refusing to attend meetings of DDS and report to work at the offices of DDS, refusing to follow the policies and directives established by DDS, and refusing to carry out the directions of the Chairman of DDS.

Defendants move to dismiss this claim as to DDS, arguing that the claim fails because: (1) the only source of a fiduciary duty is the employment agreement between Schessel and DDS, and a breach of fiduciary duty claim cannot be dependent on the existence of a contractual relationship; and (2) DDS did not allege that Schessel owed DDS a duty to disclose the information that he withheld and/or that the non-disclosure damaged DDS. Accordingly, the

Court will address these arguments.

Defendants argue that this claim fails because the only source of a fiduciary duty is the employment agreement between Schessel and DDS, and a breach of fiduciary duty claim cannot be dependent on the existence of a contractual relationship.  This argument appears to be based on the economic loss rule, which barred tort claims when the claim was dependant on the existence of a contract.  However, the Florida Supreme Court recently limited the economic loss rule to product liability claims.  See Tiara Condominium Assoc., Inc. v. Marsh & McLennan Co., Inc., 110 So. 3d 399, 407 (Fla. 2013).  Accordingly, the Court rejects Defendants' argument on this issue.

Next, Defendants argue that DDS did not allege that Schessel owed DDS a duty to disclose the information that he withheld and/or that the non-disclosure damaged DDS. Plaintiffs have not clearly and directly addressed this argument.

It is unclear from the allegations in the amended complaint when many of the non-disclosures occurred and whether Schessel had a duty to disclose such information.  For example, Plaintiffs have not alleged a basis for asserting that Schessel had a fiduciary duty to disclose the termination of his prior employment.  Furthermore, there is no allegation regarding when the fraud investigation occurred such that a fiduciary duty to disclose such information can be determined.  Likewise, there is no allegation regarding when his former employer initiated a lawsuit against him for improper use of a company credit card such that a fiduciary duty to disclose such information can be determined.  Finally, Plaintiffs do not directly allege how any of the alleged non-disclosures caused DDS damage.  Thus, the Court agrees that this claim is not sufficiently pled to the extent that it is based on non-disclosures of information and lying by

19

Schessel (allegations 1 through 5 outlined above), and to that extent, it must be dismissed without prejudice as to DDS. However, the claim remains to the extent that DDS alleges that Schessel breached his fiduciary duty to DDS by refusing to perform the duties assigned to him as president and as an employee of DDS.

### H.  Fraud

In Count VIII, DDS and Dobiesz assert a fraud claim against Schessel. Specifically, Plaintiffs allege that Schessel misrepresented and concealed material information regarding the following: (1) that Schessel's prior employment with Continuum was terminated because Schessel was involved with fraudulent activities; (2) that there was a fraud investigation by the New York State Attorney General's Office and Schessel's guilty plea to the felony charge of filing a false or fraudulent tax return; (3) that he falsely represented at his sentencing that he was the sole owner of DDS's confidential information; (4) that he lied to DDS about his unpaid income tax obligations that have resulted in IRS levies; and (5) that his former employer, Global Healthcare Exchange, had filed a lawsuit against him for improper use of a company credit card, which resulted in a $16,000 judgment rendered against him. Plaintiffs contend that Schessel concealed this information in order to induce DDS to hire him, appoint him as president of DSS, offer him membership units in DDS, and ensure his continued employment at DDS.

Defendants move to dismiss this claim to the extent that it is asserted by Dobiesz. As previously stated, there is a complete lack of allegations regarding Dobiesz in the amended complaint, and as such, there is no basis for finding that Dobiesz adequately pled a fraud claim against Schessel. As such, the Court dismisses this claim without prejudice to the extent that it is asserted by Dobiesz.

Defendants also move to dismiss this claim to the extent that it is asserted by DDS, arguing that the claim is not pled with sufficient particularity.  However, upon review of the allegations in the amended complaint, the Court rejects this argument and denies the motion to dismiss on this issue.

### I.  Breach of Employment Agreement

In Count IX, DDS asserts a breach of employment agreement claim against Schessel. This claim appears to be based on alleged breaches of the 2003 and 2009 employment agreements.  Defendants move to dismiss this claim to the extent that it relates to the 2003 employment agreement, arguing that the statute of limitations for a breach of this agreement has expired.

The 2003 employment agreement states that the term of the agreement is two years from January 6, 2003.  (Doc. No. 28-1, Ex. A, ¶ 3).  The 2003 agreement further states that the term may be extended on such terms and conditions as DDS and Schessel agree to in writing.  (Doc. No. 28-1, Ex. A, ¶ 3).  There is no evidence or allegation that ***prior to the expiration of the two-year term***, the 2003 agreement was extended.  Instead, on September 1, 2009, DDS and Schessel entered into another employment agreement that contained a three year term.  (Doc. No. 28-2, Ex. B, ¶ 3).

Plaintiffs argue that the 2009 employment agreement is a written extension of the 2003 agreement, because they alleged in the amended complaint that "Schessel and DDS reaffirmed the terms and conditions of Schessel's employment with DDS . . . when Schessel executed [the 2009] employment agreement."  (Doc. No. 28, ¶ 22).  However, that allegation is not the same as stating that DDS and Schessel extended the term of the 2003 employment agreement.

Furthermore, the 2009 agreement states that it commences as of September 1, 2009.  (Doc. No. 28-2, Ex. B, ¶ 3).  Therefore, it appears that the 2003 agreement terminated pursuant to its terms on January 6, 2005, and a breach of contract action must be brought within five years.  Fla. Stat. § 95.11(2)(b).

Because this lawsuit was not filed by January 6, 2010, and there is no allegation that the term of the 2003 agreement was extended, the Court agrees with Defendants that, based on the allegations in the amended complaint and the attached employment agreements, it appears that the statute of limitations has expired for a breach of contract claim relating to the 2003 employment agreement.  Therefore, the Court dismisses the breach of contract claim to the extent that it is based on a breach of the 2003 employment agreement.

### J.  Promissory Notes

In Count X, DDS asserts a claim against Schessel for his failure to pay certain promissory notes that he executed.  Specifically, Plaintiffs allege that between April 7, 2009 and February 9, 2010, DDS loaned Schessel $165,000, which is evidenced by ten promissory notes. Plaintiffs further allege that DDS has demanded repayment, but Schessel has refused.

Defendants move to dismiss this claim, arguing that Florida Statute § 201.08 makes this claim unenforceable at this time, because there is no evidence or allegation that the document tax has been paid.  As explained below, the Court rejects this argument.

Section 201.08 provides, in pertinent part:

> (1)(a)  On promissory notes . . . made, executed, delivered, sold, transferred, or assigned in the state . . . the tax shall be 35 cents on each $100 or fraction thereof of the indebtedness or obligation evidenced thereby. The tax on any document described in this

> paragraph may not exceed $2,450.
>
> (b)   On mortgages, trust deeds, security agreements, or other evidences of indebtedness filed or recorded in this state . . . the tax shall be 35 cents on each $100 or fraction thereof of the indebtedness or obligation evidenced thereby. . . . The mortgage, trust deed, or other instrument shall not be enforceable in any court of this state as to any such advance unless and until the tax due thereon upon each advance that may have been made thereunder has been paid.

Fla. Stat. § 201.08.  As evidenced by the separation of the provision dealing with promissary notes and the provision dealing with other evidences of indebtedness filed or recorded in this state, these types of instruments are treated differently.  Only the provision addressing other evidences of indebtedness filed or recorded in this state provides that such instruments are unenforceable until the document tax due thereon has been paid.  As such, the Court rejects Defendants' argument on this issue.[13]  See Glenn Wright Homes (Delray) LLC v. Lowy, 18 So. 3d 693, 696-697 (Fla. 4th DCA 2009)(noting that this statute has been amended and concluding that this version of the statute does not make the enforcement of promissory notes contingent on whether the taxes due thereon have been paid).

Next, Defendants argue that this claim should be dismissed because the promissory notes reference schedules, which have not been attached to the complaint.[14]  The promissory notes provide that if DDS makes additional advances of money under the promissory note, then DDS

---

[13]The Court notes that there is case law that supports Defendants' argument, but that case law stems from analysis of an earlier version of the statute.  The current separation of the provision dealing with promissary notes and the provision dealing with other evidences of indebtedness filed or recorded in this state occurred as a result of a 2002 amendment to this statute.

[14]The promissory notes have been attached to the complaint, but the referenced schedules have not been attached.

will inscribe certain information relating to each advance on a schedule attached to the promissory note.  Plaintiffs respond that no such advances were made, and instead, every time DDS loaned Schessel money, a new promissory note was executed.  As such, Plaintiffs contend that the absence of the schedules is not fatal to their claim.  The Court agrees with Plaintiffs and rejects Defendants' argument on this issue.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that Defendants' Motion to Dismiss (Doc. No. 38) is **GRANTED IN PART AND DENIED IN PART**: The motion is granted to the extent that: (a) the Court dismisses Count III (enforcement of restrictive covenants) to the extent that it is based on Plaintiffs' contention that Schessel improperly competed with DDS and solicited DDS's customers; (b) the Court dismisses Count IV (civil theft) as to FSS and FSS-FL and to the extent that it is based on a theft of the Software itself; (c) the Court dismisses Count VII (breach of fiduciary duty) without prejudice to the extent that it is asserted by Dobiesz; (d) the Court dismisses Count VII (breach of fiduciary duty) without prejudice to the extent that it is asserted by DDS and is based on Schessel's non-disclosures of information and lying; (e) the Court dismisses Count VIII (fraud) without prejudice to the extent that it is asserted by Dobiesz; and (f) the Court dismisses Count IX (breach of contract) to the extent that it is based on a breach of the 2003 employment agreement.  Otherwise, the motion is denied.

**DONE AND ORDERED** at Tampa, Florida, this 11th day of June, 2013.

Copies to:
Counsel of Record

SUSAN C. BUCKLEW
United States District Judge