**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

DEMAN DATA SYSTEMS, LLC,
a Florida limited liability company;
FLORIDA SOFTWARE SYSTEMS
CORPORATION, a Delaware corporation;
and FLORIDA SOFTWARE SYSTEMS,
INC., a Florida corporation,

                                   CASE NO.  8:12-CV-02580-SCB-EAJ

        Plaintiffs/Counter-Defendants,

v.

MARC S. SCHESSEL, and
PRIMROSE SOLUTIONS, LLC, a Delaware
corporation,

        Defendants/Counter-Plaintiffs.

_____/

## MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW OF DEFENDANT, MARC S. SCHESSEL

       Defendant, MARC S. SCHESSEL ("Defendant" or "Schessel"), pursuant to Rule 56(b), Fed.R.Civ.P. and Rule 3.01(a), M.D. Fla, seeks the entry of Summary Judgment in his favor as to the claims raised against him in the Third Amended Complaint under Count I through IX and Count V of the Amended Counterclaim.

## STATEMENT OF FACTS

       Marc Schessel has worked in supply chain management for hospitals for the past 25 years.  Schessel's Decl., ¶2[1].  Through his work in this industry Schessel learned that hospitals had trouble understanding how much they paid for products, whether they used the products that they had paid for, and whether they billed for the products that they used.  *Id.*

---

[1] Schessel's Declaration is attached as Exhibit A.

They did not know how much they should be paying for the hundreds of thousands of different products they purchase. *Id.* Schessel also saw that manufacturers and vendors were confounding hospital databases by creating thousands of variant product catalog numbers, thousands of variant product descriptions and hundreds of variant contracts for the same items in an attempt to confuse and complicate the purchasing process. *Id.* This made it impossible for hospitals to aggregate their own utilization or know for certain what the correct prices for these items should be, allowing manufacturers to charge excessive prices. Schessel's Decl., ¶2.

In early 2002, Schessel created a business called Innovative Supply Strategies, Inc. ("ISS"). *Id.* at ¶3. Schessel conceived an idea for a database that aggregated utilization and product purchase costs paid by hospitals for products from which he could create standards that would allow hospitals to do business more efficiently and benchmark prices which hospitals could use to reduce purchase costs and have visibility into their utilization. *Id.* His plan was to populate a database with purchase order history data from his hospital customers which he would normalize by adjusting for differences in product packing, product numbers, manufacturers and vendors. His customers benefitted from the benchmark prices and accurate spend information they derived from the database and he benefitted by obtaining their industry data and charging them a fee. Schessel's Decl., ¶3.

In 2002, ISS hired a company called V-GPO to write a software program to Schessel's specifications that would create the database and user interface. *Id.* at ¶3. The programmer who wrote the code for ISS was Todd Bennett. *Id.* Schessel later learned that Bennett was employed by Florida Software Systems, Inc. ("FSS") which was owned by

Norman Dobiesz, who also was the controlling owner of V-GPO.  *Id.*  Dobiesz was a businessman from Buffalo, New York who had owned a waste disposal company and a chain of gas stations, who had relocated to Florida.  *Id.*  ISS also licensed a rudimentary data base of medical products from V-GPO, which Schessel learned years later had been copied by V-GPO from a Group Purchasing Organization called "Premier."  Schessel's Decl., ¶4.

For reasons that are in dispute, Dobiesz and Schessel ended up creating an LLC together in December 2002 which Schessel named Deman Data Systems, LLC ("DDS").  Schessel's Decl., ¶5.  Dobiesz owned a controlling interest through FSS and IHC, Inc. and Schessel became an owner of a one third interest in DDS.  *Id.*  Schessel and Dobiesz initially were the only employees and Schessel was responsible as its president for sales and marketing, customer support, collections, data normalization and running the day to day business of DDS except accounting.  *Id.*  Dobiesz did not work in supply chain management and his primary role was to manage the company's finances.  *Id.*  Schessel had a number of customers using his software and database and  as part of his deal with Dobiesz, assigned all of ISS's customers and contract rights to DDS.  *Id.*  Schessel did not assign any intellectual property rights, including trade secret rights, in the software or database to DDS, FSS or any other Dobiesz entity.  Schessel's Decl. ¶5.

Dobiesz's lawyer, John Blair, prepared contracts which he presented to Schessel to sign on January 6, 2003.  Schessel's Decl. ¶6.  This included an employment agreement, a non-competition agreement, a subscription agreement and an operating agreement.  *Id.*  Schessel will agree for purposes of this motion only that the exhibits attached to the Third

Amended Complaint with those titles are authentic although he does not have copies of them and cannot vouch for their authenticity. Schessel's Decl., ¶6.

Schessel had many industry contacts and quickly began making significant sales for the company. Schessel's Decl. ¶7. By 2012 he had generated about $80 million in sales, including McKesson and Cardinal. *Id.* As sales grew, Dobiesz asserted more control over Schessel and the company. Dobiesz also revealed to Schessel that he was associated with the mafia in Buffalo and New York City and used this to intimidate and control Schessel. *Id.* Schessel lived in fear of Dobiesz and learned to appease him by making sales for DDS, praising Dobiesz and demeaning himself. By 2011, Dobiesz took steps to get Schessel out of DDS and by the end of May, 2012, had stopped sending Schessel his paychecks. *Id.* Schessel's employment at DDS ended on or about June 1, 2012. Schessel's Decl. ¶7.

Schessel had to make a living and in early June, 2012 began providing consulting services through a company owned by Manny Losada called Primrose Investments, LLC, a Texas company in which Schessel has no ownership interest. Schessel's Decl. ¶8. Schessel provided third party surplus and merger and acquisition product purchase related services for hospitals. *Id.* This required standardizing data from hospitals and vendors, which Schessel could do using Excel and MS Access. *Id.* In July, 2012 Schessel's friend, Todd Bennett, began to create software test modules and a database to make Schessel's manual Excel processes more efficient. *Id.* These modules and database evolved into the software and database at issue in this lawsuit. *Id.* On October 4, 2012, Schessel formed Primrose Solutions, LLC, a Delaware corporation. It is not affiliated in any way with Primrose Investments, LLC. Schessel's Decl., ¶¶8-9.

Additional facts regarding the claims against Primrose Solutions and Schessel are set forth in the Motion of Primrose Solutions and are incorporated herein by reference. Facts related to individual counts against Schessel are set forth below in this Memorandum.

## MEMORANDUM OF LAW

### I.       SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Keen v. Bovie Med. Corp.*, 2013 WL 1899791 *6 (M.D. Fla. May 7, 2013). Once a party makes a summary judgment motion by demonstrating the absence of a genuine issue of  material fact, whether or not accompanied by affidavits, the non-moving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). There is an absence of a genuine issue of material fact as to Counts I – IX of the Complaint and Count V of the Amended Counterclaim, so Schessel is entitled to judgment as a matter of law.

### II.      THE COMPUTER FRAUD AND ABUSE ACT CLAIM.

The Third Amended Complaint [Dkt. 419] ("TAC") alleges in Count I that Marc Schessel, knowingly, with intent to defraud, accessed the computers of DDS (which it shares with FSS) (a) without authorization, (b) exceeding his authorization in violation of 18 U.S.C. §1030 (the Computer Fraud and Abuse Act ("CFAA")) and/or (c) deleting information from

computers. Summary judgment should be granted against Plaintiffs, DDS and FSS, on Count I.

Plaintiffs' interrogatory answer No. 2 list six (6) instances of alleged CFAA violations, as follows: (1) On May 7, 2012, Schessel downloaded dozens of files from the server and he was not authorized to perform a mass download of Confidential Information; (2) On May 9, 2012 Schessel used Stacy Gallagher's log in and password on his company laptop computer to access a CadRe server and ran reports that revealed Confidential Information, when he was not authorized to access the server or to use Gallaghers credentials to access the server; (3) On May 31, 2012, Schessel did the same thing described in number (2) above; (4) On numerous occasions between August, 2012 and January, 2013, Schessel accessed Confidential Information on his company issued computer which he refused to return after he was terminated; (5) on January 23, 2013, Schessel used Phil Maneri's credentials to access the FSS DemanIQ application and ran several utilization reports that revealed Confidential Information; and (6) since 2005 Schessel has deleted hundreds of proprietary files via FTP that cannot be recreated. Schinnar Decl., ¶3.[2]

**The May 7, 9 and 31, 2012 access.**

The first alleged violation was a download of DDS files via ftp (file transfer protocol) to Schessel's laptop computer the night of May 7, 2012. Schessel had been downloading company files via an ftp that DDS established for his use as a part of his normal, daily practice since January, 2003, when Schessel co-founded DDS and became its president. Schessel Decl., ¶10. Schessel used ftp as his primary means of storing and retrieving files

---

[2] Schinnar's Declaration is attached as Exhibit B.

that he created when conducting company business because Schessel's primary residence was in New Palz, New York and he traveled on company business nearly every day making sales presentations, assisting customers, providing consulting services and analyzing data on the computer to calculate customer invoices. *Id.* By May, 2012, this had been his practice for more than nine years. *Id.*

Schessel was traveling on DDS business on May 7, 2012 and accessed the ftp site remotely from his hotel to download files related to Cardinal, a DDS marketing business partner which provided leads for customers for DDS, including Montefiore and Mt. Sinai Hospitals in New York. *Id.* at 13. Schessel needed information about Cardinal from files he had created for a report and he attempted to download them starting at around 11:00 PM. *Id.* Schessel pressed the key to begin the download and then went to bed, a procedure he normally followed when traveling. *Id.* Although Schessel did not know it, the download continued until past 12:14 AM on May 8, 2012, according to DDS's internal logs. Schinnar Decl., ¶4. Those logs show that 68 files were downloaded and that all the files were documents concerning Cardinal that Schessel personally worked with. *Id.*; Schessel Decl., ¶11.

Later that morning, Dobiesz emailed Schessel that he had been notified "that there are massive amounts of files being down loaded I told them to shut off the connection. If this affects you I will need to understand what's going on. I am in meetings and could not talk to get details." Schessel Decl., ¶12 Schessel replied by text that the download was not massive and that the shut off affected Schessel because he needed the financials and information on Cardinal's old customers to use to prepare an email to Cardinal. *Id.* at 12.

Dobiesz replied minutes later that he was told there was a major download and he said to stop it and he would check on it later. *Id.* at 13. Schessel replied that he could not work on the Montefiore payment issue and Mt. Sinai Hospital if he was not turned back on. *Id.* He asked Dobiesz to confirm that Dobiesz "removed my access to both the application and to my email and you are not having them turned back on." Dobiesz immediately denied that stating, "I AM NOT DOING ANYTHING," and explained that he simply had the download "shut down" while Dobiesz investigated. *Id.* Dobiesz did not tell Schessel that there was a policy against downloading files exceeding a certain file size and the company handbook, which describes DDS's internet policy, does not limit the file size of an ftp file download. Schessel Decl., ¶14. There was no company policy on the size of the files that could be downloaded. *Id.*

Early the next morning, on May 9, Dobiesz and Schessel exchanged texts about Schessel doing collections work at DDS customers including Montefiore ("Monte"). *Id.* Schessel sent a text to Dobiesz at 7:28 AM. stating that he "would like to work on Monte today - so we don't lose billing this month" and would "work with Stacy and *use her log in*." *Id.* Dobiesz did not reply. *Id.* Schessel went to Montefiore to work on invoices. *Id.* He sent a text to Dobiesz, Steve Platti and Jim at 1:25 AM stating that he was working with Stacy Gallagher (who reported to Schessel at DDS) and that they needed to get two sessions going so he was *going to have Stacy log on to the system using Marc's computer. Id.* His text further stated that if he did not hear from them by 2:30 he would "assume this is okay and not a breach of security." *Id.* He texted Dobiesz again about 25 minutes later stating that he had informed Steve and Jim and had not received any response from anyone stating that this

would be an issue.  *Id.*  Dobiesz immediately replied, "*They know it's OK,* also sending you stuff for HUMC [another DDS customer invoicing issue]."  *Id.*  (emphasis added)

After that incident Schessel continued to have access to the company computers and could access the DDS emails, word processing documents, company financial information, such as accounts receivable for customers, and the software.  Dobiesz 10/16/13 Depo. Tr. at 303/9-21.[3]  To access the DDS database, however, Dobiesz instructed Schessel that other employees had to log him in.  Schessel Decl., ¶15.

On May 30, 2012, Dobiesz and Schessel exchanged texts about collections at Montefiore and Mt. Sinai.  *Id.* at 16.  On May 31, 2012 Dobiesz texted Schessel, "COLLECTIONS CRUCIAL GIVE ME . . . Mt. Sinai."  *Id.*  Schessel and Gallagher went to Mt. Sinai that day and tried to have Stacy log into the system again on Schessel's laptop.  *Id.*  She did so.  She received a call from Steve Platti that night telling her that she cannot do that anymore.  Schessel Decl, ¶16;  Gallagher's Decl., ¶4.[4]  She then logged out.  That evening Schessel texted Dobiesz, "was working at Mt. Sinai today – *had as you instructed* Stacy log me in-she was then told by Steve that she can't do that –that is the instructions that you gave me-I just want to be clear on that. He told her she can't log me in anymore-is that correct?" Schessel Decl., ¶16 (emphasis added).  Dobiesz did not reply.  *Id.*  Thirty minutes later Schessel texted Dobiesz, "By the way I have never asked for any bodies [sic] sign in-I have her sign me in-just as you instructed-she was on the msmc line as there was only one line and I was sitting next to her on my hot spot."  *Id.*  Dobiesz then replied and did not deny that he had instructed Marc to have Stacy log Schessel into the computer.  *Id.*

---

[3] Dobiesz's Deposition Excerpts are attached as Exhibit C.
[4] Gallagher's Declaration is attached as Exhibit D.

Neither Schessel nor Gallagher copied, altered or deleted anything from the computer system when it was accessed on May 7, 9 and 31, 2012. Schessel Decl., ¶17; Gallagher Decl., ¶10. Neither Schessel nor Gallagher was disciplined, reprimanded or fired for the download of files on May 7 or for Stacy Gallagher logging on to the system using Schessel's laptop on May 9 or Mt. Sinai on May 31, 2012. Schessel Decl., ¶18; Gallagher's Decl., ¶6. There is not an email or text stating that Schessel or Gallagher exceeded their authorized access to the DDS system. Schessel's Decl., ¶19. There is nothing in writing informing Schessel that he could not access the computer system. Dobiesz 10/16/13 at 299/18-300/2. Although Dobiesz sent a three page letter to Schessel on July 30, 2012 stating that Schessel was fired effective June 1, 2012 and giving the reasons for his termination, Dobiesz said nothing about Schessel or Gallagher accessing the system on May 7, 9 or 31, 2012 and did not claim that Schessel violated any access limitations. Schessel Decl., ¶20.

When Schessel discontinued his employment at DDS on June 1, 2012, he kept his laptop computer that he used while employed at DDS. As an owner of one third of DDS, he had a right to continued possession of the laptop that he used while president of DDS. And the DDS records stored on it. Schessel Decl., ¶21. The laptop contains DDS and personal records that Schessel created and/or regularly worked with and had access to as president and owner.

Plaintiffs' claim against Schessel for unauthorized access under the CFAA fails because it is undisputed that Schessel, as the president and one third owner of DDS, was authorized to access the company computer system throughout his employment at DDS. *Keen v. Bovie Medical Corp.*, 2013 WL 1899791 at *14. (M.D. Fla. May 7, 2013) This court

explained in *Keen* that "without authorization" as used in the CFAA requires a showing that the defendant's initial access to the computer was not authorized." *Id.* Schessel's access clearly was not "without authorization" since his initial access to the company computer system was authorized.

Plaintiff's second basis for liability, that Schessel exceeded his authorized access likewise is without merit. The term "exceeds authorized access" means to "access a computer without authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled to so obtain." Schessel did not exceed his authorized access when downloading his Cardinal files on May 7, 2014 because there was no company policy limiting the size of downloaded files. He did not exceed his authorized access on May 9 or May 31 when he directed Gallagher to log on to the DDS system either. Gallagher had authority to access the database, since she had a company password that gave her such access. Gallagher's Decl., ¶3. And Schessel had authority as president to direct her to do so. Dobiesz testified that Schessel "had the authority" as DDS president to get confidential company information from DDS employees. Dobiesz 10/16/13 Depo. Tr. at 308/10-16. Also, when Schessel texted Dobiesz on May 9, 2012 that Stacy was going to log on to the system using his computer, Dobiesz replied that was "ok." Moreover, the text messages between Schessel and Dobiesz on May 9th and 31st state that Dobiesz "instructed" Schessel to have Stacy log on using Mark's computer.

**The August, 2012-January, 2013 access to files on Schessel's laptop**.

Schessel did not access his laptop after July 31, 2012 in violation of the CFAA either. Schessel was an owner of DDS and as such had the authority to access DDS records on the

laptop. An owner of an LLC has a right under Fla. Stat. §608.4101(2) to "accces" the company's records. Even former members have a right to access the company's records for proper purposes pertaining to the period during which they were members. *Id.*

**The alleged January 23, 2013 Phil Maneri access**.

Schessel did not access the FSS or DDS computer system on January 23, 2013. Schessel Decl., ¶22. Phil Maneri, a consultant for Cardinal which has a co-marketing contract with DDS, accessed the system using his computer and his log in credentials, which he was authorized to do as a Cardinal consultant. *Id.* Schessel did not look at the system or create reports. *Id.*

**The alleged file deletions beginning in 2005**.[5]

The only evidence of alleged file deletions is Platti's testimony that Schessel had been deleting some emails from his DDS email account that had attachments that contained proprietary information. Platti 01/17/14 Depo. Tr., at 165-167.[6] Platti thought that violated a company policy set forth in the DDS handbook, but the handbook simply does not prohibit that. *Id.;* Schessel Decl. ¶23. Platti conceded that there is no evidence of Schessel accessing the DDS or FSS servers and deleting either the database or any code so that DDS was unable to function. Platti at 168. Schessel as company president had the authority to delete emails in his own mailbox and had done so since 2003. Schessel's Decl., ¶23. DDS monitors and automatically creates backup emails in a seprate company mail box and he was never admonished in writing or otherwise informed that he was not authorized to do so. *Id.*

---

[5] Any deletions more than two years before filing the Complaint are time barred under 18 U.S.C. § 1030(g).
[6] Platti's 01/17/14 Deposition Excerpts are attached as Exhibit E.

This is not a violation of the CFAA. *Clarity Services, Inc., v. Barney*, 698 F. Supp. 2d 1309 (M.D. Fla. 2010)(rejecting claim that employee who had unrestricted access to his laptop to read, modify or delete files violated the CFAA by wiping the laptop hard drive clean upon termination of his employment.) The CFAA does not criminalize the deletion of emails in a corporate officer/owners own mailbox where he has had unrestricted access to read, modify and delete files. Rather, the CFAA is a "criminal statute originally designed to target hackers who access computers to steal information or to disrupt or destroy computer functionality, as well as criminals who possess the capacity to 'access and control high technology processes vital to our everyday lives.'" *Lee v. PMSI, Inc.*, 2011 WL 1742028 *1 (M.D. Flea May 6, 2011). There is no evidence of such "hacking," as shown about.[7] Plaintiffs are overreaching and their CFAA claim should be rejected.

### III.    Count III – Enforcement of Restrictive Covenants.

DDS's claim in Count III must fail, as the restrictive covenants contained in the Non-Competition, Non-Solicitation, and Non-Disclosure Agreement (the "Non-Competition Agreement") upon which DDS relies were no longer enforceable after January 5, 2005. Where an employer and employee enter into an employment agreement for a specific term, and the contract is fully performed and expires by its terms, any restrictive covenants set forth in that agreement cannot be enforced after the term unless the agreement contains an "express provision" that the covenants will continue in force. *Sanz v. R.T. Aerospace Corp.*, 640 So.2d 1057, 1059-1060 (Fla. 3rd DCA 1995). The Non-Competition Agreement does

---

[7] See also Declaration of Matt Decker attached as Exhibit J.

not contain any such "express provision" and Schessel is entitled to summary judgment on Count III.

In *Sanz,* upon being hired by R.T.A, employee Sanz signed a three-year employment agreement that included the following restrictive covenants:

> *Restrictive Covenants. Employee independently covenants and agrees, which covenants shall be independent of all other covenants herein contained, that he will not during the existence of his employment and for a period of twenty-four (24) months immediately following the termination of his employment,* work for [any business that competes with R.T.A].
> …
> Employee further covenants and agrees that at no time *during the term of his employment and for twenty-four (24) months immediately following the termination of his employment will he,* [solicit R.T.A's customers to buy competing products or services].

*Id.*(italics in original). After the three-year term expired, Sanz continued to work for R.T.A. "pursuant to an oral agreement with the company." *Id.* A year later, Sanz was terminated, so he began competing with R.T.A. and soliciting its customers. *Id.* The employer obtained an injunction preventing Sanz from competing.

The *Sanz* court reversed, finding that trial court erred by enforcing the restrictive covenants "in a written employment agreement which had been fully performed and had expired by its very terms." *Id.* (citing *Storz Broadcasting Co. v. Courtney*, 178 So. 2d 40 (Fla. 3rd DCA 1965), *cert. den.,* 188 So. 2 d 315 (Fla. 1966))("a covenant not to compete related to termination of employment during the term of the agreement . . . was not applicable after the contract was fully performed."). The *Sanz* court rejected R.T.A.'s argument that Sanz' continued employment after the term expired extended the provisions of the written agreement. *Sanz*, 650 So. 2d at 1060. The court noted that to give effect to any

such alleged oral agreement would violate the statute of frauds. Finally, the court was unpersuaded by R.T.A.'s argument that the restrictive covenants survived termination of the agreement because they were independent of all other terms in the agreement. *Id.* Only an express provision stating that the restrictive covenants survive termination will allow the employer to enforce the covenants after the contract is terminated or performed . *Id.*

Although Schessel's term of employment and the restrictive covenants are located in separate agreements, the result here is the same: the restrictive covenants cannot be enforced after the Employment Agreement was fully performed. This is because the Employment Agreement and the Non-Competition Agreement were part of the same transaction,[8] as evidenced by the same parties entering related agreements on the same date. As such, the two agreements must be construed together *KRC Enterprises Inc. v. Soderquist,* 553 So. 2d 760,761 (Fla. 2d DCA 1989)("When two documents are executed by the same parties as part of a single transaction regarding the same subject matter, they are to be read and construed together.") Pursuant to paragraphs 3 and 6 of the Employment Agreement, the "termination of [Schessel's] employment" occurred on January 5, 2005. Schessel's Decl. ¶27. Thus, the restrictive covenants went into effect on January 5, 2003, and ended on January 5, 2005. Because the agreements do not contain any express provision that the covenants survive termination or expiration of the agreements, DDS cannot enforce the restrictive covenants at any time after January 5, 2005, as the contract was fully performed on that date.

---

[8] The Non-Competition Agreement expressly states at page one that the consideration for the agreement includes "the terms of the Employment Agreement between" DDS and Schessel, one of the terms of which is the two-year term. *See* Employment Agreement, TAC Exh. A [419-1].

Yet in Count III, DDS attempts to enforce these covenants, despite the contracts having been fully performed seven years before suit was filed. These agreements define the non-competition periods in language that is almost identical to that in *Sanz'* agreement, which the *Sanz* court refused to enforce. *Compare* DDS Non-Competition Agreement at I.C. (prohibiting Schessel from enticing or inducing any person in the employ or service of DDS from leaving to compete with DDS "during the Restricted Period and for a period of two (2) years thereafter," where the Restricted Period is defined in Section I.A. as the "period commencing on the date of this Agreement and ending on the date which is thirty-six (36) months following the date the Employee ceases to be employed by the Company) *with* Sanz' agreement (prohibiting Sanz from competing *"during the term of his employment and for twenty-four (24) months immediately following the termination of his employment.*").

To enforce this restrictive covenant after the expiration of the agreement would violate the statute of frauds set forth in section 725.01 cited by the Sanz court, as well as the statute of frauds set forth in Florida's restrictive covenant statute at 542.335(1) that was adopted after *Sanz. See Gray v. Prime Management Group, Inc.,* 912 So. 2d 711, 713-714 (Fla. 4th DCA 2005)(finding no enforceable post-term restrictive covenants despite the employment agreement at issue defining the term as five years "unless extended by mutual agreement of the parties"; enforcement after expiration of the agreement would violate the statute of frauds). Several other Florida appellate courts have refused to enforce post-term restrictive covenants in the absence of an express survival clause in the agreement, even where the employee continues his employment after the contract term expires, as to do so would violate the statute of frauds. *See, e.g., Zupnik v. All Florida Paper, Inc.,* 997 So. 2d

1234 (Fla. 3d DCA 2008)(restrictive covenants of non-competition agreement expired at the end of the employment contract's stated two-year term even though former employee had remained employed by former employer as an at-will employee beyond the term); *Coleman v. B.R. Chamberlain & Sons, Inc*., 766 So. 2d 427, 430 (Fla. 5th DCA 2000)(questioning *sua sponte* applicability of post-term restrictive covenants in expired term employment agreement); *Storz Broad. Co. v. Courtney*, 178 So. 2d 40 (Fla. 3d DCA 1965). This Court should likewise reject DDS's attempts to enforce restrictive covenants years after the agreements between it and Schessel were performed.

IV.    **Count III-Breach of Restrictive Covenant I. C. (b).**

Summary judgment should be entered against DDS on its claim that Schessel violated section I. C. (b) of the Restrictive Covenants Agreement by "soliciting those in the service of DDS . . ." (TAC ¶57), for additional reasons. First, the Agreement says nothing about "soliciting" those in the service of DDS. Instead, it provides that during the restrictive period Schessel "will not directly or indirectly (b) entice or induce or in any manner influence, or attempt to entice, induce or in any manner influence any person who is or shall be in the employ or service of the Company [DDS] to leave such employ or service for the purpose of engaging in a business which may be in competition with the Business of the Company." This is in contrast with I. C. (a) which provides that Schessel will not "solicit, divert or attempt to solicit or divert" the Business of clients or customers or accounts of DDS. The difference in words used in the two adjacent restrictive covenants indicates that the terms have different meanings. *Campbell v. Campbell*, 489 So. 2d 774, 777 (Fla. 3d DCA 1986)(just as it is recognized that the same words used in two parts of an instrument are

deemed to mean the same thing in both places, . . . so, as in this case, the use of different language strongly implies that a different meaning was intended.); *Kel Homes, LLC v. Burris,* 933 So. 2d 699, 703 (Fla. 2d DCA 2006). Since DDS did not sue Schessel for doing anything listed in I. C. (b), TAC ¶58, its claim for breach of that provision fails.

Second, the undisputed material facts do not support this claim. DDS contends in its Interrogatory answers that Schessel solicited Todd Bennett to leave the employ of DDS. Schinnar Decl., ¶5. Bennett testified, however, that he was employed by FSS and that he left the employ or service of FSS in May, 2013, because his employment contract with FSS had expired, he was not offered any extension and he had initiated a lawsuit against Norm Dobiesz. Bennett 08/08/14 Depo. Tr., at 513-514.[9] Moreover, Bennett testified categorically that Schessel did not "entice, induce or in any manner influence, attempt to entice, induce or influence [him] to discontinue providing services to Florida Software Systems or DDS." *Id.;* Schessel Decl., ¶24. Schessel, therefore, has not breached by "soliciting those in the service of DDS." TAC ¶58.[10]

DDS also claimed that Schessel solicited John Decker and Richard Croy. Schessel denies this but, in any event, neither John Decker nor Richard Croy discontinued their

_____

[9] Bennett's 08/08/14 Deposition Excerpts are attached as Exhibit F.
[10] DDS has not alleged that Schessel breached by an "attempt" to entice, induce or influence Bennett to leave the service or employ of DDS. Such a provision is not enforceable in any event because it is not narrowly tailored to meet a DDS legitimate business interest as required by Fla. Stat. §542.335(1)(c). DDS has plead that the legitimate business interests served are the protection of DDS trade secrets and extraordinary training Schessel received in the Proprietary Software and Confidential Information. TAC ¶55. Forbidding Schessel from attempting but not succeeding to entice, induce or influence a person in the service of DDS to leave such service does not serve either of those interests.

employment.   Decker's 05/05/14 Depo. Tr. at 5[11]; Croy's 07/01/14 Depo Tr. at 5.[12]
Schessel's Decl. ¶24.

## V.      Count VII- Breach of Fiduciary Duty.

DDS alleges that Schessel had a "confidential and/or fiduciary relationship" with DDS,  that he breached his fiduciary duty by "intentionally, willfully and maliciously refus[ing] to perform the duties assigned to him including refusing to attend DDS meetings and refusing to follow DDS policies and procedures," and that "as a direct and proximate result of Schessel's breach of his confidential and/or fiduciary relationship, DDS has suffered damages. . . ."  TAC ¶77-80.  Summary judgment should be granted against DDS on this claim because refusing to perform assigned duties is not a breach of fiduciary duty.  *U.S. v. De LaMata*, 266 F. 3d 1275,1293 (11th Cir. 2001)("The fiduciary duty, or duty of loyalty, obligates officers and directors to avoid fraud, bad faith, usurpation of corporate opportunities, and self dealing.")(applying Florida law)  Not performing job duties may be grounds for termination, but it is not a breach of fiduciary duty.

To the extent DDS alleges breach of a statutory duty, the claim fails because Fla. Stat. §608.4225 creates statutory duties for managers and member managers, not officers.  FSS, not Schessel, is the manager of DDS.  Operating Agreement §4.1. [Dkt. 419-3]

## VI.      Count VIII-Fraud in the Inducement.

Summary judgment should be entered against DDS on its fraud in the inducement claim because this was no fraudulent omission, DDS did not exist when the alleged fraudulent omissions was made and DDS could not justifiably rely upon the alleged

---

[11] Decker's 05/06/14 Deposition Expcept is attached as Exhibit G.
[12] Croy's 05/06/14 Deposition Expcept is attached as Exhibit H.

fraudulent omission as a matter of law. DDS alleges in Count VIII that "DDS hired Schessel based upon his purported reputation for honesty, integrity and truthfulness." TAC ¶82. Schessel is alleged to have misrepresented his reputation by withholding material information from DDS about whether his prior employment at Continuum Health Services was terminated "because, upon information and belief, he was involved with the fraudulent activities of fellow employee, Donald Modzelewski." *Id.* at ¶83. [13]DDS alleges that as a result of this fraudulent omission, "DDS hired Schessel, appointed him president and facilitated Schessel being granted rights to acquire 1/3 ownership in DDS." DDS further alleges that this induced "Dobiesz to cause DDS to enter into the Subscription and Operating Agreement and provided Schessel the opportunity to acquire one-third ownership of DDS." *Id.* at ¶¶84; 87.

DDS came into existence on December 9, 2002 when its articles of organization were filed. Schinnar's Decl., ¶6. The Employment Agreement, Subscription Agreement and Operating Agreement were signed on January 6, 2003. Dobiesz testified that he spoke with Schessel "thirty days" before they signed the subscription agreement; *i.e.* on December 6, 2002. Dobiesz 10/16/13 Depo. Tr., at 96-97. During this interview Dobiesz asked Schessel questions, including whether he had he been removed from any of his jobs for cause and why he left Continuum.. *Id.* at 94-97. Schessel "didn't offer any background problems or issues of fraudulent activities during that conversation, and if he had any at that time, he simply omitted to tell me or chose not to tell me [Dobiesz]. *Id.* at 98. When asked whether Schessel told Dobiesz that he had a good reputation for honesty, Dobiesz replied that "he didn't say to

[13] The Court dismissed the other four alleged non-disclosures from the Second Amended Complaint by Order dated December 16, 2013 [Dkt. 147 at p. 6].

me, I'm a very honest person, if that's what you mean." *Id.* at 99. Instead, Dobiesz claims that he asked Schessel if "he had any problems, and he didn't reveal any to me." *Id.* Consequently, at the time DDS entered into the subscription agreement on January 6, 2003, DDS "had an understanding" that Schessel "had not been terminated from any prior employment positions for involvement with fraudulent activity." *Id.*

DDS's fraud claim fails for several reasons. First, DDS did not exist when the December 6, 2002 interview occurred in which Dobiesz allegedly asked Schessel about the termination of his employment at Continuum. Schessel could not have made fraudulent representations or omissions to a non-existent entity. Nor could he have intended to induce a non-existent entity to rely. A limited liability has no corporate existence, no rights and no duties prior to the filing of its articles of organization. Fla. Stat. § 608.409(1) and 608.409(4); *Greenfield Village v. Thompson,* 44 So. 2d 679, 683 (Fla. 1950)("contracts made for a corporation by its promoters prior to its creation are not enforceable *by or against* the corporation after its organization.")

Second, there are no facts to support this claim. Schessel's prior employment with Continuum was not terminated due to involvement in fraudulent activities. Schessel Decl., ¶25; Nardi's Decl., ¶3.[14] Nor was Schessel fired by Continuum. Schessel Decl., ¶25; Nardi's Decl., ¶3. Therefore, any alleged failure to disclose that Continuum terminated his employment for that reason is not a fraudulent omission.

DDS's allegation that it "hired Schessel based upon his purported reputation for honesty, integrity and truthfulness" fails for the same reason. When Dobiesz was asked if

---

[14] Naldi's Declaration is attached as Exhibit I.

Schessel represented that he had a reputation for honesty, integrity and truthfulness, he testified that Schessel did not say that. Dobiesz 10/16/13 Depo. Tr., at 99.

Third, the January 6, 2003 Employment Agreement, Subscription Agreement and Operating Agreement, which DDS alleges it was induced to enter into through Schessel's alleged fraudulent omission, each negate DDS's fraud claim. The January 6, 2003 Subscription Agreement states that the parties written agreement "supercedes any prior understandings . . . whether oral or written." [419-3 at ¶9]. The January 6, 2003 Employment Agreement similarly states at ¶10, "This Agreement constitutes the full and complete understanding and agreement of the Employee and the Company regarding the subject matter hereof, and supercedes all prior understandings . . oral or written, express or implied." [419-1 at p. 5] The January 6, 2003 Operating Agreement provides at paragraph 11.2 "This Agreement . . . supercedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the Members with respect thereto, whether or not relied or acted upon." [419-3 at p. 11].

DDS's alleged prior understanding that Schessel had not been terminated from his employment at Continuum because of involvement with fraudulent activity is not stated anywhere in the agreements. Any understanding DDS had on this issue was superceded by the parties written agreements. DDS was obliged to include this alleged understanding in the parties' written agreements, which DDS represented stated the "full and complete understanding" of the parties. Otherwise the contract provisions which state that the written agreements constitute the "full and complete understanding of the parties" and "supercede any prior understandings and agreements" would be false and, therefore, meaningless.

DDS cannot justifiably rely upon an alleged fraud that contradicts the written, integrated agreements that it signed. *Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999)("Florida courts made clear that no action for fraud in the inducement will lie where the alleged fraud contradicts the subsequent written contract.") This is true because there cannot be reasonable reliance as a matter of law upon fraudulent representations that contract the express terms of the ensuing written agreement. *Id.* at 1342. Second, the parole evidence rule forbids a party from providing evidence of prior or contemporaneous representations to vary or contradict the clear and unambiguous terms of the contract. *Id.*

Similarly, reliance upon alleged misrepresentations is unreasonable as a matter of law when the statements are not contained in the subsequent written agreement. *White Constr. Co., Inc. v. Martin Marietta Materials Inc*., 633 F. Supp. 2d 1302 (M.D. Fla. 2009)("[a] party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract."); *Schubot v. McDonalds Corp*., 757 F. Supp. 1351, 1356 (S.D. Fla. 1990), *aff'd.* 963 F. 2d 385 (11th Cir. 1992); *Yamashita v. Merck & Co., Inc*., 2013 WL 275536 at *4 (S.D. Fla. Jan. 24, 2013). Alleged representations which are not important enough to be included in the parties' subsequent integrated written agreement are not material as a matter of law. 262 F. Supp. 2d at 1342-43.

The DDS fraud claim fails because DDS's alleged reliance upon an understanding not stated in the parties' written agreements contradicts DDS's representations in the written agreements that those agreements state the "full and complete understanding" of the parties and that they "supercede any prior understandings."

## VII.    Count IX -Breach of 2003 Employment Agreement.

The January 6, 2003 Employment Agreement is a two year agreement that terminated on January 5, 2003 [Dkt. 419-A at ¶¶ 3, 6].  It has not been amended or extended.  Schessel Decl., ¶26.  The Court dismissed this claim in its entirety in its June 11, 2013 Order based upon the statute of limitations [Doc. 56 at p. 22].  However, the Court later allowed DDS to amend to allege a breach of paragraph 9 of the Employment Agreement.  The sole surviving breach provision of Count IX now provides, "The work made for hire" restrictions in paragraph 9 of the 2003 Employment Agreement survived termination and remained in effect after Schessel's termination of employment which provisions were breached by "his impermissible use of the Proprietary Software and the Confidential Information."  TAC ¶91.

Summary judgment should be granted on this claim for two reasons.  First, an alleged impermissible use of the Proprietary Software and the Confidential Information does not breach paragraph 9 of the Employment Agreement, which says nothing about use of the Proprietary Software and the Confidential Information.  Nothing in paragraph 9 prohibits Schessel's use of the Proprietary Software or Confidential Information.

Second, any duty Schessel assumed in paragraph 9 of the Employment Agreement exists only "during the term of this Agreement and for a period of one (1) year after any termination of his employment, whichever shall occur last . . ."  Employment Agreement [Doc. 419-1 at ¶9.1] This must be strictly construed because 9.1 purports to assign future patent inventions.  *New Britain Mach. Co. v. Yeo*, 358 F. 2d 397 405 (6th Cir. 1966)("Such a contract [assigning future inventions] is to be strictly construed against the grant of inventions that may be perfected in the future.") Moreover, the agreement was drafted by

DDS (Dobiesz's 10/16/13 Depo. Tr., at. 33-36) and must be construed against DDS. *City of Homestead v. Johnson,* 760 So. 2d 80, 84 (Fla. 2000)("An ambiguous term in a contract is to be construed against the drafter.")

Paragraph 6 of the Employment Agreement defines both the "term of this Agreement" and the "termination of his employment." The term is from contract execution to expiration two years later, unless earlier terminated. So the term of the Agreement ended on January 5, 2005. Paragraph 6 further provides that "the employment of the Employee hereunder shall terminate upon the first to occur of (a) the expiration of the Term of this Agreement as set forth in Section 3 hereof, . . ." Therefore, when the Employment Agreement expired on January 5, 2005, Schessel's "employment hereunder" terminated. The termination of Schessel's employment *under the Employment Agreement* constitutes "any termination of his employment" as that phrase is used in paragraph 9.1. Schessel's duties under 9.1 ended, therefore, on January 6, 2006, one year after the termination of his employment under the Employment Agreement.

DDS is not narrowly interpreting the contract against itself. Instead, DDS interprets the contract broadly in its favor so that "any" termination of his employment is interpreted to mean "every" termination of his employment. DDS erroneously concludes from this broad interpretation that the second termination of Schessel's employment 7 ½ years after the Employment Agreement expired extended Schessel's duties under 9.1 to also cover the one year period following the second termination of his employment in 2012. This is not what "any termination of his employment means." It means any termination for the numerous reasons and events triggering termination provided for in paragraph 6.

Since any duty owed by Schessel under paragraph 9 ended on January 5, 2006, any claim against him for breaching paragraph 9 would be barred because DDS did not file suit until November 14, 2012, more than five years later. The Court need not decide this issue, however, because Count IX simply does not allege that Schessel breached any duty created in paragraph 9 of the Employment Agreement. DDS alleged unauthorized use and paragraph 9 says nothing about unauthorized use.

## VIII.   Counts II, IV, V and VI-Misappropriation of Trade Secrets, Civil Theft, Tortious Interference and Civil Conspiracy to Tortiously Interfere

Summary judgment should be entered against Plaintiffs and in favor of Schessel on the claims for misappropriation of trade secrets, civil theft, tortious interference and civil conspiracy to tortiously interfere for the same reason that summary judgment should be entered against them on those claims against Primrose Solutions. Schessel incorporates by reference the facts stated and arguments made in support of the Primrose Solutions Motion for Summary Judgment on those counts.

## IX.   Count V - Declaratory Judgment (Schessel)

The DDS Operating Agreement [Dkt. 419-3] as well as every DDS tax return and IRS form K-1 from 2003 through 2012, identify Schessel as a one third owner of DDS. DDS now claims, however, that Schessel forfeited his ownership in DDS pursuant to an alleged Operating Agreement amendment dated August 30, 2011. Dobiesz wrote to Schessel on July 30, 2012 that, "All rights and Membership Interests you may have been entitled to are terminated and forfeited." (July 30, 2012 termination letter). The Operating Agreement does not provide for a forfeiture of ownership or otherwise authorize this and Schessel never agreed to it. Schessel's Decl., ¶27.

Schessel requests a declaratory judgment from this Court that the Operating Agreement has not been lawfully amended and that the amendment is not a lawful, enforceable amendment of the Operating Agreement. The alleged Amendment purports to permit FSS to expel Schessel as an owner and to confiscate Schessel's one third interest in DDS with or without cause without paying Schessel the "fair value" of his interest as required by Fla. Stat. §608.427(2). Instead, it provides that DDS would pay him book value or, if expelled "for cause," half the book value, of his interest in DDS. In this case, that would be zero because, according to Dobiesz, who manages the DDS books, the book value is "negative." Dobiesz 10/16/13 Depo. Tr., at 197.[15] The "cause" provision, purports to allow DDS to reduce any payment to Schessel for his ownership interest by half for contrived reasons. In the alleged new 9.5(b) provision, "cause" to expel Schessel exists if Schessel either "fails or refuses to carry out the directions of the Manager (Dobiesz) or Chairman of the Company (Dobiesz)." Dobiesz, therefore, easily could expel Schessel "for cause" by simply directing Schessel to do something impossible. If Schessel then "failed" to carry out Dobiesz's directive, then FSS could expel Schessel and DDS would pay only 50% of the book value of his interest in DDS. *I.e.* nothing.

The alleged Amendment is unconscionable and unenforceable for several reasons. First, it was made by the majority member/managing member, FSS, without Schessel's consent and in violation of the non-amendable duty of good faith and fair dealing imposed by Fla. Stat. §608.4225(1)(c); §608.423(2)(d). Making a secret amendment that purports to

---

[15] This is remarkable since Schessel generated about $80 million in revenue in DDS over nine (9) years and DDS's damages expert has stated that DDS operates at an 75% profit margin. Schessel Decl., ¶9; Schinnar Decl. ¶7.

work a forfeiture of Schessel's entire ownership interest in DDS without paying him fair value for his interest as required by Fla. Stat. §608.427(2) is neither good faith nor fair dealing. The law abhors a forfeiture and a majority owner in a company cannot by secret fiat divest a minority owner of his ownership interest. *Sharpe v. Sentry Drugs, Inc.,* 505 So. 2d 618 (Fla. 3rd DCA 1987) ("It is well established that both equity and the law abhor forfeitures" and the court may relieve a party from a forfeiture where the forfeiture would result in an unconscionable and inequitable result); *American Fire & Cas. Co. v. Callura*, 163 So. 2d 784, 791(Fla. 2d DCA 1964) ("Forfietures are not favored either in law or equity and the courts should avoid them if possible."); (*Todd v. Southland Broadcasting Co*., 231 F. 2d 225, 229 (5th Cir. 1956) (although failure to pay additional consideration for stock may have breached contract, it did not effect a forfeiture of his beneficial interest existing through his stock ownership); *Metz v. Kennedy Inv. Co.*, 118 Fla. 807, (Fla 1935)(requiring forfeited stock to be returned to owner because the forfeiture was a penalty for breach and not liquidated damages.)

FSS's purported amendment violated the duty of good faith and fair dealing for the additional reason that it permits both a forfeiture of Schessel's ownership interest in DDS for failing to carry out Dobiesz's directions and a suit against Schessel for damages for the same alleged failure. In fact, DDS sued Schessel for damages in Count VII, Breach of Fiduciary Duty, for his alleged failure do what Dobiesz directed him to do.

Additionally, FSS did not follow the procedure for amending the Operating Agreement. §608.423(3) Fla. Stats. provides that the power to amend the Operating Agreement "shall be vested in the members of the limited liability company," unless vested

in the manager or managers in the Operating Agreement.  The operating agreement does not vest the power to amend in the manager.  Section 5.8(a) of the operating agreement permits actions which require a vote of the members, such as amendments, to be taken without a meeting and without notice to the members if written consent signed by a sufficient number of Members to take the action are delivered to the Company. [Doc. 419-3].  There was no signed, written consent here and Schessel was not given notice of a meeting to vote.  Schessel's Decl. ¶28.  Defendants requested DDS to produce its "written consents" in its Second Request for Production of Documents and DDS did not produce any.  Schinnar's Decl, ¶8.  Nor did DDS produce any such written consents as part of its Rule 26 disclosures.  *Id*.

Nor was there a meeting to vote on the alleged amendment.  DDS did not produce minutes of any such meeting in response to Defendants' request for all minutes of meetings of DDS (Schinnar Decl., ¶8) and §3.3 of the Operating Agreement requires DDS to " keep  . . . minutes of all meetings of the Members."  Nor did DDS produce any such minutes in its Rule 26 disclosures.  *Id*. at 8.  Schessel did not waive any of these requirements in writing or otherwise, so DDS's failure to comply with them is fatal to the alleged amendment.  Schessel Decl., ¶28; Operating Agreement at 11.5 (requiring any waiver to be in writing signed by the party alleged to have waived.)

Even if DDS had followed these requirements, the amendment is not effective because it fails to comply with §11.2 which requires amendments to "specifically refer to each provision of this Agreement being amended."  [Doc. 419-3].  The alleged Amendment, if valid, would amend Section 1.1(k) of the Operating Agreement which is the *only* provision

defining a "member." It states that a "Member shall mean each Person who or which executes a counterpart of this Agreement as a Member and each Person who or which may hereafter become a party to this Agreement." *Id.* The alleged Amendment purports to change the meaning of "Member" to exclude persons who execute the Agreement as a member but who later are expelled, yet it does not refer to Section 1.1(k) as required by Section 11.2. Moreover, the Amendment provides at paragraph 5 that, except as expressly amended by the Amendment, all terms and conditions of the Operating Agreement remain in "full force and effect." This means that section 1.1(k) remains in full force and effect and that Schessel, therefore, remains a "member" of DDS.

Finally, even if the Amendment was effective, DDS and FSS did not follow it and so it cannot be enforced. The amendment says that the expulsion of a member will occur by "vote or written consent." There was no vote or written consent. As previously explained, Defendants requested production of all written consents and minutes of meetings and none were produced. Schinnar Decl., ¶8 Moreover, Dobiesz testified that he expelled Schessel by his July 30, 2012 letter, not by vote or written consent. Dobiesz 10/16/13 Depo. Tr., at 195-196.

WHEREFORE, Defendant, MARC S. SCHESSEL, seeks the entry of summary judgment in his favor as to each claim raised against him in Counts I-IX of the Third Amended Complaint and Count V of the Amended ounterclaim. Plaintiffs do not have evidence to support those claims and judgment must be entered against them as a matter of law. *Celotex*, 477 U.S. at 324. Schessel moves for all other and further relief as this Court deems just.

Dated: September 5, 2014

By: /s/ *G. Donovan Conwell, Jr.*
      G. Donovan Conwell, Jr.
      Florida Bar No. 0371319
      **CONWELL BUSINESS LAW, P.A.**
      12610 Race Track Road, Suite 200
      Tampa, FL 33626
      (813) 282-8000;
      (813) 855-2631 (Facsimile)
      dconwell@conwellbusinesslaw.com
      *Attorneys for Defendants/Counter-Plaintiffs,*
      *Primrose Solutions, LLC and Marc Schessel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of September 2014, I electronically filed the foregoing using the Court's CM/ECF system which will send a Notice of Electronic Filing to the following:

| | |
|---|---|
| Gregory W. Kehoe, Esq. | John N. Blair, Esq. |
| Ryan D. Maxey, Esq. | BLAIR & ROACH, LLP |
| GREENBERG TRAURIG, P.A. | 2645 Sheridan Drive |
| 625 East Twiggs Street Suite 100 | Tonowanda, New York 14150 |
| Tampa, Florida 33602 | jnblair@blair-roach.com |
| 813-318-5700 | |
| kehoeg@gtlaw.com | |
| maxeyr@gtlaw.com | |
| rechtinh@gtlaw.com | |

I FURTHER CERTIFY that I served via U.S. Mail a true and accurate copy of the foregoing to the following non-CM/ECF participants: None.

      */s/ G. Donovan Conwell, Jr.*
      Attorney