UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEMAN DATA SYSTEMS, LLC,
a Florida limited liability company,
FLORIDA SOFTWARE SYSTEMS
CORPORATION, a Delaware corporation, and
FLORIDA SOFTWARE SYSTEMS, INC., a
Florida corporation,

       Plaintiffs/Counter-Defendants,

v.                                CASE NO.: 8:12-cv-2580-T-24-EAJ

MARC S. SCHESSEL and
PRIMROSE SOLUTIONS, LLC, a Delaware
corporation,

       Defendants/Counter-Plaintiffs.
_____/

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

     Plaintiffs, Deman Data Systems, LLC ("DDS"), Florida Software Systems Corporation, and Florida Software Systems, Inc. ("FSS"), pursuant to Fed. R. Civ. P. 56, move for partial summary judgment as to ten of Defendants' thirty-one Affirmative Defenses (Doc. 149) and as to Counts I, II, IV, V, VI, and VII in Defendants' Second Amended Counterclaim (Doc. 89).[1]

## BACKGROUND

     Plaintiffs own, develop, and license software and databases used by hospitals and hospital systems to reduce their costs in purchasing materials.  Among other features, Plaintiffs' software allows customers to identify cost savings by comparing their purchases against purchases made by other customers.  Plaintiffs' database, compiled over more than a decade,

---

[1] Plaintiffs will promptly seek leave to supplement this motion with discovery that is subject to a pending motion to compel (Doc. 423) and any other discovery Defendants maintain they will produce after the filing of this motion.

includes millions of rows of purchase data for numerous hospitals.  Plaintiffs' system enables customers to find the best prices for the countless products that hospitals purchase.

In the months before the termination of his employment with Plaintiffs in July 2012, Defendant Marc S. Schessel ("Schessel") began forming Defendant Primrose Solutions, LLC ("Primrose") and soliciting Plaintiffs' customers.  Schessel, with surreptitious assistance from an "inside man" (Plaintiffs' Chief Technology Officer, Todd Bennett), used Plaintiffs' proprietary software and databases to create software and databases for Primrose, virtually overnight. Schessel, Primrose, and Todd Bennett concealed the latter's involvement, as Plaintiffs' were paying Todd Bennett $250,000 a year while he secretly assisted Defendants in their malfeasance. Discovery has revealed that Todd Bennett's brother, Bradford Bennett, is an owner of Primrose.

## MEMORANDUM OF LAW

"A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*

## ARGUMENT

I.     **Defendants' Affirmative Defenses.**

*Defendants' First Affirmative Defense*

In their First Affirmative Defense, Defendants allege that "[t]he Second Amended Complaint fails to state a claim against Schessel upon which relief may be granted."  (Doc. 149-1 at 10).  This "is not an affirmative defense, but rather, a failure of pleading."  *Long v. Baker*, ___ F. Supp. 2d ___, 2014 WL 3887740 (M.D. Fla. Aug. 7, 2014); *see In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 n.9 (11th Cir. 1988) (same).

### Defendants' Second Affirmative Defense

In their Second Affirmative Defense, Defendants allege that "Schessel has been an owner of DSS [sic] and as owner, has the right and permission to access the DSS [sic] computers, software used on the computers and data used by DSS [sic]." (Doc. 149-1 at 10). Assuming *arguendo* that Schessel was ever an owner of DDS, even Schessel does not contend that he ever owned more than one third of DDS. There is no support for the notion that a minority owner of an LLC has the right to access the LLC's computers, software used on the computers, or data used by the LLC. To the contrary, Florida law recognizes that where, as here, an LLC is managed by a single manager, "unless otherwise provided in its articles of organization or operating agreement … any matter relating to the business of the limited liability company may be exclusively decided by the manager." Fla. Stat. 608.422(4).

DDS is managed by Florida Software Systems, Inc.[2] Schessel himself alleges that FSS was "at all materials times" the manager of DDS. (Doc. 89 ¶ 48). As the manager, FSS had the exclusive right to determine Schessel's access to DDS's computers, software, and data. FSS's exclusive right is not abridged by any provision in the Operating Agreement.

### Defendants' Twelfth Affirmative Defense

In their Twelfth Affirmative Defense, Defendants allege that "Plaintiffs' claims are barred, in whole or in part, by their failure to mitigate damages and the doctrine of avoidable consequences." (Doc. 147-1 at 12). Under Florida law, "[t]he doctrine of avoidable consequences, which is also somewhat inaccurately identified as the 'duty to mitigate' damages, commonly applies in contract and tort actions." *Sys. Components Corp. v. Fla. Dep't of Transp.*,

---

[2] Exhibit A (Operating Agreement) § 4.1.

14 So. 3d 967, 982 (Fla. 2009). "The doctrine does not permit damage reduction based on what 'could have been avoided' through Herculean efforts." *Id.* "Rather, the injured party is accountable for those hypothetical ameliorative actions that could have been accomplished through 'ordinary and reasonable care,' without requiring undue effort or expense." *Id.*

Defendants, who bear the burden of proving this defense, have not established that the doctrine of avoidable consequences applies to Plaintiffs' statutory claims (Counts I, II, and IV). As for Plaintiffs' contract- and tort-based claims, Defendants must offer proof of "hypothetical ameliorative actions that could have been accomplished through 'ordinary and reasonable care', without requiring undue effort or expense." *Id.* There is no such evidence.

### Defendants' Nineteenth Affirmative Defense

In their Nineteenth Affirmative Defense, Defendants allege that "[t]he Amended Complaint is barred in whole or in part by estoppel. Plaintiffs have made misrepresentations of material fact to Schessel, and Schessel relied upon those material misrepresentations to his detriment." (Doc. 149-1 at 14). There is no evidence that the Amended Complaint "is barred in whole or in part by estoppel." There is also no evidence that "Plaintiffs have made misrepresentations of material fact to Schessel, and Schessel relied upon these material misrepresentations to his detriment."

### Defendants' Twentieth Affirmative Defense

In their Twentieth Affirmative Defense, Defendants allege that "the Plaintiffs' claims for Breach of Contract are barred by the Plaintiff's prior material breach of the alleged contracts." (Doc. 149-1 at 14). Plaintiffs' breach-of-contract claims pertain to (1) Schessel's 2003 DDS employment agreement (Doc. 419 ¶ 91), (2) his 2003 DDS non-competition, non-solicitation, and non-disclosure agreement (Doc. 419 ¶¶ 58-59), and (3) several promissory notes that he

executed in favor of DDS (Doc. 419 ¶¶ 94-97).   The only parties to these agreements are Schessel and DDS.  *See* (Doc. 419-1; Doc. 419-4; Doc. 419-5).

The 2003 non-competition, non-solicitation, and non-disclosure agreement required DDS to agree to the terms of the 2003 employment agreement.  (Doc. 419-4 at 1).  There is no dispute that DDS did so.  The 2003 employment agreement, in turn, required DDS, for a two-year period commencing on January 6, 2003 and ending on January 6, 2005, to (1) pay Schessel $4,000 per week, (2) provide Schessel four weeks of paid vacation yearly, and (3) reimburse Schessel for expenses.  (Doc. 419-1 ¶¶ 3-5).  There is no evidence that DDS failed to satisfy these obligations during the stated two-year period.  As for the "Line Notes," DDS's only obligation was to pay Schessel the money contemplated by each note.  (Doc. 419-5).  Schessel admits that DDS did so.[3]  There is no evidence of a prior breach of any contract at issue.

### *Defendants' Twenty-First Affirmative Defense*

In their Twenty-First Affirmative Defense, Defendants allege that "[a]s a defense to DDS's claim for breach of contract, the claim is barred in whole or in part by the hindrance of Schessel's performance by, *inter alia*, DDS refusing to reimburse his business travel expenses and cutting off his access to DDS server, emails, marketing materials, and software during all relevant and material time periods.."  (Doc. 149-1 at 14).  Although Defendants do not identify the breach-of-contract claims to which the defense pertains, Plaintiffs allege that Schessel breached (1) his 2003 employment agreement with DDS (Doc. 419 ¶ 91), (2) his 2003 non-competition, non-solicitation, and non-disclosure agreement with DDS (Doc. 419 ¶¶ 58-59), and (3) several promissory notes that he executed in favor of DDS (Doc. 419 ¶¶ 94-97).

---

[3] Exhibit B (Schessel's Response to Plaintiffs' First Set of Requests for Admission) #22, #23; Exhibit C (Schessel's Answers to Plaintiffs' Second Set of Interrogatories) #6.

Assuming *arguendo* that DDS refused to reimburse Schessel his travel expenses or cut off his access as alleged, neither act could have reasonably hindered Schessel in complying with the provisions at issue in Plaintiffs' breach-of-contract claims, which required him to (1) assign "works for hire" or "inventions" to DDS (Doc. 419 Count IX; Doc. 419-1 ¶ 9), (2) maintain the confidentiality of Plaintiffs' confidential information (Doc. 419 Count III; Doc. 419-4 ¶ I.B), and (3) repay money he obtained under the promissory notes (Doc. 419 Count X; Doc. 419-5).

### Defendants' Twenty-Fifth Affirmative Defense

In their Twenty-Fifth Affirmative Defense, Defendants allege that "[t]he fraud claim is barred in whole or in part by the plain language of the alleged Operating Agreement and Subscription Agreements, including but not limited to the merger and integration clauses."  (Doc. 149-1 at 15).   The fraud is Schessel's failure to disclose that his prior employment was terminated due to suspected involvement in fraudulent activities.  (Doc. 147 at 6).

"[A] merger clause will not categorically preclude the consideration of extraneous evidence of fraud in the inducement, except where the statements alleging fraudulent inducement are explicitly contradictory to a specific and unambiguous provision of the contract."  *Natarajan v. Paul Revere Life Ins. Co.*, 720 F. Supp. 2d 1321, 1329 (M.D. Fla. 2010); *see B & E Gibson Enters. Inc. v. Darngavil Enters. LLC*, No. 6:12–cv–1865–Orl–31GJK, 2013 WL 1969288, at *2 (M.D. Fla. May 13, 2013) ("Although the mere presence of a merger clause is not an impediment to a cause of action for fraud in the inducement, an express provision in a contract which directly contradicts the alleged misrepresentation will defeat a claim for fraud in the inducement.") (internal citations and quotations omitted).   Nothing in the Subscription Agreement or the Operating Agreement contradicts Plaintiffs' claim that Schessel failed to disclose that his employment was terminated due to suspected involvement in fraudulent activities.

Moreover, the reasons Schessel's employment terminated are not the subject matter of either agreement.  The mergers clauses are limited to the "subject matter" of the agreements.[4] The Operating Agreement involves the formation of DDS and establishment of related rights.[5] The Subscription Agreement involves DDS's desire to sell to Schessel, and Schessel's desire to purchase from DDS, membership units of DDS.[6]  Neither agreement encompasses the reasons Schessel's employment terminated.  Thus, neither agreement bars Plaintiffs' fraud claim.

### Defendants' Twenty-Sixth Affirmative Defense

In their Twenty-Sixth Affirmative Defense, Defendants allege that "DDS is estopped to avoid its obligations to Schessel through its fraud claim because the allegations of the fraud claim are inconsistent with and contradicted by DDS's representations and covenants in the Operating Agreement and Subscription Agreement."  (Doc. 149-1 at 15).  DDS's fraud claim centers on Schessel's failure to disclose that his prior employment was terminated due to his suspected involvement in fraudulent activities.  (Doc. 147 at 6).  Schessel's failure to disclose that his prior employment was terminated due to suspected involvement in fraudulent activities is not inconsistent with or contradicted by any representation in either agreement.

### Defendants' Twenty-Eighth Affirmative Defense

In their Twenty-Eighth Affirmative Defense, Defendants allege that "[t]he employment of Schessel pursuant to the alleged 2003 employment agreement ended on January 6, 2005 and any claim for breach of that employment agreement is time barred by laches and the statute of limitations applicable to claims for breach of contract."  (Doc. 149-1 at 15).  This Court has

---

[4] Exhibit A (Operating Agreement) § 11.2; Exhibit D (Subscription Agreement) § 9.

[5] Exhibit A (Operating Agreement) at 1.

[6] Exhibit D (Subscription Agreement) at 1.

already rejected Defendants' position, finding as a matter of law that the 2003 employment agreement is not determinative of when Schessel's employment with DDS ended and, as a result, that Plaintiffs' claim under the agreement is not time-barred.  (Doc. 147 at 7-8).

The evidence confirms that Schessel's employment with DDS did not end on January 6, 2005, but instead ended more than seven years later.  Schessel admits that DDS notified him of his termination on or about July 30, 2012.  (Doc. 149-1 ¶ 28).[7]  Schessel further concedes that he worked for DDS until at least May 2012.[8]  As no facts support Defendants' Twenty-Eighth Affirmative Defense, the Court should enter summary judgment in favor of Plaintiffs.

### *Plaintiffs Thirtieth Affirmative Defense*

In their Thirtieth Affirmative Defense, Defendants allege that "DDS is estopped to enforce the disclosure and assignment provisions of the alleged employment agreements by its conduct as set forth in the Amended Counterclaim."  (Doc. 149-1 at 16).  "The elements of estoppel under Florida law are: '(1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that position, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon.'"  *Fifth Third Bank v. Alaedin & Majdi Invs., Inc.*, No. 8:11–CIV–2206–T–17–TBM, 2013 WL 623895, at *4 (M.D. Fla. Feb. 20, 2013) (citing *State v. Harris*, 881 So. 2d 1079, 1084 (Fla. 2004)).  There is no evidence that DDS represented any material fact that is contrary to its position that Schessel was obligated to disclose and assign inventions to DDS, that Schessel relied on any such position, or that DDS changed its position to the detriment of Schessel.

---

[7] Although Schessel admitted such in response to Plaintiffs' Second Amended Complaint, the allegation to which he responded is identical in Plaintiffs' Third Amended Complaint.  Defendants appear to rest on the answer they filed in response to the Second Amended Complaint as they have not filed an answer to the Third Amended Complaint.

[8] Exhibit E (August 5, 2014 Schessel Deposition) at Tr. 579:18 – 579:19.

## II.     Defendants' Counterclaims

### A.     Count I: Tortious Interference by DDS and FSS, Inc.

In Count I of Defendants' counterclaims, Primrose alleges that DDS and FSS interfered with Primrose's advantageous business relationships with ROI HealthCare ("ROI") and FTI Consulting, Inc. ("FTI").  (Doc. 89 at 9-10).  Summary judgment is appropriate as the claim is wholly premised on inadmissible hearsay and subject to the economic privilege defense.[9]

According to Primrose, DDS and FSS interfered with Primrose's relationship with ROI because Norman R. Dobiesz ("Mr. Dobiesz") allegedly advised ROI that Schessel had violated a non-competition agreement, as follows:

> ROI agreed to pay Primrose for work performed on behalf of ROI for a prospective client of ROI …  All activities in this regard ended when Norman Dobiesz sent a letter to ROI falsely asserting that Primrose and/or Marc Schessel were violating a non-competition agreement and threatened ROI if it continued doing business with Marc Schessel or Primrose.[10]

In a similar vein, Primrose testified that Plaintiffs tortiously interfered with Primrose's relationship with FTI because Mr. Dobiesz allegedly told FTI "that there were covenants not to compete."[11]  Other than statements related to "covenants not to compete," Primrose could not identify anything that DDS or FSS said or did to interfere.  Primrose merely referred to "other things" that were purportedly said or done without providing any specifics.[12]

Primrose's tortious interference claim is premised solely on Mr. Dobiesz allegedly advising ROI and FTI of Schessel's non-compete agreement.  Schessel's 2003 non-competition,

---

[9] DDS and FSS have each asserted economic privilege as an affirmative defense.  (Doc. 383 at 6); (Doc. 384 at 6).

[10] Exhibit F (Primrose's Answers to Plaintiffs' Second Set of Interrogatories) #6.

[11] Exhibit G (August 6, 2014 Primrose Deposition) at Tr. 245:3 – 245:13.

[12] Id.

non-solicitation, and non-disclosure agreement precluded him from competing against DDS for three years following the end of his employment with DDS.  (Doc. 419-4 § I.A).[13]  Schessel concedes that he worked for DDS until at least May 17, 2012.[14]  DDS and FSS thus had financial and economic interests in not competing against Schessel through at least May 17, 2015.  Mr. Dobiesz's alleged statements to ROI and FTI were plainly designed to promote these interests.

"As a matter of law, '[t]here can be no claim [for tortious interference with a business relationship] where the action complained of is undertaken to safeguard or promote one's financial or economic interest.'"  *Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins. Co.*, 422 F. App'x 819, 822 (11th Cir. 2011) (citing *Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So. 2d 281, 293 (Fla. 3d DCA 2007)).  "This is true even if there is evidence that the action was undertaken with malice or ill-will as well."  *Ingenuity, Inc. v. Linshell Innovations Ltd.*, No. 6:11–cv–93–Orl–28KRS, 2014 WL 1230695, at *6 (M.D. Fla. Mar. 25, 2014) (citing *Alexis v. Ventura*, 66 So. 3d 986, 988 (Fla. 3d DCA 2011) and *McCurdy v. Collis*, 508 So. 2d 380, 383 (Fla. 1st DCA 1987)).

Assuming *arguendo* that Mr. Dobiesz advised ROI and FTI of Schessel's covenants not to compete, Primrose's claim can survive only if there is evidence that Mr. Dobiesz made the statements without any intent to safeguard or promote DDS's or FSS's financial or economic interest.  *See Gunder's Auto Ctr.*, 422 F. App'x at 822 n.* (noting that economic privilege may

---

[13] Schessel admits that he executed a non-competition, non-solicitation, and non-disclosure agreement with DDS on or around January 6, 2003, the handwritten date on the face of (Doc. 419-4), but claims that he is without knowledge as to whether the original of (Doc. 419-4) is a genuine document or whether he executed the original of (Doc. 419-4).  Exhibit H (Schessel's Response to Plaintiffs' Second Set of Requests for Admission) #4, 14-16.  Schessel's asserted lack of knowledge does not create a genuine issue of material fact as to whether (Doc. 419-4) is the agreement that he executed on or around January 6, 2003.  Moreover, Plaintiff's expert has confirmed that Schessel's signature on the document is authentic.  Exhibit I.

[14] Exhibit E (August 5, 2014 Schessel Deposition) at Tr. 579:18 – 579:19.

be waived if malice is the "sole" reason for the act complained of).  As there is no evidence that the alleged statements were not made to safeguard or protect DDS's and FSS's financial and economic interests, the Court should enter summary judgment in favor of DDS and FSS.  *See, e.g., Gunder's Auto Ctr.*, 422 F. App'x at 822-23 (affirming summary judgment where defendant was protecting its own interest); *Ingenuity, Inc.*, 2014 WL 1230695, at *6-7 (granting summary judgment in favor of defendant because its actions were "clearly done to safeguard its interests").

Alternatively, summary judgment is appropriate because the claim is supported solely by inadmissible hearsay.  *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.").  Schessel was not present when Mr. Dobiesz allegedly told FTI about Schessel's non-competition agreement.[15]  Defendants did not depose ROI or FTI and there are no documents confirming that Mr. Dobiesz made any of the alleged statements.  Schessel's bare assertion that unidentified individuals at ROI and FTI told him of Mr. Dobiesz's alleged statements is inadmissible hearsay that cannot be used to avoid summary judgment on this claim.  *See T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 826-28 (11th Cir. 1991) (reasoning hearsay could not be admitted to prove that a defendant tortiously interfered with a business relationship by making comments to the plaintiff's customers, regardless of the fact that the plaintiff was not trying to prove the truth of the comments).

## B.    Count II: Defamation by DDS and FSS, Inc.

In Count II of Defendants' counterclaims, Defendants allege that DDS and FSS defamed Schessel and Primrose because Mr. Dobiesz, on behalf of DDS and FSS, made "Defamatory

---

[15] Exhibit G (August 6, 2014 Primrose Deposition) at Tr. 245:8 – 245:21.

Statements" about Schessel to ROI and FTI.  (Doc. 89 ¶¶ 23, 28, 38-40).  Summary judgment is appropriate as (1) the only evidence supporting the claim is inadmissible hearsay within Schessel's incredulous testimony and (2) it does not satisfy the elements of a defamation claim.

Schessel cannot identify the "Defamatory Statements."[16]  When asked to do so, Schessel responded "I can't be sure.  I can't recall what they were."[17]  Twice more, Schessel confirmed that he did not know what the statements were and would have to "look at [his] notes."[18]  Schessel later testified that "hospitals were calling me, saying, you know, things were being said about me that were untrue; that I was stealing, that I was a thief, that I was – several things like that," but he could not identify the hospitals or individuals.[19]  He stated that he would identify them after looking at his "notes,"[20] but he never supplemented his testimony and the contents of the "notes" is unknown as Schessel subsequently refused to produce them, claiming privilege.

The sole evidence as to the statements is Schessel's testimony that unidentified employees of ROI, FTI, and other unidentified entities told him about the statements.  None of the "Defamatory Statements" were made in his presence.  Summary judgment is appropriate where, as here, a defamation claimant "relies purely on hearsay testimony that some person or another told [the claimant] they heard that [the defendant] made defamatory statements to someone else about [the claimant]."  *Bosen v. Manatee Cnty. Sch. Bd.*, No. 8:11–CV–2198–T–EAK, 2013 WL 1278165, at *9 (M.D. Fla. Mar. 28, 2013).  Such "rank hearsay" cannot be used to defeat summary judgment on a defamation claim.  *Corp. Fin., Inc. v. Principal Life Ins. Co.*,

---

[16] Exhibit J (June 26, 2013 Schessel Deposition) at Tr. 288:8 – 289:6.

[17] *Id.* at 289:7.

[18] *Id.* at 290:4 – 290:7.

[19] *Id.* at 291:15 – 291:24.

[20] *Id.* at 292:4 – 292:8.

461 F. Supp. 2d 1274, 1295-96 (S.D. Fla. 2006); *see, e.g.*, *Bosen*, 2013 WL 1278165, at *8-9; *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1349 (M.D. Fla. 2006).

Moreover, even if the inadmissible hearsay is considered, it cannot sustain the claim. The five elements of a defamation claim are "(1) publication to a third party; (2) a false statement; (3) fault, amounting to at least negligence, in the making of the publication; (4) actual damages; and (5) a defamatory statement." *Bosen*, 2013 WL 1278165, at *8. There is no evidence of what Mr. Dobiesz allegedly said, the falsity of it, or of his fault in saying it.[21]

### C.    Count IV: Breach of Duty of Loyalty and Care by FSS, Inc.

In Count IV of Defendants' counterclaims, Schessel alleges that FSS, as the manager of DDS, breached a statutory duty of loyalty and care owed to Schessel as a member of DDS. (Doc. 89 ¶¶ 48-49); *see* Fla. Stat. § 608.4225(1)(a)-(b) (defining the duties of loyalty and care).[22] Summary judgment is appropriate because Schessel has never been a member of DDS due to his failure to deliver the consideration he promised in return for the DDS membership units he hoped to purchase. Alternatively, summary judgment is appropriate as to four subparts of Count IV regarding (1) DDS's alleged diversion of money to Mr. Dobiesz, (2) DDS's employment of Mr. Dobiesz's family members, (3) DDS's entry into contracts with entities that Mr. Dobiesz owned, and (4) DDS's alleged failure to act in good faith and deal fairly with Schessel.

---

[21] Defendants may try to preserve the claim by asserting that a non-party, Tony Caprio, made the "Defamatory Statements." Defendants' claim, however, alleges that Mr. Dobiesz, not Mr. Caprio, made the "Defamatory Statements" on behalf of DDS and FSS. (Doc. 89 ¶ 23, 28,  39). Moreover, there is no evidence that Tony Caprio could or did make the "Defamatory Statements" on behalf of DDS or FSS.

[22] Defendants may assert that the Florida Revised Limited Liability Company Act ("Revised Act"), codified at Fla. Stat. § 605.0101, should apply. However, the Revised Act provides that "[b]efore January 1, 2014, and during any transition period thereafter, chapter 608 [the "LLC Act"] is applicable to a limited liability company organized pursuant to this act before January 1, 2014…." Fla. Stat. § 621.13(2)(a). DDS was formed and organized under the LLC Act on December 9, 2002. Since the Company was organized prior to January 1, 2014, it is respectfully submitted that chapter 608, the LLC Act (and not chapter 605, the Revised Act) should govern.

**(i)     Schessel was never a member of DDS.**

**(a)     Schessel agreed that his purchase of DDS membership units was conditioned on his full and final delivery of the consideration for the purchase.**

On or around January 6, 2003, Schessel executed the Operating Agreement and a subscription agreement with DDS (the "Subscription Agreement").[23]  Schessel entered into the Operating Agreement to establish his rights and obligations regarding the formation of DDS.[24]  Schessel entered into the Subscription Agreement to purchase membership units in DDS.[25]

Under the Operating Agreement, Schessel promised to make a capital contribution of "[p]ayment, performance and delivery of the consideration described in the Subscription Agreement with the Company dated January ___, 2003."[26]  Under the Subscription Agreement, Schessel (the "Subscriber") agreed to the specifics of the consideration and further agreed that the DDS membership units he hoped to purchase would not be deemed issued until he fully and finally paid, performed, and delivered the consideration:

3.     Purchase of Units by Subscriber.

a.     *The consideration which must be fully and finally paid, performed and delivered by Subscriber in order to receive the Units (prior to which the Units shall be deemed not issued) shall be the following*:

1.     Receipt by Florida Software Systems, Inc. of all Fees and reimbursements of costs under the License Agreement with the Company.

---

[23]  Exhibit A (Operating Agreement); Exhibit D (Subscription Agreement); Exhibit H (Schessel's Response to Plaintiffs' Second Set of Requests for Admission) #5, #6.

[24]  Exhibit A (Operating Agreement) at 1 ("WHEREAS" clauses).

[25]  Exhibit D (Subscription Agreement) at 1 ("WHEREAS" clauses).

[26]  Exhibit A (Operating Agreement) § 6.1; *id.* Ex. B.

2.     Payment of approximately $85,000 of Florida Software Systems, Inc. start up expenses (to be paid from distributions to Subscriber).

3.     Assignment to the Company of all contracts and contract opportunities related to the business of the Company by Subscriber and his affiliates (including, specifically but not exclusively Innovative Supply Strategies, Inc.).

4.     Operations of the Company for two years within the Budgets attached as Exhibit B to this Agreement.[27]

The fact that Schessel's membership was contingent on his delivery of these four categories of consideration is reaffirmed by a Certificate of Membership Interest prepared in Schessel's name and dated January 2003, which DDS retained pending Schessel's delivery of the consideration.[28]   Consistent with the Subscription Agreement, the Certificate of Membership stated that the units represented by the certificate would not be deemed issued unless and until Schessel delivered the consideration enumerated in the Subscription Agreement, as follows:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AND SHALL BE DEEMED NOT TO HAVE BEEN ISSUED UNLESS AND UNTIL THE CONSIDERATION DESCRIBED IN THE SUBSCRIPTION AGREEMENT BETWEEN THE COMPANY AND SCHESSEL DATED JANUARY      , 2003 HAS BEEN FULLY AND FINALLY PAID, PERFORMED AND DELIVERED.[29]

**(b)     Schessel's agreement to condition his purchase of membership units on his delivery of cash, property, and/or services is consistent with Florida law.**

Schessel's agreement that the membership units he hoped to purchase would not be deemed issued unless and until he fully and finally paid, performed, and delivered the

---

[27] Exhibit D (Subscription Agreement) § 3 (emphasis added).

[28] (Doc. 440) (Dobiesz Declaration) ¶ 8.

[29] (Doc. 440) (Dobiesz Declaration) Ex. C.

consideration is consistent with Section 608.4211 of the Florida Statutes, which governs obligations to contribute capital to a limited liability company.   First, Section 608.4211 contemplates contributions in the form of "cash, property, or services rendered, or a promissory note or other obligation to contribute cash or property or to perform services."   § 608.4211(1), Fla. Stat.  The items of consideration listed in Subsection 3(a) of the Subscription Agreement all fall within the categories described in § 608.4211(1).

Further, an obligation to contribute property or services to a limited liability company remains enforceable even if the party so obligated "is unable to perform because of [his] death or disability or any other reason."  *See* § 608.4211(3), Fla. Stat.  The obligation to make a contribution "may be compromised only by consent of all the members."  *See* § 608.4211(4), Fla. Stat.  It is undisputed that the DDS members never authorized any compromise of the conditions to issue membership interests of DDS listed in the Subscription Agreement.[30]

Significantly, the last paragraph of Section 608.4211, Fla. Stat. confirms that Schessel's obligations to contribute property and services to DDS were legitimate conditions precedent to the issuance of membership units to him:

> (5)   The articles of organization or operating agreement of a limited liability company may provide that the interest of ***any member who fails to make any contribution that the member is obligated to make shall be subject to specified penalties for, or specified consequences of, such failure. Such penalties or consequences may take the form of*** reducing the defaulting member's proportionate membership interest in the limited liability company, subordinating the defaulting member's interest in the limited liability company to that of the nondefaulting members, a forced sale of the defaulting member's membership interest, ***the forfeiture of the defaulting member's membership interest***, the lending by other members of the amount necessary to meet the

---

[30] <u>Exhibit D</u> (Subscription Agreement) § 3; (Doc. 440) (Dobiesz Declaration) ¶¶ 32-33, 36-37.

> defaulting member's commitment, a fixing of the value of the defaulting member's membership interest by appraisal or by formula and redemption or sale of the defaulting member's membership interest at such value, or other penalties or consequences.

§ 608.4211(5), Fla. Stat. (emphasis added).   Accordingly, in the event of a default of an obligation to contribute to a limited liability company, the operating agreement may require the forfeiture of a defaulting member's membership interest.  *See id.*

The non-issuance of membership units under the Subscription Agreement is equivalent to this.  Put simply, to say that a buyer never received an unpaid purchase is substantially the same as saying that he forfeits the purchase for which he failed to pay.  Therefore, Mr. Schessel's ownership claim is, at best, a claim to a forfeitable interest in DDS, which he forfeited by failing to perform the conditions to issuance of membership interests of DDS which are listed in Subsection 3(a) of the Subscription Agreement.[31]

> **(c)** **There is no genuine issue of material fact as to Schessel's failure to deliver each of the categories of consideration, much less all four categories.**

> **(1)** **Schessel's failure to meet agreed-upon budgets.**

Part of the consideration Schessel agreed to deliver in return for membership units was "operations of the Company for two years within the Budgets attached as Exhibit B to this Agreement."[32]   The budgets ("Budgets") attached to the Subscription Agreement, which are initialed and dated December 5, 2012 by Mr. Schessel, list gross profits of $1,571,719 in Year 1; $6,733,633 in Year 2; and $17,277,295 in Year 3.[33]   Actual gross profits were $964,205.50 in

---

[31] Exhibit D (Subscription Agreement) § 3.

[32] Exhibit D (Subscription Agreement) § 3.a.4.

[33] Exhibit D (Subscription Agreement) Ex. B.

Year 1 (2003); ($463,659.05) in Year 2 (2004); and ($2,256,796.58) in Year 3 (2005).[34]  Thus, Schessel failed to achieve operations of DDS for two (2) years within the Budgets.

> **(2)  Schessel's failure to deliver FSS all fees and reimbursements of costs.**

Another part of the consideration Schessel agreed to deliver in return for membership units was "[r]eceipt by Florida Software Systems, Inc. of all Fees and reimbursements of costs under the License Agreement with the Company."[35]  FSS received less than all fees and reimbursements of its operating costs, as required under its license agreement with DDS.[36]

> **(3)  Schessel's failure to pay start up expenses.**

Another part of the consideration Schessel agreed to deliver in return for membership units was "[p]ayment of approximately $85,000 of Florida Software Systems, Inc. start up expenses (to be paid from distributions to Subscriber)."[37]  Schessel failed to pay $85,000.00 of the start up expenses of FSS.[38]

> **(4)  Schessel's failure to assign all contracts and contract opportunities.**

The fourth category of the consideration Schessel agreed to deliver in return for membership units was "[a]ssignment to the Company of all contracts and contract opportunities related to the business of the Company by Subscriber and his affiliates (including, specifically but not exclusively Innovative Supply Strategies, Inc.)."[39]  Schessel recently testified that he is

---

[34] (Doc. 440) (Dobiesz Declaration) ¶ 23.

[35] Exhibit D (Subscription Agreement) § 3.a.1.

[36] (Doc. 440) (Dobiesz Declaration) ¶ 13.

[37] Exhibit D (Subscription Agreement) § 3.a.2.

[38] (Doc. 440) (Dobiesz Declaration) ¶¶ 15-16.

[39] Exhibit D (Subscription Agreement) § 3.a.3.

still the personal owner of intellectual property rights related to the business of DDS, which he claims he developed prior to joining DDS.  If this assertion were true, Mr. Schessel failed to assign to DDS all contracts and/or contract opportunities related to the business of DDS.

> **(d)    As there is no evidence that Schessel satisfied each and every category of the consideration, Schessel was never a member of DDS and FSS never owed a statutory duty of loyalty and care to Schessel.**

For Count IV to survive summary judgment, there must be a genuine issue of material fact as to whether Schessel fully and finally delivered each and every category of consideration discussed above.  There is simply no evidence that Schessel delivered any of the four consideration categories.  Thus, under the terms of the Subscription Agreement, the membership units Schessel hoped to purchase were never deemed issued and Schessel has never been a member of DDS.  Accordingly, FSS never owed a statutory duty of loyalty and care to Schessel.

DDS sent Schedules K-1 to Mr. Schessel listing him as an owner of a percentage of the profit, loss and capital of DDS.[40]  In considering the evidentiary value of Schedules K-1 on questions of ownership, Florida courts have viewed Schedules K-1 as a factor to consider, but not as dispositive.  *See, e.g.*, *BDO Seidman, LLP v. Bee*, 24 So. 3d 1278, 1280 (Fla. 3d DCA 2010); *Berlin v. Pecora*, 968 So. 2d 47, 49-50 (Fla. 4th DCA 2007); *Dreyfuss v. Dreyfuss*, 701 So. 2d 437, 439-440 (Fla. 3d DCA 1997).  DDS sent Schedules K-1 to Mr. Schessel to address the possibility that Mr. Schessel could have performed the conditions to issuance of membership interests of DDS, in which case he might be eligible to carry forward his share of operating losses of DDS.[41]  Showing Mr. Schessel as an owner of a percentage of the profit, loss and

---

[40] (Doc. 440) (Dobiesz Declaration) ¶¶ 30-35, Ex. K.

[41] (Doc. 440) (Dobiesz Declaration) ¶¶ 31-32.

capital of DDS was therefore necessary to avoid potential claims by Mr. Schessel that DDS

prevented him from receiving the economic benefit of net operating loss carry-forwards.[42]

> **(ii)    Alternatively, summary judgment is appropriate as to subparts of Count IV regarding (1) DDS's alleged diversion of money to Mr. Dobiesz, (2) DDS's employment of Mr. Dobiesz's family members, (3) DDS's alleged failure to act in good faith and deal fairly with Schessel, and (4) DDS's entry into contracts with entities that Mr. Dobiesz owned.**

> **(a)    DDS's alleged diversion of money to Mr. Dobiesz.**

Schessel claims that FSS breached its statutory duty of loyalty and care by "taking money

owed by DDS to Schessel for salary, distributions and expense reimbursements and diverting it

to Dobiesz, the present and owner of FSS Inc." (Doc. 89 ¶ 49(a)).  This allegation puts at issue

(1) the date of each alleged diversion of money from DDS to Mr. Dobiesz, (2) the amount of

each alleged diversion, and (3) the amount of salary, distributions, and expense reimbursements

owed to Schessel at the time of each alleged diversion.

Plaintiffs asked Schessel to provide this information, as follows:

> Describe in detail each instance in which Dobiesz or FSS Inc. took money owed by DDS to you for salary, distributions, and expense reimbursements and diverted it to Dobiesz. For each such diversion, state the amount of money owed by DDS to you at the time for salary, distributions, and expense reimbursements, the date(s) of the diversion, and the amount of money diverted.[43]

Schessel responded as follows:

> Some of this information is in the exclusive possession of Plaintiffs and is the subject of discovery requests from me to Plaintiffs. The requested information is described for the periods 2008 – 2012 : DDS 003123 - DDS 003256 containing DDS tax returns 2008-2012, and DDS DDS 005313 - DDS 005313 DDS containing

---

[42] (Doc. 440) (Dobiesz Declaration) ¶ 33.

[43] Exhibit C (Schessel's Answers to Plaintiffs' Second Set of Interrogatories) #7.

> Balance Sheets and P&L 2008-2012. For the period 2003 through
> 2007 – DDS has not yet produced the documents and information
> evidencing Dobiesz or FSS taking money owed by DDS to me for
> salaries, distributions and reimbursement.[44]

Schessel's response failed to provide any details as to the date of each alleged diversion, the amount of each alleged diversion, or the amount of salary, distributions, and reimbursement expenses owed to Schessel at the time of each alleged diversion. Schessel has had DDS's general ledger, which identifies all of DDS's financial transactions from 2003 to 2014, for more than two months. The lack of evidence as to the date and amount of each alleged diversion and the amount of salary, distributions, and reimbursement expenses he was owed at the time of each alleged diversion makes it impossible to evaluate the claim. Plaintiffs will be unfairly prejudiced if Schessel withholds this information until trial and then suddenly picks and chooses from tens of thousands of transfers in DDS's general ledger.

### (b)  DDS's employment of Mr. Dobiesz's family members.

Schessel claims that FSS breached its statutory duty by "causing DDS to employ Dobiesz's family members and paying them using DDS funds when the family members were not qualified for such employment and did not contribute value to DDS equivalent to the money being paid to them." (Doc. 89 ¶ 49(b)). This allegation puts at issue (1) the family members' identities, (2) the qualifications for their employment, and (3) the qualifications they lacked.

Plaintiffs asked Schessel to identify the qualifications at issue, as follows:

> Describe in detail each instance in which Dobiesz or FSS Inc.
> caused DDS to employ and pay a member of Dobiesz's family
> using DDS funds when the family member was not qualified for
> such employment. For each such instance, identify the family
> member, state the date(s) DDS employed the family member, state

---

[44] *Id.*

each qualification for such employment, and state whether the family member satisfied each such qualification.[45]

Schessel responded as follows:

> Norman Dobiesz employed members of his family that were paid through DDS revenue long before the time they actually began to provide services to DDS. DDS has not yet provided employment and or compensation documents that quantify when his family members were placed on any payroll connected with DDS and FSS. Norman Dobiesz caused his son, Aaron Dobiesz, to be hired by the company to initially provide data analytics support for hospitals. Aaron had no experience and it was quickly relayed to me via e-mail that Aaron was not doing any work. Aaron later worked in sales and had to be sent home on occasion. Aaron had not previously worked in either sales or healthcare. DDS also employed Maureen Dobiesz, who likewise has no experience in healthcare. Maureen was hired for marketing services with her friend Kari Wolf. Neither had healthcare experience. When they started and for all the time afterwards I had to tutor them on our business.[46]

Schessel's response identified Mr. Dobiesz's son and wife as the family members at issue. The response notably failed to identify, as requested, the alleged qualifications for their positions. It also failed to identify, as requested, the qualifications that they supposedly lacked.

As for whether they "contribute[d] value to DDS equivalent to the money being paid to them," (Doc. 89 ¶ 49(b)), Defendants have not offered any support for the notion that causing an LLC to pay an employee more than the value he or she contributes to the LLC is a violation of the statutory duty. Moreover, there is no evidence as to the value that Mr. Dobiesz's wife or son contributed to DDS, as necessary to establish whether or not their pay exceeded such value.

**(c)    DDS's entry into contracts with Dobiesz-owned entities.**

---

[45] Exhibit C (Schessel's Answers to Plaintiffs' Second Set of Interrogatories) #8.

[46] *Id.*

Schessel claims that FSS breached its statutory duty of loyalty and care by "causing DDS to enter into contracts with entities owned directly or indirectly by Dobiesz and paying money to them without receiving products or services with a value equivalent to the payments made to them."  (Doc. 89 ¶ 49(e)).  Plaintiffs sought information related to this claim, as follows:

> Describe in detail each instance in which Dobiesz caused DDS to enter into a contract with an entity owned directly or indirectly by DDS and paid money to the entity without receiving products or services with a value equivalent to the payments made to the entity, including the name of the entity, the amount DDS paid the entity, when DDS paid the entity, the products and services DDS received from the entity, and the value of the products and services DDS received from the entity.[47]

Schessel responded as follows:

> See response interrogatory #7. We have requested information about this in discovery from Plaintiffs, but it has not been provided to us.[48]

The referenced financial documents do not identify the alleged products and services that DDS supposedly obtained from other entities and state their alleged value.  Schessel has had DDS's general ledger, which identifies all of DDS's financial transactions from 2003 to 2014, for more than two months.  Yet he has failed to produce any evidence of the products and services at issue and their values, as necessary to determine whether DDS overpaid for them.

>    **(d)    DDS's alleged failure to act in good faith and deal fairly with Schessel.**

Schessel claims that FSS breached its statutory duty of loyalty and care by "failing to act in good faith and to deal fairly with Schessel."  (Doc. 89 ¶ 49(f)).  The statutory duty does not require the manager of a LLC to "act in good faith and to deal fairly with" its members.  The

---

[47] Exhibit C (Schessel's Answers to Plaintiffs' Second Set of Interrogatories) #10.

[48] Id.

duty of loyalty requires the manager to account to the LLC for property, profit, or benefit derived from the managerial relationship, to refrain from dealing with the LLC on behalf of a party with an adverse interest, and to refrain from competing with the LLC.  § 608.4225(1)(a), Fla. Stat. The duty of care "is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." § 608.4225(1)(b), Fla. Stat.  Schessel's vague allegation that FSS "fail[ed] to act in good faith and to deal fairly with Schessel" is insufficient to support a claim for violation of the statutory duty of loyalty and care.

### D.    Counts V: Declaration of Rights

In Count V of Defendants' counterclaims, Schessel seeks a declaratory judgment invalidating the August 30, 2011 amendment of the DDS operating agreement.  (Doc. 89 ¶ 58). Summary judgment is appropriate because the August 2011 amendment of the DDS operating agreement was executed by a majority of DDS's membership interests.[49]

### (i)    Under Florida law, a "majority-in-interest" can amend an operating agreement absent conflicting provisions in the articles of organization or the operating agreement.

The right to amend an operating agreement is vested "in the members of the limited liability company unless vested in the manager or managers of the limited liability company by the articles of organization or the operating agreement, provided that any amendment to an operating agreement shall be in writing." § 608.423(3), Fla. Stat.  Absent a conflict with the articles of organization or the operating agreement, "[i]n all matters in which a vote is required, a vote of a majority-in-interest of the members shall be sufficient…." § 608.4231(3)(b), Fla. Stat.

---

[49] If the Court enters summary judgment as to Count V, it should additionally do so as to Count IV to the extent it alleges that FSS breached a statutory duty of loyalty and care by "purporting to 'expel' Schessel as an owner of DDS member units without any legal basis to do so" and "purporting to amend the Operating Agreement without the consent of Schessel," as both are premised on the amendment's invalidation.  (Doc. 89 ¶ 49(c), (g)).

"The governance and operation of an LLC in the absence of other written terms is a simple matter of majority rule."  *Kertesz v. Spa Floral, LLC*, 994 So.2d 473, 475 (Fla. 3d DCA 2008).    On any matter which is subject to a vote of members, the members may act without a meeting, without prior notice, and without a vote if consents are signed by at least a majority-in-interest of the members.  See, § 608.4231(8), Fla. Stat.

> **(ii)**     **Consistent with the presumption in the Florida statutes, the operating agreement authorized amendment by a majority of DDS's membership interests, not "the consent of all members."**

In Count V, Schessel alleges that the amendment of the operating agreement required "the consent of all members."  (Doc. 89 ¶ 54).  This is directly contrary to the plain language of the operating agreement, which permits a majority of the DDS membership interests to amend the operating agreement as follows:

> No amendment to this Agreement shall be effective unless made in a writing duly executed by a majority of the Membership Interests and specifically referring to each provision of this Agreement being amended.[50]

Consistent with Section 608.4231(3)(b), Fla. Stat. and *Kertesz*, *supra* at __, Schessel agreed that the "majority rule" principle applied to amendments of the operating agreement.

> **(iii)**     **A majority of DDS's membership interests amended the operating agreement in compliance with the operating agreement and Florida law.**

FSS and IHC Investments, Ltd. ("IHC") have at all times owned a majority of DDS's membership units.[51]   In August 2011, FSS and IHC amended the operating agreement by

---

[50] <u>Exhibit A</u> (Operating Agreement) § 11.2.

[51] (Doc. 440) (Dobiesz Declaration) ¶ 4, 37.   Even Schessel does not contend that he ever owned more than one third of the membership units.

executing a written Amendment to Operating Agreement (the "Amendment").[52] The Amendment added Section 9.5 to the Operating Agreement, authorizing members holding a majority of the membership interests to expel a member and surrender his membership interests in exchange for the member's *pro rata* share of a percentage of the "book value" of DDS.[53]

The Amendment (1) was made in writing, (2) was duly executed by a majority of the membership interests, and (3) specifically refers to each provision of the Operating Agreement that was amended.[54] The Amendment satisfies the requirements of the Operating Agreement, the LLC Act, and the "majority rule" principle articulated in *Kertesz*, 994 So.2d at 475.

> **(iv)** **The Amendment does not "permit a majority owner to simply declare that the ownership interest of a minority owner is forfeited."**

In Count V, Schessel alleges that "FSS Inc. is not permitted by the Operating Agreement or Florida law to amend the Operating Agreement to permit a majority owner to simply declare that the ownership interest of a minority owner is forfeited." (Doc. 89 ¶ 54). This allegation is beside the point. The Amendment authorizes the expulsion of a member subject to paying the expelled member its *pro rata* share of a percentage of DDS's book value.[55] Schessel's allegation to the contrary is baseless and irrelevant to the Amendment's validity.

> **(v)** **Any lack of notice or untimely notice to Schessel regarding the amendment is inadequate to invalidate the amendment.**

Finally, Schessel challenges the Amendment based on an alleged lack of notice (Doc. 89 ¶ 54). The LLC Act contemplates notice to non-consenting members within ten (10) days after

---

[52] (Doc. 440) (Dobiesz Declaration) ¶ 37.

[53] (Doc. 440) (Dobiesz Declaration) Ex. H § 9.5.

[54] *See* Exhibit A (Operating Agreement) § 11.2.

[55] (Doc. 440) (Dobiesz Declaration) Ex. H § 9.5.

obtaining authorization by written consent, *see* § 608.4231(8), Fla. Stat., and the Operating

Agreement contemplates "[p]rompt notice of the taking of the action."[56]

**(a)**      **Schessel was in no way harmed by any lack of notice following the execution of the Amendment.**

The purpose of shareholder notice and consent requirements such as those found in §

607.241, Fla. Stat. (now § 607.1202, relating to sale of substantially all corporate assets), and

dissenters' rights statutes such as Sections 607.244 and 607.247 (now §§ 607.1301 thru

607.1303), are to ensure that owners' investments are not changed without informed approval,

and to give dissenters an opportunity to withdraw from the corporation. *See South End*

*Improvement Group, Inc. v. Mulliken*, 602 So.2d 1327, 1332 (Fla. 4th DCA 1992); *Schwadel v.*

*Uchitel*, 455 So.2d 401, 403, FN1 (Fla. 3d DCA 1984) (the purpose of a shareholder consent

provision is "to protect the shareholders from fundamental change, or more specifically to

protect the shareholders from the destruction of the means to accomplish the purposes or objects

for which the corporation was incorporated and actually performs").

Assuming *arguendo* that Mr. Schessel was a member of DDS when the Amendment was

effected, any lack of notice was harmless.  Schessel could not withdraw his membership once the

Amendment was effected as it precluded any member from withdrawing without the consent of a

majority of the membership interests.[57]  Moreover, Schessel could not have withdrawn before the

Amendment was effected because, absent a contractual restriction on withdrawal, a member can

withdraw from a limited liability company "only at the time or upon the occurrence of any event

---

[56] Exhibit A (Operating Agreement) § 5.8(c).

[57] (Doc. 440) (Dobiesz Declaration) Ex. H § 9.4.

GREENBERG TRAURIG, P.A.

27

specified in…and in occurrence with the articles of organization or operating agreement."   § 608.427(1), Fla. Stat.  No such event occurred near the time the Amendment was effected.

Schessel also could not have transferred his membership near the time the Amendment was effected.  The Operating Agreement precludes the transfer of membership interests absent the manager's written approval.[58]  Again, any lack of notice following the Amendment's execution caused no harm to Schessel.

**(b)**      **Any failure to provide prompt notice of the Amendment to Schessel was cured by subsequent notice.**

In June 2013, Plaintiffs produced a copy of the Amendment (Bates labeled DDS 000019 to 000021) to Schessel in response to a request for production.  There is no evidence that Schessel was harmed by receiving notice of the Amendment in June 2013.  There is no evidence of any action that Schessel could and would have taken between the time the Amendment was effected and the date it was produced in discovery.

In *Knight v. Pine Island Fruit Corporation*, 445 So.2d 684 (Fla. 2d DCA 1984), the court declined to set aside a corporation's sale of its only asset for failure to provide written notice to its shareholders as required by § 607.241, Fla. Stat.  *See id.* at 685.  The corporation's subsequent compliance with procedures under § 607.394, Fla. Stat. (which is the corporate equivalent to Section 608.4231 of the LLC Act) cured the procedural deficiency under Section 607.241.  *See id.*  Thus, subsequent compliance may correct a prior deficiency and avert judicial action.  *See id.*

Absent authority interpreting analogous provisions of the LLC Act, the principle articulated in cases interpreting the Florida Business Corporation Act should apply.  A technical,

---

[58] <u>Exhibit A</u> (Operating Agreement) § 9.1

GREENBERG TRAURIG, P.A.

28

procedural deficiency, which has no effect on the ability of a party to change position (*i.e.*, by withdrawal or transfer of an interest), should be capable of cure by subsequent compliance.

### E.    Count VI: Breach of Undisclosed Amendment by DDS

In Count VI of Defendants' counterclaims, Schessel alleges that DDS breached the August 2011 amendment of the operating agreement "by failing to pay Schessel his membership interests in DDS." (Doc. 89 ¶ 60).  Schessel was never a member of DDS.  *See supra* at __.  As a matter of law, DDS could not have breached the August 2011 amendment of the operating agreement by failing to pay Schessel for membership interests he never had.

### F.    Count VII: Breach of Operating Agreement by FSS, Inc.

In Count VII of Defendants' counterclaims, Schessel alleges that FSS breached Section 4.5 of the Operating Agreement by "failing to act in good faith in the performance of its duties, including the duty to manage the DDS money, and which such care as an ordinarily prudent person in a similar position would use under similar circumstances." (Doc. 89 ¶ 60).  To the extent Section 4.5 confers liability on FSS as the manager of DDS, any such liability extends only to DDS or its members.[59]  Schessel was never a member of DDS.  *See supra* at __.  As a matter of law, DDS had no duties to Schessel under Section 4.5 of the Operating Agreement.

## <u>CONCLUSION</u>

For the reasons stated above, there is no genuine issue of material fact and DDS and FSS are entitled to judgment as a matter of law as to (1) Defendants First, Second, Twelfth, Nineteenth, Twentieth, Twenty-First, Twenty-Fifth, Twenty-Sixth, Twenty-Eighth, and Thirtieth Affirmative Defenses and (2) Counts I, II, IV, V, VI, and VII in Defendants' counterclaims.

---

[59] <u>Exhibit A</u> (Operating Agreement) § 4.5.

Respectfully submitted,

s/ **Gregory W. Kehoe**
Gregory W. Kehoe
Florida Bar No. 0486140
kehoeg@gtlaw.com
Ryan D. Maxey
Florida Bar No. 0059283
maxeyr@gtlaw.com
**GREENBERG TRAURIG, P.A.**
625 East Twiggs Street Suite 100
Tampa, Florida 33602
Telephone: 813-318-5700
Facsimile:  813-318-5900
- and -
John N. Blair, Esq.
Florida Bar No. 0546267
jnblair@blair-roach.com
BLAIR & ROACH, LLP
2645 Sheridan Drive
Tonawanda, New York 14150
Telephone: 716-834-9181

*Trial Counsel for Plaintiffs/Counter-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

s/ **Gregory W. Kehoe**
Attorney