UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEMAN DATA SYSTEMS, LLC,
a Florida limited liability company,
FLORIDA SOFTWARE SYSTEMS
CORPORATION, a Delaware corporation, and
FLORIDA SOFTWARE SYSTEMS, INC., a
Florida corporation,

        Plaintiffs/Counter-Defendants,

v.                                    CASE NO.: 8:12-cv-2580-T-24-EAJ

MARC S. SCHESSEL and
PRIMROSE SOLUTIONS, LLC, a Delaware
corporation,

        Defendants/Counter-Plaintiffs.
_____/

**PLAINTIFFS' RESPONSE TO DEFENDANT
<u>MARC S. SCHESSEL'S MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs Deman Data Systems, LLC ("DDS"), Florida Software Systems Corporation,

and Florida Software Systems, Inc. ("FSS"), respond to Defendant Marc S. Schessel's Motion

for Summary Judgment (Doc. 439).  The motion should be denied because Schessel has failed to

demonstrate that judgment as a matter of law is appropriate as to any claim or issue he raises.

**I.**       **The Computer Fraud and Abuse Act.**

Plaintiffs allege that Defendant Marc S. Schessel ("Schessel") violated the Computer

Fraud and Abuse Act, 18 U.S.C. § 1030, by accessing Plaintiffs' computers without

authorization or in excess of his authorization.  Plaintiffs have identified six CFAA violations.

(Doc. 439-8).

       **a.**      **Violations #1, #2, and #3**

TPA 511950649v1

Schessel contends that it is "undisputed" that he was authorized to access DDS's computer system so long as he was an employee. (Doc. 439 at 9). Schessel reasons this is so because he allegedly was "the president and one third owner of DDS." *Id.*

Assuming *arguendo* that Schessel was an employee, president, and one-third owner of DDS when the violations occurred, this would has no bearing on whether Schessel violated the CFAA. Where, as here, an LLC is managed by a single manager, "unless otherwise provided in its articles of organization or operating agreement … any matter relating to the business of the limited liability company may be exclusively decided by the manager." Fla. Stat. 608.422(4).

DDS is managed by FSS, as Schessel concedes. Exhibit A (Operating Agreement) § 4.1; (Doc. 89 ¶ 48). As the manager, FSS had the exclusive right to determine Schessel's access to DDS's computer system. FSS's exclusive right is not abridged by the Operating Agreement, and Schessel does not argue otherwise.

Schessel's second argument regarding Violations #1, #2, and #3 is that he did not exceed his authorized access. This argument is addressed for each of the violations.

> **(i)** **Violation #1: On May 7, 2012, Schessel downloads a massive amount of DDS's information from DDS's server for the benefit of Primrose.**

On May 7, 2012, at 10:58 p.m., Schessel connected to DDS's FTP server to download a massive amount of information related to DDS's customers. (Doc. 469) ("Platti Decl.") ¶ 6, Ex. A. When Schessel downloaded these files, he was authorized to access DDS's FTP server solely for the benefit of DDS and/or FSS. *Id.* ¶ 7. Schessel was not authorized to access DDS's FTP server to download files for the benefit of his nascent competing company, Primrose. *Id.* ¶ 8.

One of the files Schessel downloaded is related to OSF HealthCare, a DDS customer for five years. Platti Decl. Ex. A; Exhibit B (July 23, 2014 Darryl Long Depo) at Tr. 14:18 – 14:23,

20:2 – 20:8.  Weeks before he downloaded the file, Schessel surreptitiously solicited OSF's business for Primrose.  On June 18, 2012, Schessel, using the alias "Brad Thompson,"[1] sent a Primrose Statement of Work ("SOW") to OSF.  Exhibit D.  Darryl Long, an OSF employee, testified that OSF entered into the SOW no later than June 25, 2012, when Schessel's wife, using the alias "Emily Brown,"[2] sent a $47,000 invoice to OSF for the work proposed.  Exhibit B at Tr. 53:20 – 59:1; Exhibit E.

Mr. Long confirmed that he first heard of Primrose a "few months" before OSF entered into the SOW.  Exhibit B at Tr. 31:7 – 31:9.  In other words, Mr. Long had first heard of Primrose no later than "a few months" before June 25, 2012.  Schessel was clearly already soliciting OSF's business for Primrose on May 7, 2014, when Schessel downloaded the OSF file and numerous other files from DDS's FTP server.

Although Schessel was downloading OSF-related information from DDS's FTP server, Schessel never disclosed to DDS that he was soliciting OSF's business for Primrose.  (Doc. 468) ("Dobiesz Decl.") ¶ 61.  His use of an alias to solicit OSF for Primrose reaffirms a factual issue as to whether he exceeded his authorization by downloading files for Primrose, in violation of 18 U.S.C. § 1030(a)(2) and (4).  *See Ryan, LLC v. Evans*, No. 8:12–cv–289–T–30TBM, 2012 WL 1532492, at *5 (M.D. Fla. Mar. 20, 2012), *report and recommendation rejected in part by* 2012 WL 1551285, at *1 (M.D. Fla. Apr. 30, 2012) (declining to adopt Magistrate Judge's conclusion and instead finding that theft of information for competitor "exceeds authorization" in violation of § 1030(a)(2) and (4) even if the defendant had authorization to access the information); *see also United States v. Rodriguez*, 628 F.3d 1258, 1263 (finding criminal defendant "exceeded his

---

[1] Schessel admits that "Brad Thompson" is his alias.  Exhibit C (Aug. 5, 2014 Schessel Depo) at Tr. 613:4 – 613:10.

[2] Schessel admits that "Emily Brown" is his wife's (Terri Schessel's) alias.  *Id.* at Tr. 618:3 – 618:14.

authorized access and violated [§ 1030(a)(2) of] the Act when he obtained personal information for a nonbusiness reason").

> **(ii)     On May 8, 2014, FSS, as the manager of DDS, revoked Schessel's access to CadRe.**

CadRe is the name of a proprietary software application that FSS develops and licenses to DDS, which in turn licenses CadRe to its customers.  Platti Decl. ¶ 10.  On May 8, 2012, FSS revoked Schessel's authorization to access CadRe.  *Id.*  On May 15, 2012, Schessel sent an email to Mr. Dobiesz acknowledging that his authorization to access CadRe had been revoked a week earlier.  Exhibit F.

> **(iii)    Violation #2: On May 9, 2012, Schessel accesses a CadRe server without authorization using another employee's credentials.**

FSS issued an FSS-owned laptop to Schessel with the unique machine name "1BDZS1-MS."  Platti Decl. ¶ 12.  On May 9, 2012 at 2:58 p.m., Schessel used the laptop  to connect to one of the CadRe servers (DPCADRE04).  *Id.* ¶ 12, Ex. B.  The connection was authenticated using credentials for Stacy Gallagher ("Gallagher").  *Id.* ¶ 12, Ex. B.  Schessel was not authorized to access CadRe or to use Gallagher's credentials to do so.  *Id.* ¶ 13.

Notably, at the time Schessel's laptop connected to the CadRe server, Gallagher's personal computer (STACY-PC) was connected to a different CadRe server (DPCADRE07) using Gallagher's credentials.  *Id.* ¶ 14, Ex. B.  The use of Gallagher's credentials to access CadRe from two different computers triggered a security alert.  *Id.* ¶ 15, Ex. C.

The jury should be permitted to assess the credibility of any testimony that Gallagher was using both computers at the same time.  The jury could reasonably find that Schessel used Gallagher's credentials to access CadRe, one day after his authorization to access CadRe was revoked, and thereby acted fraudulently to "fool" DDS's security system.

### (iv) On May 15 and 17, 2012, Schessel unequivocally acknowledges that he did not have authorization to access CadRe.

As previously discussed, *supra* at 4, on May 15, 2012, Schessel sent an email conceding that his authorization to access CadRe had been revoked a week earlier. Exhibit F. Again on May 15 and 17, 2012, Schessel made the same concession. Exhibit G; Exhibit H; Exhibit I.

### (v) Violation #3: On May 31, 2012, Schessel again accesses a CadRe server without authorization using Gallagher's credentials.

On May 31, 2012 at 12:48 p.m., Schessel again used his laptop to connect to a CadRe server (DPCADRE01) using Gallagher's credentials. Platti Decl. ¶ 17, Ex. D. Schessel was not authorized to access CadRe or to use Gallagher's credentials to do so. *Id.* ¶ 18.

### b. Violation #4

Schessel concedes that, following his termination, he "potentially" altered and deleted data on FSS's laptop and "would imagine that some things were deleted." Exhibit J (Aug. 2014 Schessel Depo) at Tr. 846:1 – 847:7. Plaintiffs cannot assess the extent of the alterations and deletions because Defendants' counsel refuses to return the laptop, over Schessel's admission that he does not own it. *Id.* at 844:10 – 845:18.

Schessel attempts to overcome his obvious violation of 18 U.S.C. 1030(a)(5) by arguing that he "was an owner of DDS and as such had the authority to access DDS records on the laptop," citing Fla. Stat. § 608.4101, (Doc. 439 at 11-12), which enumerates the limited "records" that must be made available to a member of an LLC. Fla. Stat. § 608.4101(1). There is no evidence that the laptop contained any of this information, much less only this information. To the contrary, according to a list of files produced by Defendants, the laptop contained voluminous information, such as customer PowerPoint presentations and customer budgets, that could not possibly fall within the statutory definition of "records."

### c.     Violation #5

On January 23, 2013 at 11:36 p.m. (23:36), Phil Maneri's credentials were used to access Plaintiffs' "DemanIQ" application.  Platti Decl. ¶ 20, Ex. E.  Schessel argues that summary judgment is appropriate based on his bare assertion that Mr. Maneri, not Schessel, accessed Plaintiffs' computer system.  (Doc. 439 at 12).  Schessel fails to address his October 2012 email stating "[i]n terms of Phil [Maneri] – he has nothing to do with anything other than we were setting up a goto meeting with him so that he could get us on the latest dds application – me and Todd could then take it over and review were dds was in terms of development."  Exhibit K.

## II.     Count III - Enforcement of Restrictive Covenants

DDS alleges that Schessel breached his "2003 Restrictive Covenants Agreement" (the "RCA"), (Doc. 419-4), by soliciting those in the service of DDS and by utilizing and disclosing DDS's confidential information.  (Doc. 419 ¶ 56).  In exchange for "the benefits of employment with [DDS]," Schessel agreed to not solicit those in the service of DDS and to not disclose or utilize DDS's confidential information during a "Restricted Period," defined as "commencing on the date of this Agreement and ending on the date which is thirty-six (36) months following the date [Schessel] ceases to be employed by [DDS] for any reason."  (Doc. 419-4 § I.A).

Relying on *Sanz v. R.T. Aerospace Corp.*, 650 So. 2d 1057 (Fla. 3d DCA 1995), Schessel argues that the Restricted Period in the RCA, which runs at least three years, is somehow truncated by the two-year term of a separate agreement that Schessel and DDS entered into on the same date, "the 2003 Employment Agreement" (the "EA").  (Doc. 439 at 13-16); (Doc. 419-1).  In *Sanz*, the court concluded that restrictive covenants *within* an employment agreement do not survive the expiration of the employment agreement "in the absence of an express provision

to that effect." 650 So. 2d at 1059. *Sanz* is inapposite as it is undisputed that Schessel agreed to the restrictive covenants not in the EA, but in the wholly distinct RCA.

Furthermore, the RCA expressly provides its own, independent term for the Restrictive Covenants: the Restrictive Period. Nothing in the RCA suggests that the Restrictive Period ends upon expiration of the two-year term of the EA. To the contrary, it ends three years **after** the cessation of Schessel's employment with DDS, regardless of when the EA terminated. The Restrictive Period survives the termination of Schessel's employment in 2012 by *three years*. It did not end upon the two-year expiration of the EA.

That the restrictive covenants survive expiration of the EA is reaffirmed by each containing "an express provision to that effect." *Sanz*, 650 So. 2d at 1059. The restriction on Schessel's disclosure or exploitation of confidential information runs "[d]uring the Restricted Period and thereafter." (Doc. 419-4 § I.B). The restriction on the solicitation of those in the service of DDS runs "during the Restricted Period and for a period of two (2) years thereafter." *Id.* § I.C. In the face of these express provisions, Schessel's argument fails.

The RCA also refutes Schessel's argument regarding the applicability of the Statute of Frauds. (Doc. 439 at 16-17). For each of the restrictive covenants at issue, Schessel expressly agreed that the restrictive covenant would terminate no sooner than the end of Restrictive Period, *i.e.*, no sooner than three years following the cessation of his employment by DDS. As nothing in the RCA suggests that the agreement itself could or would expire before the end of the Restricted Period, the restrictive covenants are outside the Statute of Frauds.

### III. Count III – Breach of Restrictive Covenant I.C(b).

#### a. Semantics.

Schessel next attempts to avoid accountability for his breach of the RCA by arguing the the claim fails because § I.C(b) does not use the word "solicit" and instead uses "entice," "induce," and "influence."semantics of the word "solicit." (Doc. 439 at 17-18). DDS's use of the term "solicit" in its allegations is wholly consistent with the meaning of the terms "entice," "induce," and "influence." *See, e.g.*, Black's Law Dictionary (9th ed. 2009) (defining "entice" as "to lure or *induce*; esp., to wrongfully *solicit* (a person) to do something") (emphasis added). Schessel is clearly on notice as to the alleged breach and the issue he raises is "merely a matter of semantics." *Rodgers v. Shave Mfg. Co., Inc.*, 993 F. Supp. 1428, 1432 (M.D. Ala. 1998). This Court has characterized a similar argument regarding the sufficiency of allegations as meritless. *See Fla. Family Ass'n, Inc. v. Sch. Bd. of Hillsborough Cnty.*, No. 8:05-CV-2045-T-24 TG, 2006 WL 1063738, at *5 (M.D. Fla. Apr. 21, 2006).

**b. Todd Bennett.**

Schessel also asserts that "the undisputed material facts do not support this claim" because Todd Bennett denies that Schessel solicited him. (Doc. 439 at 18). The credibility of Todd Bennett's credibility regarding this (and any other) issue must be assessed by the jury. Todd Bennett, while collecting more than $250,000 per year in salary and benefits as Plaintiffs' Chief Technology Officer, conspired with Schessel to misappropriate Plaintiffs' trade secrets for the benefit of Primrose. Discovery has revealed that Todd Bennett's brother is a co-owner of Primrose. Exhibit L. Todd Bennett revealed none of this to Plaintiffs during the year-long period that he surreptitiously performed services for Primrose. Dobiesz Decl. ¶ 62.

From July 2012 to June 2013, BayCare Health System ("BayCare"), CentraState Healthcare System ("CentraState"), and Geisinger Health System ("Geisinger") were DDS business partners. Emails from these entities reveal that, at the same time, Todd Bennett actively

assisted Primrose in soliciting and providing services to DDS's customers. *See generally* Exhihit M. BayCare's handwritten meeting notes identified him as Primrose's "Main Developer" and "Lead Developer" in 2012. Exhibit N.

Todd Bennett recently testified under oath that he *never* provided services to Primrose in 2012. Exhibit O at Tr. 464:12 – 464:14. This is wholly inconsistent with the voluminous evidence documenting his attendance at Primrose customer meetings, his submission of a six-figure invoice to BayCare, and his role as Primrose's lead developer, main developer, and the person in charge of Primrose's IT department. Given Todd Bennett's incredulous attempt to conceal his involvement with Primrose, the jury must be permitted to assess his assertion that Schessel never solicited him or attempted to solicit him.

### c. John Decker and Richard Croy

Schessel asserts that summary judgment is appropriate as to his solicitation of John Decker and Richard Croy because neither discontinued his employment. Schessel overlooks that he agreed to not "attempt" to entice, induce, or influence these individuals. (Doc. 419-4) § I.C(b).

## IV. Count VII - Breach of Fiduciary Duty.

DDS alleges in Count VII that Schessel breached his fiduciary duties, by "intentionally, willfully and maliciously refus[ing] to perform the duties assigned to him." (Doc. 419 ¶¶ 77-80). In deciding Defendants' motions to dismiss the Amended Complaint, the Court preserved Count VII only "to the extent that DDS alleges that Schessel breached his fiduciary duty to DDS by refusing to perform the duties assigned to him as president and as an employee of DDS." (Doc. 56, page 20). On five (5) occasions, Schessel breached a duty assigned by Mr. Dobiesz, as President of FSS, the Manager of DDS. Dobiesz Decl. ¶ 16. Mr. Dobiesz directed Schessel five

(5) times to truthfully disclose to DDS any conduct prior to his employment with DDS that could embarrass or reflect adversely on DDS and on Schessel as President.  Schessel breached his common law duty of loyalty as an employee of DDS by refusing to tell the truth to FSS, as Manager of DDS in response to direct questions.  Schessel's refusal, to disclose a prior felony conviction for filing a fraudulent New York State tax return and payment of $100,000 restitution to Continuum Health Partners ("Continuum") for illegally causing a $100,000 rebate payment due to Continuum to be diverted to a different company (Dobiesz Decl. ¶ 17), breached Schessel's common law duty of loyalty as an employee of DDS.

A fiduciary duty is a duty of loyalty owed by an agent to his principal, and that duty is breached when the agent acts to protect or advance his own interests, to the direct detriment of the principal.[3]  A Federal Court applying Florida law denied a motion to dismiss a breach of fiduciary duty claim alleging the employee was placed in a position of trust and confidence, but the employee failed to act in the company's best interests.  Treco International S.A. v. Kromka, 706 F. Supp. 2d 1283, 1288 (S.D. Fla. 2010) (citation omitted).  As a former President of DDS, Schessel was placed in a position of trust and confidence, but by refusing to tell the truth regarding his past conduct, Schessel failed to act in the best interests of DDS.  See, id.

Florida courts recognize that an employee owes a duty of utmost good faith and loyalty to the employer.  See, e.g., Van Woy v. Willis, 14 So.2d 185, 191 (Fla. 1943).  Even employees in non-managerial roles owe a fiduciary duty to the employer.[4]  Courts have also noted that the

---

[3] See, e.g., Fairways Royale Association, Inc, v. Hasam Realty Corp., 419 So.2d 667, 668 (Fla. 4th DCA 1982)

[4] See, Fish v. Adams, 401 So.2d 843, 845 (Fla. 5th DCA 1981) (observing that an employee is not permitted to use confidential information acquired during the course of his employment).

correct measure of damages is equal to the amount improperly received by the employee.[5]  The employee's fiduciary duty to the employer persists throughout the entire period of the employee's employment.[6]  Thus Schessel, as an employee of DDS from 2003 until 2012, owed to DDS a duty of loyalty and utmost good faith, to act in the best interests of DDS, not his own.

By refusing to respond honestly five (5) times regarding his fraudulent conduct as an employee of Continuum, Schessel protected his continued employment to the detriment of DDS. In the face of direct questions from Mr. Dobiesz, Schessel concealed facts from DDS which, if known, would have resulted in immediate termination, and Schessel knew that.  Instead, he left DDS with a President who committed fraudulent conduct regarding materials management at hospitals.  Schessel had a clear duty to protect DDS instead of himself, and he breached that duty by concealing his fraudulent conduct in response to direct questions throughout Schessel's employment at DDS.[7]

Schessel's conduct disqualified him to serve as the President of DDS, a provider of information services to hospitals.  That conduct resulted in an investigation by the Medicaid Fraud Control Unit of the New York State Attorney General, and Schessel was required to pay restitution to Continuum.  Had DDS known, it would never have been able to hire Schessel in any leadership capacity.  Therefore, in concealing his fraudulent conduct, Schessel falsely retained the benefit of his employment as the President of DDS.

---

[5] See, e.g., Phillips Chemical Co. v. Morgan, 440 So.2d 1292, 1294 (Fla. 3d DCA 1983) (internal citations omitted).

[6] Insurance Field Services, Inc. v. White & White Inspection and Audit Service, Inc., 384 So.2d 303, 308 (Fla. 5th DCA 1980) (internal citations omitted).

[7] The five (5) specific instances in which Schessel refused to disclose his prior, fraudulent conduct and his resulting criminal conviction, in response to direct questions from Mr. Dobiesz, acting as President of FSS, the Manager of DDS, are described in detail within the accompanying Dobiesz Decl. ¶¶ 16 - 33.

In addition, DDS suffered material harm from Schessel's active concealment of his fraudulent conduct at Continuum. Subsection 14(t) of the McKesson License obligates DDS to "arrange for the personnel…assigned to perform the Services under this Agreement to be available to DDS during the Term of this Agreement." Dobiesz Decl. ¶ 29, Ex. G. Schessel was a key employee of DDS who was assigned to perform much or all of the Services under the McKesson License. Schessel admitted that he "was responsible as [DDS's] president for sales and marketing, customer support, collections, data normalization and running the day to day business of DDS except accounting." (Doc. 439, p. 3; Doc. 439-A, ¶ 5). Schessel's fraudulent conduct at Continuum directly related to his role at DDS. Dobiesz Decl. ¶ 32. DDS has been forced to disclose Schessel's fraudulent conduct to some customers and business partners, which has and will continue to result in loss of contracts, business relationships, and business opportunities. Dobiesz Decl. ¶ 33. Therefore, Schessel's fraudulent conduct and deception to DDS resulted in a breach of his fiduciary duty to DDS.

## V.      Count VIII – Fraud.

In Count VIII, DDS alleges that Schessel fraudulently misrepresented his reputation prior to DDS hiring him and continued the fraud through at least 2012.

### a.  The meeting date.

Schessel first argues that DDS's claim fails because DDS supposedly did not exist until two days after Schessel made his fraudulent misrepresentations. Schessel's argument is premised on a mischaracterization of Mr. Dobiesz's testimony as to when the misrepresentation occurred. During his deposition, Defendants' counsel asked Mr. Dobiesz whether he understood that Mr. Schessel had a good reputation for honesty on January 6, 2003, when Schessel and Mr. Dobiesz executed a "Subscription Agreement." Exhibit P (October 16, 2013 Dobiesz Depo) at

Tr. 94:5 – 94:11.  Mr. Dobiesz responded that he had met with Schessel "in December" and, based on the interview, found no reason to think Schessel was dishonest.  *Id.* at 94:14 – 94:17. Mr. Dobiesz then explained that when he and Schessel executed the Subscription Agreement on January 6, 2003, he had known Schessel "for *approximately* 30 days."  *Id.* at 94:18 – 94:20 (emphasis added).

After questions regarding the details of the meeting, Defendants' counsel asked the question "Did you – and this was all in an interview you had of him 30 days before you all signed the subscription agreement?"  *Id.* at 96:25 - 97:3.  In asking the question, Defendants' counsel misstated Mr. Dobiesz's prior testimony that he had known Schessel "for *approximately* 30 days."  *Id.* at 94:18 – 94:20 (emphasis added).  By answering "Yes," Mr. Dobiesz merely confirmed that his testimony pertained to a single December 2002 meeting.  He did not testify that the meeting occurred *exactly* 30 days before January 6, 2003.

Assuming *arguendo* that the meeting occurred on December 6, 2002, this has no bearing on the claim.  An LLC's existence begins "on a date specified in the articles of organization, if such date is within 5 business days prior to the date of filing."  Fla. Stat. § 608.409(1).  As the articles of organization were filed on December 9, 2002 and the date specified on them is December 6, 2002, (Doc. 439-11 at 5), DDS's existence began on December 6, 2002.

**b.  Facts supporting the claim.**

Schessel next argues that "there are no facts to support this claim."  (Doc. 439 at 21).  To the contrary, Schessel's longstanding concealment of his fraudulent conduct is well documented.

**(i)     During the December 2002 meeting with Mr. Dobiesz, Schessel represents that he is an honest person.**

Defendants mistakenly assert that "[w]hen Dobiesz was asked if Schessel represented that he had a reputation for honesty, integrity, and truthfulness, he testified that Schessel did not say that." (Doc. 439 at 21-22). In fact, Mr. Dobiesz merely stated that Schessel did not say "I'm a very honest person." Exhibit P at Tr. 99:3 – 99:11. Mr. Dobiesz's testimony makes clear that, *based on Schessel's representations* during the meeting, Mr. Dobiesz "found no reason to think [Schessel] was dishonest." *Id.* at Tr. 94:9 – 94:20. Similarly, *based on Schessel's answers*, Mr. Dobiesz understood that Schessel had not been involved in any fraudulent activities. *Id.* at 98:3 – 98:13. Among other things, Schessel told Mr. Dobiesz that "he left [Continuum] on his own accord to pursue "bigger" opportunities. *Id.* at 95:7 – 95:12.

>        **(ii)    During a December 2002 meeting with Mr. Dobiesz, Schessel conceals that he had participated in a scheme to cheat his former employer.**

From 1997 to 2000, prior to obtaining employment with DDS, Schessel worked for Continuum Health Partners ("Continuum") and Beth Israel Medical Center ("Beth Israel") as a Vice-President of Purchasing and Materials Management. Exhibit Q at 1. After conspiring with his supervisor and a vendor to steal from his employers, Schessel pleaded guilty to felony tax evasion for failing to pay taxes for money he obtained as fruit of the conspiracy.

Schessel "acknowledge[d] his responsibility" in directing $100,000 due to his employer, Continuum, to another entity. *Id.* at 9. Schessel also "agreed to make a restitution payment of $100,000 to Continuum Health Partners prior to his sentencing." *Id.* As part of his plea agreement, Mr. Schessel agreed to execute a Confession of Judgment. *Id.* In the Confession of Judgment, Schessel admitted that he diverted $100,000 due to his employer, Continuum, to his co-conspirator's company:

>        This confession of judgment is for a debt justly due the plaintiff Continuum Health Partners arising out of my former employment as a Vice-

President of Purchasing and Materials Management with Continuum Health Partners and the Beth Israel Medical Center. During the period December 1998 to June 1999, I caused a $100,000 rebate payment due to Continuum Health Partners from Allied Office Supplies, Inc., to be directed to Advance Graphics Corporation. As a result of my actions, Continuum Health Partners did not receive $100,000 to which it was entitled.

I have agreed to make a restitution payment to Continuum Health Partners in the amount of $100,000, payable on or before I am sentenced on the charge currently pending against me of Filing a Fraudulent New York State Tax Return.

*Id.* at 11.

(iii) **During his deposition, Schessel initially denies the truthfulness of the statements in his Confession of Judgment, but later admits that they are true and that he cheated Continuum out of $100,000.**

During his June 26, 2013 deposition, Schessel was asked about the Confession of Judgment. Exhibit R (June 26, 2013 Schessel Depo) at Tr. 336:22 – 339:16. Schessel admitted that he executed the document, but initially claimed "[i]t's not true, but I signed it, so that I can get out – so that Norm and I can continue our business." *Id.* at 337:13 – 337:15. After Plaintiffs' counsel reminded Schessel that he had signed the document under oath, Schessel denied his guilt, but admitted that the statements in the Confession of Judgment are true. *Id.* at 337:16 – 338:11. Schessel concedes that "based on [his] actions, Continuum was cheated out of $100,000 that it should have gotten that went to Colucci's company." *Id.* at 339:12 – 339:16.

(iv) **Mr. Schessel's longtime friend confirms that Schessel was fired by Continuum.**

Jane Girling was the corporate representative of CentraState Healthcare System. Exhibit S at Tr. 1, 7:13 – 7:17. Since 2007, Ms. Girling has been CentraState's vice president of supply chain. *Id.* at 20:3 – 20:9. She has known Schessel for more than 14 years, knows him "very well," and considers him a friend. *Id.* at 21:2 – 21:19, 25:22, 68:5 – 68:10.

Ms. Girling testified that she knew that Schessel worked for Continuum. *Id.* at 24:1 –
24:3. When asked whether she knew what had occurred at Continuum, Ms. Girling responded "I
know that a whole group of people at Continuum were brought up on charges and there was a
whole big to do, and Marc was part of that group that – *he ended up getting fired with that
group.*" *Id.* at 24:4 – 24:10 (emphasis added). Ms. Girling explained that "it was in the paper
… everybody knew what was going on." *Id.* at 25:4 – 25:6. Ms. Girling later reaffirmed that she
"knew he was fired from Continuum." *Id.* at 185:19 – 185:22.

> **(v)      As recently as June 14, 2012, Schessel continues his decade-long
> practice of telling Mr. Dobiesz that "there was no wrongdoing at
> Continuum."**

On June 14, 2012, Schessel sent an email to Mr. Dobiesz stating "[a]s you know, there
was no wrongdoing at the Continuum level." <u>Exhibit T</u> at 2. Schessel had clearly advised Mr.
Dobiesz that there was no wrongdoing at Continuum and had not revealed it as of June 14, 2012.

### c. The merger clauses.

Schessel next argues that DDS's fraud claim is barred because of merger clauses in the
Employment Agreement, the Subscription Agreement, and the Operating Agreement. Schessel's
argument fails because "a merger clause will not categorically preclude the consideration of
extraneous evidence of fraud in the inducement, except where the statements alleging fraudulent
inducement are explicitly contradictory to a specific and unambiguous provision of the contract."
*Natarajan v. Paul Revere Life Ins. Co.*, 720 F. Supp. 2d 1321, 1329 (M.D. Fla. 2010); *see B & E
Gibson Enters. Inc. v. Darngavil Enters. LLC*, No. 6:12–cv–1865–Orl–31GJK, 2013 WL
1969288, at *2 (M.D. Fla. May 13, 2013). Nothing in Plaintiffs' fraud claim is "explicitly
contradictory to a specific and unambiguous provision of the contract."

Moreover, the merger clauses are limited to the "subject matter" of the agreements. The reasons Schessel's employment terminated are not the subject matter of any of these agreements. The Employment Agreement involves Schessel's duties, compensation, and benefits as a DDS employee. (Doc. 419-1 at 1). The Operating Agreement involves the formation of DDS and establishment of related rights. Exhibit A at 1. The Subscription Agreement involves DDS's desire to sell, and Schessel's desire to purchase, membership units of DDS. (Doc. 419-2 at 1).

## VI.  Count IX – Breach of 2003 Employment Agreement

### a.  Impermissible use of the Proprietary Software and the Confidential Information

Section 9.1 of the 2003 Employment Agreement required Schessel to assign to DDS all intellectual property conceived or developed by him, "or improvements or modifications thereof" related to DDS's business or his employment. (Doc. 419-1 at 4). Schessel concedes in his Motion for Summary Judgment, "The sole surviving breach provision of Count IX now provides, 'The work for hire' restrictions in paragraph 9 of the 2003 Employment Agreement survived termination and remained in effect after Schessel's termination of employment which provisions were breached by 'his impermissible use of the Proprietary Software and the Confidential Information.'" (Doc. 439, p. 24). He then contends that [n]othing in paragraph 9 [of the 2003 Employment Agreement] prohibits Schessel's use of the Proprietary Software or the Confidential Information." (Doc. 439, p. 24).

The terms "Proprietary Software" and "Confidential Information" in the Third Amended Complaint refer to software and information created by employees of DDS for use in its business. (Doc. 419, ¶ 91). As such, "Proprietary Software" and "Confidential Information" fall within the broad definition of "Inventions" Schessel agreed to assign to DDS under the 2003 Employment Agreement. (Doc. 419-1 at 4). The Proprietary Software, as such, consists of

"programming sequences and codes, works," and as a claimed work for hire of DDS, it is "intellectual property," which is included in the 2003 Employment Agreement's definition of "Inventions." *Id.* The Confidential Information (including the data warehouse used by the Proprietary Software), as such, consists of "product composition, works, know-how, intellectual property" and together with the Proprietary Software, as such amounts to "methods of manufacture,… management,… negotiating or otherwise[.]" *See* (Doc. 419 ¶ 91); (Doc. 419-1 at 4). Since the Proprietary Software and the Confidential Information are "Inventions," Schessel assigned them to DDS and could not use them for any unauthorized purpose. By Schessel's undisputed use of Proprietary Software and Confidential Information, he breached the 2003 Employment Agreement.

Even if "Proprietary Software" and "Confidential Information" are deemed not to be "Inventions," they would still belong to DDS. Courts have observed:

> [u]nder the works-for-hire doctrine, a presumption arises, in the absence of an express contractual reservation to the contrary, that the employer or other person at whose instance and expense the work was produced, and not the employee or other person who created the work, is the owner of the copyright in the work.[8]

DDS employed Schessel for his background as a manager in the marketing of information services for materials management groups within hospitals. Dobiesz Decl. ¶ 34. Schessel's use of that background helped to develop the Proprietary Software and the Confidential Information. Dobiesz Decl. ¶ 35. Schessel admitted he was responsible "for sales and marketing, customer support, collections, data normalization and running the day to day business of DDS except accounting." (Doc. 439, p. 3; Doc. 439-A, ¶ 5). Schessel's duties included sales and marketing input for the Proprietary Software and data normalization that helped develop the Confidential

---

[8] Van Dusen v. Southeast First National Bank of Miami, 478 So.2d 82, 85-86 & n.5 (Fla. 3d DCA 1985).

Information.  Dobiesz Decl. ¶ 36.  Under the works-for-hire doctrine, as an employee of DDS whose work included developing Proprietary Software and Confidential Information, he developed them for DDS, not himself.  Van Dusen, 478 So.2d at 85-86, FN 5.

**b.  As a "work for hire" claim, Count IX seeks relief under the Copyright Act.**

In Community for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989), the Supreme Court observed that under the Copyright Act, "a work is 'for hire' under two sets of circumstances: (1) a work prepared by an employee within the scope of his employment; or (2) a work specially ordered or commissioned…."  Reid, 490 U.S. at 738, 109 S. Ct. at 2171.  Therefore, to the extent that an employee prepares a work of authorship as part of his duties, the work is for hire within the meaning of Section 101 of the Copyright Act. See, id.  Since Schessel was an employee of DDS who helped develop the Proprietary Software and the Confidential Information (Dobiesz Decl. ¶ 35), they are works for hire within Section 101 of the Copyright Act.  See, id.

Count IX pleads a Copyright Act claim, even though it does not reference the Copyright Act.  "Although a complaint may not state a Copyright Act claim on its face, federal jurisdiction may be appropriate if resolution requires application of the work-for-hire doctrine of the Copyright Act."  JustMed, Inc. v. Byce, 600 F.3d 1118, 1124 (9th Cir. 2009).  The Courts of Florida have also determined that a work-for-hire claim "arises under" the federal copyright laws, giving the federal courts exclusive jurisdiction.  See, e.g., EMSA Limited Partnership v. Lincoln, 691 So.2d 547, 549-550 (Fla. 4th DCA 1997) (holding that "[a]though appellant did not allege that its ownership arose under [the Copyright Act], the allegations in its claim of ownership fit within that section").  Count IX alleges Schessel's violation of the "work for hire" provisions in paragraph 9 of the 2003 Employment Agreement (Doc. 439, p. 24), and thereby

raises issues requiring application of the work-for-hire provisions of the Copyright Act, which can only be determined in a federal court.  See, e.g., Reid, 490 U.S. at 738, 109 S. Ct. at 2171; JustMed, 600 F.3d at 1124; EMSA Limited Partnership, 691 So.2d at 549-550.

### c. Term of Schessel's obligation to assign works for hire.

Schessel attempts to re-argue the applicability of the statute of limitations to Count IV (Doc. 439 at 24-26), even though this Court already rejected Schessel's position.  (Doc. 147 at 7-8).  Without addressing the Court's determination, Schessel contends that paragraph 6 of the 2003 Employment Agreement determined when his employment ended.  (Doc. 439 at 25).

Paragraph 6 states, "the employment of the Employee *hereunder* shall terminate" upon the expiration of the agreement.  (Doc. 419-1 ¶ 6) (emphasis added).  This Court found that it "interprets paragraph 6 as stating that the employment of Schessel ***under the terms of the 2003 agreement*** terminated on January 6, 2005."  *Id.* at 7 (emphasis in original).  This Court further found that it "does not interpret paragraph 6 to mean, nor do Plaintiffs allege, that Schessel's employment with DDS ended in 2005."  *Id.*

As for paragraph 9.1, the Court said that "[t]his provision is broadly written to cover inventions made from January 6, 2003 through a period ending one year after Schessel's employment was terminated."  *Id.* at 8. There is no dispute that Schessel's employment with DDS actually ended no sooner than May 2012.  Exhibit U at Tr. 579:18 – 579:19.   Therefore, the statute of limitations is not applicable.

### VII.   Counts II, IV, V, and VI – Misappropriation of Trade Secrets, Civil Theft, Tortious Interference and Civil Conspiracy to Tortiously Interfere.

Schessel attempts to incorporate by reference Primrose's arguments regarding Plaintiffs' claims for misappropriation of trade secrets, civil theft, tortious interference, and civil

conspiracy. This is impossible as Schessel and Primrose are distinct entities with distinct liability. Primrose contends it is not liable for anything that occurred before October 2012. (Doc. 442 at 16-18). Schessel argues that some of the trade secrets and other materials at issue, including a purportedly "redesigned DDS product," were his personally, not Primrose's, and that he verbally authorized Primrose to use them. Exhibit V at Tr. 75:2 – 81:6.

This is also a blatant attempt to circumvent the Court's 30-page limit for summary judgment motions. Plaintiffs cannot address 50 pages of argument in a 25-page response. *See Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC*, 845 F. Supp. 2d 1241, 1253 (M.D. Fla. 2012); *Powell v. Carey Int'l, Inc.*, 483 F. Supp. 2d 1168, 1174 n.3 (S.D. Fla. 2007). Nonetheless, should the Court consider Primrose's argument in resolving Schessel's summary judgment motion, Plaintiffs request that the Court similarly consider Plaintiffs' response.

## VIII. Schessel's Claim for a "Declaration of Rights."

In his Amended Counterclaim, Schessel asks the Court to determine his rights under DDS's Operating Agreement and an August 2011 amendment (the "Amendment"). Exhibit W.

Schessel does not argue or cite evidence that he delivered the consideration that he agreed to deliver in exchange for DDS membership units, nor does he dispute that his membership units would "be deemed not issued" unless and until he delivered the consideration.[9] Delivery of the consideration was required by the Subscription Agreement and the Operating Agreement. Exhibit A § 6.1, Ex. B (requiring Schessel's "[p]ayment, performance and delivery of the

---

[9] *See* (Doc. 419-4 § 3.a) ("Purchase of Units by Subscriber") (enumerating "[t]he consideration which must be fully and finally paid, performed and delivered by [Schessel] in order to receive the Units (***prior to which the Units shall be deemed not issued***)") (emphasis added).

consideration described in the Subscription Agreement").[10]   Under the Operating Agreement and the Subscription Agreement, Schessel's "failure to pay his capital contribution nullified his ownership from the beginning."[11]   Schessel admits this in his email to Mr. Dobiesz of October 8, 2009, stating, "Take it all – it means nothing to me as I know – that I never really owned anything that in a seconds [sic.] notice you couldn't take away…."   Dobiesz Decl. ¶ 38, Ex. J. Schessel acknowledged the forfeitable nature of any Membership Interests he might have held, by recognizing Mr. Dobiesz's ability to "take [them] away."   Dobiesz Decl. Ex. J.

Count V relies on Schessel having (1) obtained membership units in DDS and (2) rights under the Operating Agreement.  He has no rights to membership interests he never acquired. He offered no evidence or argument that he delivered any consideration required to be issued membership units of DDS.  He cannot obtain summary judgment on Count V.  Nonetheless, to reduce the number of issues for trial, Plaintiffs address each of Schessel's arguments.

a. **The Amendment does not violate the duty of good faith and fair dealing set forth in Fla. Stat. § 608.4225(1)(c).**

Schessel argues that the Amendment violates the duty of good faith and fair dealing in Fla. Stat. § 608.4225(1)(c) as a "secret amendment that purports to work a forfeiture of Schessel's entire ownership interest in DDS without paying him fair value."  (Doc. 439 at 28). The Amendment cannot violate § 608.4225(1)(c), which applies to the "discharge [of] duties to the limited liability company" by a "manager [or] managing member."  FSS did not amend the Operating Agreement as the manager or managing member, but as the holder of a majority of the

---

[10] Schessel's failure to satisfy his obligation to deliver the consideration, as necessary to complete his purchase of membership units, is fully briefed in Plaintiffs' summary judgment motion.  (Doc. 441 at 14-20).

[11] *Flores v. Murray*, 2007 WL 3034512, at *13 (N.J. Super. Ct. App. Div. Oct. 19, 2007) (applying New Jersey law); *see* Fla. Stat. § 608.4211 (approving of forfeiture of membership interests as a consequence for an LLC member's failure to make a required capital contribution).

membership interests.  Exhibit W.  Section 608.4225(1) simply does not apply.

Even assuming *arguendo* that § 608.4225(1)(c) governs an action by Members, there was no breach of the duty of good faith and fair dealing.  First, there was nothing "secret" about the Amendment.  In August 2011, Mr. Dobiesz and Schessel met with a customer to repair damage Schessel had caused to DDS's relationship with the customer.  Exhibit X at Tr. 80:8 – 80:22.  A few days later, Mr. Dobiesz presented Schessel with the Amendment and they discussed it.  *Id.* at 80:23 – 80:25, 81:10 – 81:18, 82:10 – 82:25, 84:2 – 84:13, 85:18 – 86:10. Schessel agreed to it because he recognized that he had put an important customer relationship in jeopardy and could have destroyed DDS.  *Id.* at 80:25 – 81:9, 84:10 – 84:13, 86:2 – 86:6.

Second, the Amendment provides for payment of an expelled member.  The payment provisions of the Amendment are more favorable to Schessel than the requirements of Florida law, which only entitle a *withdrawing member* to "fair value … based upon the *withdrawing member's* right to share in distributions" only "if not otherwise provided in the articles of organization and operating agreement."  Fla. Stat. § 608.427(2) (emphasis added).  Crucially, Schessel did not withdraw as a Member of DDS – he was expelled.  Dobiesz Decl. ¶ 41, Ex. L. Schessel never had a right to withdraw as a Member of DDS because the Operating Agreement did not expressly permit it (Exhibit A), as required under the Florida LLC Act.

Schessel contends that paying an expelled member a *pro rata* share of "Book Value," or 50% thereof, is a "forfeiture," he fails to cite valid authority for this proposition.  Subsection 608.4211(5) specifically permits "the forfeiture of the departing member's membership interest" as a remedy for the member's failure "to make any contribution that the member is obligated to make[.]"  Fla. Stat. § 608.4211(5).  Schessel does not dispute that he failed to make at least three (3) of the (4) contributions to DDS he was required to fully pay, perform and deliver under the

Subscription Agreement and the Operating Agreement. Exhibit A at 14; (Doc. 419-2 at 3). Therefore, the forfeiture of his Membership Interests is expressly authorized by the Florida LLC Act. See, Fla. Stat. § 608.4211(5).

**b. The procedures for amending the Operating Agreement.**

Schessel argues that "FSS did not follow the procedure for amending the Operating Agreement" (Doc. 439 at 28-29) but does not dispute that FSS held the majority of the Membership Interests necessary to amend the Operating Agreement. Rather, he complains that FSS should have either (1) executed a written consent regarding the Amendment or (2) held a meeting and provided notice of the Amendment to Schessel. *Id.* at 29. Mr. Dobiesz met with Schessel in person and presented him with the Amendment. Dobiesz Decl. ¶ 39. Schessel agreed to it. *Id.* FSS therefore satisfied any meeting or notice requirement.

**c. The definition of "Member" under the Amendment.**

Schessel states the Amendment is invalid because it "purports to change the meaning of 'Member'" without referring to § 1.1(k) of the Operating Agreement, which defines the term "Member." (Doc. 439 at 30). However, the Amendment does not modify the definition of "Member." It merely adds a Section 9.5 providing that expelled members shall be paid a *pro rata* share of the "Book Value." Exhibit W at 1-2. Nothing in the Operating Agreement required FSS to modify Section 1.1(k) to add Section 9.5.

**d. The procedure for expulsion.**

Schessel argues the Members failed to authorize his expulsion "by vote or written consent." (Doc. 439 at 30). This argument is absurdly technical since Mr. Dobiesz is directly and indirectly the sole owner and President of IHC and FSS, the only Members of DDS.

TPA 511950649v1

<u>Dobiesz Decl.</u> ¶ 37. Mr. Dobiesz held a majority of the Membership Interests and his act of expelling Schessel by letter was an act of the Members. (<u>Dobiesz Decl.</u> ¶ 41, Ex. L).

Even if Schessel's expulsion was unauthorized by a vote or written consent of the Members, IHC and FSS ratified Schessel's expulsion by filing tax returns reflecting their 50% interests in DDS, in response to Schedules K-1 for 2012 showing them as 50% owners of DDS. (Doc. 470) ("Stevens Decl.") ¶¶ 21-22. Members or shareholders need not approve an action before the company effectuates it. *See* <u>Meyer v. Nator Holding Co.</u>, 136 So. 636, 638 (Fla. 1931); <u>see</u>, <u>also</u>, <u>Crow v. Context Industries, Inc.</u>, 260 So.2d 865 (Fla. 3d DCA 1972).

IHC and FSS, as Members of DDS, ratified the expulsion of Schessel as a Member, by acknowledging that his expulsion increased the Membership Interests of IHC and FSS from 33% each to 50% each. <u>Stevens Decl.</u> ¶¶ 21-22, Ex. D. DDS issued 2012 Schedules K-1 to IHC and FSS as 50% owners of DDS for August through December, 2012. Stevens Decl. ¶ 21, Ex. C. In response, IHC and FSS each filed 2012 tax returns showing that they accepted their 50% ownership interests in DDS. Stevens Decl. ¶ 22, Ex. D. By acknowledging 50% ownership, IHC and FSS "voluntarily accept[ed] the benefits accruing to [them]…and after full knowledge, and having full liberty to decline the same," ratified DDS's action of expelling Schessel (<u>see</u>, <u>Meyer</u>, 136 So. at 638), and cured any lack of prior authorization. <u>See</u>, <u>Priskie</u> 958 So.2d at 613. Therefore, Schessel's argument, of a lack of authorization for his expulsion by the Members of DDS, must fail.

Respectfully submitted,

s/ **Gregory W. Kehoe**
Gregory W. Kehoe
Florida Bar No. 0486140

<span style="text-align:center">Greenberg Traurig, P.A.</span>

kehoeg@gtlaw.com
Ryan D. Maxey
Florida Bar No. 0059283
maxeyr@gtlaw.com
**GREENBERG TRAURIG, P.A.**
625 East Twiggs Street Suite 100
Tampa, Florida 33602
Telephone: 813-318-5700
Facsimile:  813-318-5900
- and -
John N. Blair, Esq.
Florida Bar No. 0546267
jnblair@blair-roach.com
BLAIR & ROACH, LLP
2645 Sheridan Drive
Tonawanda, New York 14150
Telephone: 716-834-9181

*Trial Counsel for Plaintiffs/Counter-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

s/ **Gregory W. Kehoe**
Attorney