UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEMAN DATA SYSTEMS,
LLC, ET AL.,

Plaintiffs,

v. Case No. 8:12-cv-2580-T-24 EAJ

MARC S. SCHESSEL, ET AL.,

Defendants.
______________________________

MARC S. SCHESSEL, ET AL.,

Counter-Plaintiffs,

v.

DEMAN DATA SYSTEMS,
LLC, ET AL.,

Counter-Defendants.
__________________________________/

**ORDER**

This cause comes before the Court on three motions: (1) Defendant Schessel's Motion for Summary Judgment (Doc. No. 486), which Plaintiffs oppose (Doc. No. 473); (2) Defendant Primrose Solutions' Motion for Summary Judgment (Doc. No. 487), which Plaintiffs oppose; and (3) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 441), which Defendants oppose (Doc. No. 472). As explained below, these motions are granted in part and denied in part.

## I. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

## II. Background

The facts in this case are largely in dispute. However, the following background provides a framework for the few legal issues that can be decided, or at least narrowed, at this stage.

### Schessel's Prior Employment

Defendant Marc Schessel was employed by Continuum prior to his relationship with Plaintiffs. Schessel's employment at Continuum ended in 2000, and later in the summer of 2003, a felony charge was brought against Schessel relating to conduct that occurred while he was employed at Continuum. (Doc. No. S-511, depo. p. 332-33). There is no clear evidence before the Court that Continuum was aware of Schessel's felonious conduct prior to his termination from Continuum and/or that such conduct was the reason for his termination from Continuum. Instead, the person that Schessel reported to at Continuum has stated that Schessel was not fired by Continuum and that Schessel was not terminated from Continuum due to any involvement in fraudulent activities. (Doc. No. 444-20; Doc. No. 444-1, ¶ 25).

In 2002, Schessel created a company called Innovative Supply Strategies, Inc. ("ISS"). Schessel's plan for ISS was to create a database that would help hospitals analyze their purchasing costs and utilization of products that they purchased. To do this, ISS hired a company called V-GPO to write a software program to Schessel's specifications for the creation of the database. The V-GPO programmer that wrote the code for ISS was Todd Bennett. According to Todd Bennett, 99% of the mapping and data normalization functionality of the software program that he wrote for Schessel and ISS now exists in the CAdRe software at issue in this case. (Doc. No. 445-14, ¶ 3).

**The Creation of DDS**

Todd Bennett was employed by Plaintiff Florida Software Systems, Inc. ("FSS"), which is owned by Norman Dobiesz, who was also the controlling owner of V-GPO.[1] Schessel and Dobiesz met, and they ended up creating Plaintiff Deman Data Systems, LLC ("DDS") in January of 2003. Dobiesz became the Chairman and CEO of DDS, while Schessel was the president of DDS.

Prior to the formation of DDS, Dobiesz asked Schessel about the termination of his employment with Continuum. (Doc. No. 444-14, depo. p. 95). Schessel told Dobiesz that he left on his own accord in order to go on to bigger and better things. (Doc. No. 444-14, depo. p. 95). During this discussion, Schessel did not indicate that he was involved in any fraudulent activities while employed by Continuum. (Doc. No. 444-14, depo. p. 98).

The business of DDS consisted of licensing proprietary software (called CAdRe) to hospitals; this software helped hospitals analyze their purchasing costs and utilization of

[1]FSS has since changed its name to Healthcare IQ, LLC. (Doc. No. 472-11, depo. p. 19). However, the Court will refer to this entity as FSS throughout this Order.

products that they purchased. DDS licensed the software from FSS; FSS created the software. (Doc. No. S-511, Ex. 7B; S-504, depo. p. 226-27). The software, however, was owned by another entity, Plaintiff Florida Software Systems Corporation ("FSS-Corp."). (Doc. No. S-504, depo. p. 227; Doc. No. S-507, depo. p. 192). Thus, FSS-Corp. owns the software that FSS develops, and FSS-Corp. licensed the software to FSS.[2] (Doc. No. S-507, depo. p. 192, 197; Doc. No. 468-13). FSS, in turn, sub-licensed the software to DDS, and DDS licensed the software to hospitals. (Doc. No. S-507, depo. p. 197).

**The 2003 Operating Agreement**

According to an Operating Agreement dated January 2, 2003 (Doc. No. 419-3), there were three equal members of DDS: FSS, Schessel, and IHC Investments, Ltd. ("IHC").[3] Dobiesz was the president of both FSS and IHC at the time that the Operating Agreement was executed. According to the Operating Agreement, the managing member of DDS was FSS.

Paragraph 4.5 of the Operating Agreement provides the standards for FSS's management of DDS. Specifically, paragraph 4.5 provides the following:

> The Manager [FSS] shall perform . . . its duties in good faith, in a manner . . . it reasonably believes to be in the best interest of [DDS] and with such care as an ordinary prudent person in a similar position would use under similar circumstances. . . . The Manager shall not be liable to . . . any Member for any loss or damage sustained by . . . any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

(Doc. No. 419-3, p. 4).

---

[2]As previously stated, Dobiesz is the sole owner of FSS. (Doc. No. S-507, depo. p. 192). However, the ownership of FSS-Corp. is not completely clear. Dobiesz testified that either he is the owner of FSS-Corp. or FSS is the owner of FSS-Corp. (Doc. No. S-507, depo. p. 24-25, 192).

[3]Dobiesz owned 100% of FSS and 50% of IHC. (Doc. No. S-504, depo. p. 75).

The Operating Agreement also specifies the capital contributions required of each member. For Schessel, the Operating Agreement specifies that his capital contribution would consist of "[p]ayment, performance, and delivery of the consideration described in the Subscription Agreement with [DDS] dated January __, 2003." (Doc. No. 419-3, p. 14).

**The Subscription Agreement**

The 2003 Subscription Agreement (Doc. No. 419-2) provides the following conditions on Schessel's purchase of 1/3 of the membership units in DDS:

> The consideration which must be fully and finally paid, performed and delivered by [Schessel] in order to receive the [DDS Membership] Units (prior to which the Units shall be deemed not issued) shall be the following:
>
> 1. Receipt by [FSS] of all Fees and reimbursements of costs under the License Agreement with [DDS].
> 2. Payment of approximately $85,000 of [FSS's] start up expenses (to be paid from distributions to [Schessel]).
> 3. Assignment to [DDS] of all contracts and contract opportunities related to the business of [DDS] by [Schessel] and his affiliates (including, specifically but not exclusively Innovative Supply Strategies, Inc.).
> 4. Operations of [DDS] for two years within the Budgets attached as Exhibit B to this Agreement.

(Doc. No. 419-2, p. 3). These conditions are not well explained within the Subscription Agreement.

There is no further explanation regarding the first condition's requirement regarding payment to FSS of "Fees and reimbursements of costs under the License Agreement with [DDS]." There is no indication regarding who is to pay such fees and reimbursements to FSS, nor is there any indication regarding the amount of such fees and reimbursements within the Subscription Agreement. Furthermore, Schessel contends that this condition was satisfied, because DDS had paid all of the FSS license fees and costs as of January 6, 2003. (Doc. No.

472-4, ¶ 16).

With regard to the third condition, the Subscription Agreement contains a provision that purports to assign certain rights and opportunities of Schessel and ISS to DDS. Specifically, the Subscription Agreement provides that there is an "Exhibit A" attached to the Subscription Agreement that lists all of the "contracts, customers and contract/customer opportunities" relating to the healthcare/supply chain material management business of DDS, which are "unconditionally and fully assigned" to DDS by Schessel and ISS. (Doc. No. 419-2, p. 2). However, Exhibit A to the Subscription Agreement is titled "Budgets of the Company." Additionally, there is an Exhibit B to the Subscription Agreement, which is titled "Contracts, Customers and Contract/Customer Opportunities," but that exhibit is blank beyond its title.

With regard to the fourth condition—that DDS is operated for two years within the budgets attached as Exhibit B—there are no budgets attached at Exhibit B. There is an Exhibit A attached to the Subscription Agreement, which is titled "Budgets of the Company," but that exhibit simply states that the budgets are attached as Schedule A-1, but no schedule or budget is attached. Schessel has stated that no budgets were attached to the Subscription Agreement. (Doc. No. 472-4, ¶ 15).

**<u>The 2003 Employment Agreement</u>**

Schessel became the president of DDS and executed a two-year Employment Agreement, dated January 6, 2003. (Doc. No. 419-1). Paragraph 9.1 of the Employment agreement, which is at issue in this case, provides the following:

> [Schessel] agrees that any Inventions (as hereinafter defined) that he, alone or with others, may conceive, develop, make or perfect, in whole or in part, during the term of this Agreement and for a period of one (1) year after any termination of his employment, which ever shall occur last, which relate to the existing scope of [DDS's]

> business, or that he, alone or with others, may conceive, develop, draw, design, draft, make or perfect, in whole or in part, in the performance of the duties of his employment by [DDS], . . . shall be and hereby is assigned exclusively to [DDS] . . . and shall become the sole property of [DDS] or its nominee. For purposes hereof, the term "Inventions" shall mean . . . ideas, concepts, systems, designs, product toolings, architectures, product composition and formula, programming sequences and codes, works, trade secrets, know-how, [and] intellectual property . . . .

(Doc. No. 419-1, p. 4).

**<u>The Restrictive Covenants Agreement</u>**

In connection with his employment with DDS, Schessel also executed a Non-Competition, Non-Solicitation, and Non-Disclosure Agreement ("Restrictive Covenants Agreement" or "RCA") with DDS, dated January 6, 2003. (Doc. No. 419-4). Two provisions of the Restrictive Covenants Agreement are implicated in this case. First, the RCA provides that Schessel "will not, directly or indirectly disclose to anyone, or use or otherwise exploit for [Schessel's] own benefit or for the benefit of anyone other than [DDS], any confidential information ." (Doc. No. 419-4, p. 2).

Second, the RCA provides that "during the Restricted Period and for a period of two (2) years thereafter, [Schessel] will not directly or indirectly . . . entice or induce or in any manner influence, or attempt to entice, induce or in any manner influence, any person who is or shall be in the employ or service of [DDS] to leave such employ or service for the purpose of engaging in a business which may be in competition with the Business of [DDS]." (Doc. No. 419-4, p. 2-3). The RCA defines the "Restricted Period" as the "period commencing on [January 6, 2003] and ending on the date which is thirty-six (36) months following the date [Schessel] ceases to be employed by [DDS] for any reason." (Doc. No. 419-4, p. 1). The RCA defines the "Business" of DDS as "the marketing, sale and support of certain proprietary software for supply chain

management and optimization in the medical and hospital industry." (Doc. No. 419-4, p. 1).

**The 2003 Software License Agreement Between FSS and DDS**

FSS licensed the CAdRe software to DDS, which DDS licensed to its hospital customers. Pursuant to the 2003 License Agreement between DDS and FSS, DDS was required to pay a license fee to FSS that consisted of three components (Doc. No. S-511, Ex. 7B): The first component was a monthly license fee[4] that ranged from $150,000 to $250,000 per month (and contained a 20% increase when the license agreement automatically renewed). The second component was payment to FSS of 1/3 of the net proceeds generated by DDS (after payment of the license fee[5] and payment of DDS's expenses). The third component was payment of FSS's out-of-pocket expenses, which according to Exhibit B to the License Agreement appear to be described as "[a]ll expenses incurred in the daily operations of carrying out [FSS's] obligations relating to the License Agreement." (Doc. No. S-511, Ex. 7B).

During the eleven year period of 2003 through 2013, DDS was required to pay FSS over $100 million in license fees. (Doc. No. 468-2). At the time of his deposition in October of 2013, Dobiesz stated that he believed that DDS owed FSS approximately $20 million in unpaid license fees.

**Schessel's Prior Felonious Conduct**

In the summer of 2003, a felony charge was brought against Schessel relating to conduct

---

[4]Like most of the legal documents being sued upon in this case, the License Agreement is poorly drafted. The "License Fee" is defined as having three components, one of which is called the "License Fee." (Doc. No. S-511, Ex. 7B, p. 10).

[5]It is not clear which "License Fee" this component is referring to—the License Fee that has three components or the License Fee described as the first component.

that occurred while he was employed at Continuum. (Doc. No. S-511, depo. p. 332-33). Specifically, while he was employed at Continuum, Schessel engaged in a fraudulent scheme for which he received $545,000, and he did not pay taxes on such income. (Doc. No. S-511, depo. p. 306). As a result of his failure to pay taxes on the $545,000, the State of New York charged Schessel with felony tax evasion for the 1999 tax year. (Doc. No. S-511, Ex. 79, 81).

Part of the fraudulent scheme included Schessel diverting a $100,000 rebate that should have been paid to Continuum and causing it to be paid to another company. (Doc. No. S-511, Ex. 86, 87; Doc. No. S-511, depo. p. 328). Schessel was not charged for his part in the fraudulent scheme; he was only charged with tax evasion.

On August 6, 2003, Schessel pled guilty to the tax evasion charge. (Doc. No. S-511, Ex. 82). As part of his guilty plea, Schessel agreed to pay $100,000 in restitution to Continuum for the diversion of the $100,000 rebate. (Doc. No. S-511, Ex. 86, 87; Doc. No. S-511, depo. p. 328).

Schessel contends that prior to pleading guilty, he told Dobiesz about the situation and the felony charge against him. (Doc. No. S-511, depo. p. 328-29). Specifically, Schessel states that he met Dobiesz at a Boy Scout retreat that Dobiesz was attending with his son, and Schessel explained the entire situation to Dobiesz. (Doc. No. S-511, p. 329-46). According to Schessel, Dobiesz responded that they would take care of the situation; that Schessel should plead guilty and they would send $100,000 to Continuum. (Doc. No. S-511, depo. p. 329). Dobiesz disputes that Schessel ever told him the true details about the fraudulent scheme and tax evasion charge, and instead, Schessel simply told Dobiesz that he had an IRS tax debt. (Doc. No. 468, ¶ 21).

The parties do not dispute that Dobiesz agreed to help Schessel pay the $100,000 he owed. On May 18, 2004, Dobiesz transferred $100,000 from DDS's bank account to Schessel's

bank account so that Schessel could make the restitution payment. (Doc. No. S-511, p. 332, Ex. 66). However, according to Dobiesz, he believed that this money was being used to pay an IRS tax debt. (Doc. No. 468, ¶ 21). According to Dobiesz, at the time of their discussion regarding the guilty plea and restitution payment, Dobiesz specifically asked Schessel if there was anything about his past that would reflect adversely on DDS, to which Schessel replied that there was not anything. (Doc. No. 468, ¶ 21). According to Dobiesz, Schessel never told him the true details about the fraudulent scheme and tax evasion charge. (Doc. No. 468, ¶ 21, ¶ 23, 25).

**Schessel's Employment with FSS**

On September 1, 2007, FSS made Schessel its president. (Doc. No. S-507, depo. p. 201, 212-13, 216-17, 270-75). Dobiesz has stated that FSS employees and DDS employees act in concert and are not treated separately. (Doc. No. S-506, depo. p.11; Doc. No. S-507, depo. p. 216-17, 274). Dobiesz considered Schessel to be in charge of both DDS and FSS. (Doc. No. S-507, depo. p. 271-72).

**DDS's Financial Transactions**

DDS licensed the CAdRe software to hospitals, and Schessel was under the belief that DDS was very profitable. However, Schessel contends that Dobiesz prevented him from reviewing relevant DDS financial information. Furthermore, Schessel's capital account at the end of 2012 had a book value of negative $1.8 million. (Doc. No. 472-5, p. 10). A review of Dobiesz's deposition testimony in this case reveals certain financial transactions worth mentioning.

First, Dobiesz treats FSS and DDS like a single company, wherein DDS funds all of the expenses of FSS. (Doc. No. S-506, depo. p. 236, 251-52, 294; Doc. No. S-507, depo. p. 128). As previously stated, Dobiesz has stated that FSS employees and DDS employees act in concert

and are not treated separately. (Doc. No. S-506, depo. p.11; Doc. No. S-507, depo. p. 216-17, 274). FSS's only "customer" is DDS. (Doc. No. S-506, depo. p. 12).

Dobiesz's family members were hired and paid salaries by FSS, which were reimbursed by DDS. Dobiesz's wife, Maureen Donovan, is the executive vice president of administration and customer service at FSS, and Dobiesz contends that she provides services to both FSS and DDS. (Doc. No. S-506, depo. p. 11). Her salary is $90,000. (Doc. No. S-506, depo. p. 18). Schessel contends that Donovan lacked the experience for the position, and instead, the value of her services was $15,000, as she merely provided clerical assistance. (Doc. No. 472-4, ¶ 18). Furthermore, Schessel contends that Donovan did not provide any services nor did she come into the offices of DDS or FSS prior to late 2009, yet she received a salary at all times since the formation of DDS in 2003. (Doc. No. 472-4, ¶ 18).

Dobiesz's son, Aaron Dobiesz, is the director of sales for FSS, and he does software demonstrations for DDS's potential customers. (Doc. No. S-506, depo. p. 24). His salary is $75,000. (Doc. No. S-507, depo. p. 184). Schessel contends that Aaron lacked the experience for the position, and instead, the value of Aaron's services was $15,000, as he merely provided clerical assistance. (Doc. No. 472-4, ¶ 17). Dobiesz's daughter, Tracey Carter, is FSS's controller and accountant. (Doc. No. S-506, depo. p. 221).

Dobiesz also owns a company called International Limo, Inc., which is a corporation that owns transportation assets. (Doc. No. S-507, depo. p. 54). One of International Limo's assets is an aircraft lease. (Doc. No. S-507, depo. p. 55-56). Dobiesz states that DDS and FSS each pay $50,000 per month to International Limo for use of the aircraft. (Doc. No. S-507, depo. p. 80, 122-23, 135-36). However, the actual lease payments for the aircraft range between $20,000 to $30,000 per month, even though DDS and FSS pay a total of $100,000 per month in order to,

according to Dobiesz, cover the expenses of the aircraft (such as gas, renting the hangar, landing fees, and insurance). (Doc. No. S-507, depo. p. 143-44).

International Limo also owns cars which were paid for by FSS and/or DDS. (Doc. No. S-507, depo. p. 54-61). Dobiesz states that the cars are used by FSS and/or DDS, but the cars are titled to International Limo in order to get better car insurance rates. (Doc. No. S-507, depo. p. 61).

Finally, while DDS's financial statements and general ledgers are not before the Court, Dobiesz was questioned about them during his depositions. Dobiesz acknowledged that DDS paid him an amount equal to his income tax payments, and he acknowledged two such payments in the amounts of $243,969 and $700,000 (Doc. No. S-507, depo. p. 102-03, 110-11). By December 31, 2011, Dobiesz's draws from DDS exceeded $1 million (Doc. No. S-507, depo. p. 133-34, 138-39, 148). At one point, Dobiesz was receiving a $50,000 per month salary from FSS, while Schessel was only receiving a $12,500 per month salary from DDS. (Doc. No. S-507, depo. p. 281-84). Finally, according to Arie Schinnar, Defendants' expert who reviewed DDS's general ledger, Dobiesz's draws from DDS were fifteen times the amount of Schessel's draws, and Dobiesz's wages and advances were three times the amount of Schessel's wages and advances. (Doc. No. 472-10, ¶ 14).

**<u>The 2009 and 2010 Promissory Notes Executed by Schessel</u>**

From April 2009 through February of 2010, Schessel executed ten promissory notes in favor of DDS in exchange for a total of $165,000. (Doc. No. 419-5). The promissory notes provide that DDS had the right to convert any or all amounts advanced under the promissory notes into employment compensation that DDS owed Schessel. (Doc. No. 419-5).

Schessel contends that he does not owe anything to DDS under these promissory notes.

(Doc. No. 472-4, ¶ 9). Instead, he contends that, prior to signing the notes, Dobiesz told him that the notes were advances for Schessel's salary and that DDS would not be demanding payment as long as Schessel was employed by DDS for the month following the advance. (Doc. No. 472-4, ¶ 9). DDS is both suing Schessel for repayment of the promissory notes and has issued Schessel a 1099 tax form for the amount due under the notes (as if the amounts provided under the notes were compensation). (Doc. No. 9, ¶ 9).

**The 2011 Purported Amendment to the 2003 Operating Agreement**

By 2011, the business relationship between Schessel and Dobiesz began to deteriorate. As a result, FSS purported to amend the 2003 Operating Agreement via a document titled "Amendment to Operating Agreement" dated August 30, 2011 ("2011 Amendment"). (Doc. No. 89-2).

However, pursuant to paragraph 11.2 of the 2003 Operating Agreement, an amendment to the Operating Agreement was required to be in writing and executed by the holders of a majority of the outstanding membership interests in DDS. (Doc. No. 419-3, p. 11). FSS executed the 2011 Amendment to the Operating Agreement as the manager of DDS and as the holder of a majority of the membership interests in DDS.[6] However, it appears that FSS was not, in fact, a holder of a majority of the membership interests in DDS on August 30, 2011.[7]

Dobiesz stated in his deposition that in 2006, FSS bought all of IHC's membership

---

[6]Dobiesz signed the 2011 Amendment as Chairman of DDS and as the Chairman of FSS; he did not expressly sign the 2011 Amendment on behalf of IHC. (Doc. No. 89-2).

[7]In their response to Schessel's motion for summary judgment, Plaintiffs appear to concede that FSS could not amend the Operating Agreement simply based on its status as the manager, as Plaintiffs state that "FSS did not amend the Operating Agreement as the manager." (Doc. No. 473, p. 22).

interest in DDS and became the holder of a majority of DDS's membership interests. (Doc. No. S-504, depo. p. 74-75). However, DDS's Schedule K-1 tax form for the 2012 tax year shows that IHC's ownership in DDS increased from 33.333% to 50% in 2012. (Doc. No. 477-3; Doc. No. 477, ¶ 22). Furthermore, Dobiesz states in his declaration filed with the Court that both FSS and IHC are members of DDS. (Doc. No. 468, ¶ 37). Finally, in their response brief to Schessel's motion for summary judgment, Plaintiffs appear to acknowledge that FSS did not hold a majority of the membership interest and concede that FSS and IHC each held 33%. (Doc. No. 473, p.24-25).

The purported 2011 Amendment added a paragraph 9.5 to the Operating Agreement, which provided for expelling a member of DDS. Specifically, this paragraph has two provisions:

> (a) A Member may be expelled from Membership in [DDS], without cause, and required to surrender to [DDS] his or her Membership Interest upon the vote or written consent of Members who hold at least a majority of the Membership Interests. In exchange for the expelled Members' [sic] Membership Interest, [DDS] shall pay the expelled Member an amount equal to his or her pro rata share of the Book Value of [DDS], determined by [DDS] as of the last day of the quarter immediately preceding the date of expulsion ("Book Value").
>
> (b) A Member may be expelled from Membership in [DDS], "with cause" (as hereinafter defined), and required to surrender to [DDS] his or her Membership Interest upon the vote or written consent of Members who hold at least a majority of the Membership Interests. In exchange for the expelled Members' [sic] Membership Interest, [DDS] shall pay the expelled Member an amount equal to fifty percent (50%) of the Book Value determined by [DDS] as of the last day of the quarter immediately preceding the date of expulsion. "With cause" under this Section 9.5 shall mean facts which permit a conclusion by [DDS] that the Member has . . . failed or refused to carry out the directions of the Manager or the Chairman of [DDS]. . . .

(Doc. No. 89-2).

Dobiesz contends that after FSS executed the 2011 Amendment, he showed the document to Schessel and Schessel verbally agreed to it. (Doc. No. S-504, depo. p. 80-83). Schessel denies that he was shown the document or that he ever agreed to it. (Doc. No. 444-1, ¶ 28).

**<u>Schessel's Computer Access and the Termination of Schessel's Employment with DDS</u>**

By May of 2012, the business relationship between Schessel and Dobiesz had completely soured. Dobiesz caused FSS to stop paying Schessel for his travel expenses, and Schessel stopped traveling to DDS's Florida office. (Doc. No. S-511, depo. p. 29-30, 348-49).

While Schessel was traveling on DDS business on May 7, 2012, he remotely accessed his DDS files from his hotel room by connecting to FSS's and DDS's server and started to download the files before he went to bed. (Doc. No. 444-1, ¶ 11; Doc. No. 444-8). Uploading and downloading DDS files via remote access was part of Schessel's normal practices, as he was the president, co-founder, and co-owner of DDS. (Doc. No. 441-1, ¶ 10). However, because Schessel had downloaded 67 files, on the morning of May 8, 2012 the IT department of DDS became suspicious, reported the situation to Dobiesz, and Dobiesz instructed the IT department that Schessel's remote connection be terminated while the situation was investigated. (Doc. No. 444-2; Doc. No. 444-1, ¶ 12-13; Doc. No. 469, ¶ 6). Plaintiffs contend that as of May 8, 2012, FSS revoked Schessel's ability to use his credentials to access CAdRe. (Doc. No. 469, ¶ 10).

On May 9, 2012, Schessel was doing work for one of DDS's customers and needed to remotely access DDS's computers. (Doc. No. 444-1, ¶ 14). Schessel was still unable to access DDS's computers, and he contends that he informed Dobiesz that he told the IT department that he would have Stacy Gallagher (who reported to Schessel at DDS) use his company-issued laptop and log him into FSS's and DDS's CAdRe servers. (Doc. No. 444-1, ¶ 14; Doc. No. S-

512, depo. p. 847-49; Doc. No. 444-8). Schessel contends that he told Dobiesz that he had not heard back from the IT department about Gallagher logging him in, and Dobiesz responded, “They know it’s OK.” (Doc. No. 444-1, ¶ 14). However, Plaintiffs dispute this evidence and take the position that Schessel was not authorized to have Gallagher log him in. (Doc. No. 444-8, p. 3; Doc. No. 444-8, p. 8; Doc. No. 469, ¶ 13; Doc. No. 468, ¶ 57).

Schessel states that after the incident, Dobiesz instructed him that other employees had to log Schessel into the DDS database. (Doc. No. 444-1, ¶ 15). As a result, on May 31, 2012, while Schessel was doing work for one of DDS’s customers, he had Gallagher use his company-issued laptop and log him into FSS’s and DDS’s CAdRe servers. (Doc. No. 444-1, ¶ 16; Doc. No. S-512, depo. p. 847-49; Doc. No. 444-8). Plaintiffs dispute that Schessel was allowed to have Gallagher log him in, and instead, Plaintiffs take the position that Schessel was not authorized to do this. (Doc. No. 444-8, p. 3; Doc. No. 444-8, p. 8; Doc. No. 469, ¶ 18; Doc. No. 468, ¶ 57). Thereafter, Steve Platti from the IT department instructed Gallagher that she could no longer log Schessel into the computer. (Doc. No. 444-1, ¶ 16).

Neither Schessel nor Gallagher were reprimanded for accessing the computer in May. (Doc. No. 444-1, ¶ 19-20). Gallagher has stated that when she logged Schessel into the computer, they were both performing services for DDS and using the computer access in order to perform those services and for nothing else. (Doc. No. 444-15, ¶ 5). The first time that Schessel learned that he had allegedly violated any access limitations was via this lawsuit.

By June 1, 2012, Dobiesz and Schessel agreed that they could no longer work together, and Schessel worked with their attorney to try to form a transition plan. (Doc. No. S-512, depo. p. 582, 586). However, on July 30, 2012, Dobiesz, as CEO and Chairman of DDS, sent Schessel

a letter terminating his employment with DDS for cause, effective June 1, 2012.[8] (Doc. No. 444-6). Dobiesz states in the letter that Schessel's termination was due to: (1) Schessel's failure to follow the policies and directives of DDS, (2) Schessel's breach of his fiduciary duties as president of DDS (including contacting DDS's customers in order to provide services to them that are competitive with DDS), (3) Schessel's failure to report to DDS's Florida office, and (4) Schessel's failure to carry out the directions of the Chairman of DDS. (Doc. No. 444-6). Additionally, Dobiesz states in the letter that Schessel was expelled with cause as a member of DDS, and as a result, all rights and membership interests that Schessel may have been entitled to were terminated and forfeited. (Doc. No. 444-6). Finally, Dobiesz states in the letter that Schessel was directed to immediately return all computers paid for or made available to him by DDS. (Doc. No. 444-6).

Prior to receiving the termination letter, Schessel had been accessing DDS materials (and asking other employees to do so for him) and using hotmail, dropbox, and zoho to transfer such materials to himself. (Doc. No. S-511, depo. p. 180-81, 194, 201-02, 356-57; Doc. No. S-504, depo. p. 307-12, 328, 334-37). Plaintiffs contend that Schessel did this in order to steal DDS's trade secrets (consisting of its confidential information, database, global catalog of information, and CAdRe software). According to Dobiesz, there are emails between Schessel and Todd Bennett regarding the transfer of computer codes. (Doc. No. S-504, depo. p. 246-50, 254-56, 266-67).

After his termination, Schessel kept the laptop computer that he used while employed at DDS, because he believed that he had purchased it himself. (Doc. No. 444-1, ¶ 21). Schessel

---

[8]The letter does not mention termination of Schessel's position as president of FSS. (Doc. No. 444-6; Doc. No. S-507, depo. p. 274-75).

was asked during his deposition if he altered any of the information on his laptop after July 1, 2012, and he responded that he "potentially" did because he did not know that the laptop belonged to DDS. (Doc. No. S-512, depo. p. 846). Plaintiffs contend that after his termination, Schessel accessed confidential information from his company-issued laptop on numerous occasions. (Doc. No. 444-8, p. 3; Doc. No. 444-8, p. 8). Plaintiffs also contend that Schessel deleted company emails that had attachments that contained proprietary information. (Doc. No. 444-16).

Additionally, Plaintiffs contend that on January 23, 2013, Schessel used another employee's credentials (Phil Maneri) and accessed DDS's and FSS's software and ran reports. (Doc. No. 444-8, depo. p. 3; Doc. No. 444-8, p. 8; Doc. No. 469, ¶ 20). Schessel disputes this. (Doc. No. 444-1, ¶ 22).

On January 24, 2014, DDS provided Schessel with the serial numbers of the computers that it claimed to own. (Doc. No. 444-1, ¶ 21). The laptop that Schessel had kept was one of the computers that DDS claimed to own, and as a result, Schessel turned the laptop over to his attorney. (Doc. No. S-512, depo. p. 844-46).

**Primrose Investments**

In June through October of 2012, Schessel did work as a consultant for a company called Primrose Investments. (Doc. No. S-513, depo. p. 7). Todd Bennett's brother, Brad Bennett, was also a consultant for Primrose Investments. (Doc. No. S-513, depo. p. 17). Manny Losada owned Primrose Investments. (Doc. No. S-513, depo. p. 7).

Schessel describes Primrose Investments as a precursor to a company that Schessel later formed, Defendant Primrose Solutions, LLC ("Primrose"). (Doc. No. S-511, depo. p. 19). According to Schessel and Primrose, Primrose Investments and Primrose are completely separate

companies with separate ownership. However, from June 2012 until Primrose was formed, there are several emails that exist that refer simply to "Primrose" without specifically identifying Primrose Investments, which Plaintiffs contend relate to Primrose Solutions.

For example, Darryl Long, who worked for OSF (a former DDS customer), testified that he received emails on behalf of Primrose in June of 2012 from people named Emily Brown and Brad Thompson. (Doc. No. 476-2; Doc. No. 476-4; Doc. No. 476-5). It is undisputed that Schessel and his wife used those aliases. OSF entered into an agreement for work with a Primrose entity in June of 2012, but it is unclear which Primrose entity (Primrose Investments or Primrose Solutions) was the party to that agreement. (Doc. No. 476-2; Doc. No. S-510, depo. p. 404-09; Doc. No. S-513, depo. p. 71).

Over the 4th of July weekend in 2012, Schessel and his brother, Larry Schessel, met in New York to discuss the formation of Primrose. (Doc. No. S-511, depo. p. 41-43). Todd Bennett, Manny Losada, and a man from FTI were also there.[9] (Doc. No. S-511, depo. p. 42-43). After the July meeting, Schessel approached Todd Bennett's brother, Brad Bennett, to discuss the formation of Primrose. (Doc. No. S-511, depo. p. 101-02).

**The Formation of Primrose Solutions, LLC**

On October 4, 2012, Schessel, Larry Schessel, and Brad Bennett formed Defendant Primrose. (Doc. No. S-511, depo. p. 16; Doc. No. 445-3). Schessel is CEO and owns 80% of Primrose, while Larry Schessel and Brad Bennett each own 10% of Primrose. (Doc. No. S-511, depo. p. 16, 60).

Schessel and Brad Bennett started developing Primrose's software and database in

---

[9]FTI had provided consulting services to DDS. (Doc. No. S-511, depo. p. 53).

August of 2012, and by December of 2012, Primrose had the capability to normalize data. (Doc. No. S-511, depo. p. 80-81, 88-89, 92; Doc. No. S-510, depo. p. 399). According to Schessel, Primrose, like DDS, has a database that helps hospitals analyze their purchasing costs. However, Schessel contends that: (1) unlike DDS, Primrose focuses on the surplus market; and (2) Primrose did not copy DDS's software. (Doc. No. S-513, depo. p. 287; Doc. No. 445-9, ¶ 6; Doc. No. 445-14, ¶ 10). Todd Bennett has stated that he created Primrose's database from scratch for Schessel after Schessel left DDS. (Doc. No. 445-14, ¶ 5, 10, 14). Plaintiffs, on the other hand, contend that Primrose directly competes with DDS using software that is very similar to DDS's software.

**IDMS**

In 2012, Brad Bennett owned a company named Innovative Data Management Systems ("IDMS"). (Doc. No. S-511, depo. p. 94; Doc. No. S-513, depo. p. 139-40, 231). Todd Bennett worked as a consultant for IDMS, and through that company, Todd Bennett provided his services to Primrose. (Doc. No. S-513, depo. p. 140-41). In 2012 and 2013, Todd Bennett was providing consulting services for IDMS to Primrose while he was still employed by FSS. (Doc. No. S-512, depo. p. 829). Todd Bennett's employment with FSS did not end until June 28, 2013. (Doc. No. 445-14, ¶ 4).

**Primrose's Customers**

At the time of Schessel's deposition in June of 2013, Primrose had seven or eight customers, four of which were formerly DDS's customers. (Doc. No. S-511, depo. p. 64-65; Doc. No. S-510, depo. p. 392). Those four former DDS customers were NorthShore-LIJ, Valley Health, BayCare, and Geisinger. (Doc. No. S-510, depo. p. 392).

Schessel began soliciting work from Geisinger in July of 2012, and Geisinger became a Primrose customer in November of 2012. (Doc. No. S-512, depo. p. 629-30; Doc. No. S-511, depo. p. 61; Doc. No. S-510, depo. p. 475). Schessel began soliciting work from BayCare in November or December of 2012, and BayCare became a Primrose customer in December of 2012. (Doc. No. S-510, depo. p. 470-73). Schessel began soliciting work from NorthShore-LIJ in September of 2012, and NorthShore-LIJ became a Primrose customer in March of 2013. (Doc. No. S-510, depo. p. 392-93). Schessel began soliciting work from Valley Health in September or October of 2012, and Valley Health became a Primrose customer in November of 2013. (Doc. No. S-510, depo. p. 396-97).

During 2013, Primrose and FTI were in discussions regarding forming a company together. (Doc. No. S-510, depo. p. 508-09; Doc. No. S-513, depo. p. 246-47). However, by September of 2013, Dobiesz allegedly had said something to FTI that caused FTI to end their discussions with Primrose. (Doc. No. S-510, depo. p. 506-10; Doc. No. S-513, depo. p. 245-48; Doc. No. 445-6; Doc. No. 472-4, ¶ 11).

**DDS, FSS, and FSS-Corp.'s Claims Against Schessel and Primrose**

On November 14, 2012, Plaintiffs DDS, FSS, and FSS-Corp. filed suit against Defendants Schessel and Primrose. The following ten claims remain pending against Defendants (Doc. No. 413, 147): In Count I, DDS and FSS assert a claim for violation of the Computer Fraud and Abuse Act against Schessel and Primrose. In Count II, DDS, FSS, and FSS-Corp. assert a misappropriation of trade secrets claim against Schessel and Primrose. In Count III, DDS asserts a claim to enforce the RCA against Schessel. In Count IV, DDS, FSS, and FSS-Corp. assert a civil theft claim, pursuant to Florida Statute § 772.11, against Schessel and

Primrose. In Count V, DDS asserts a tortious interference claim against Schessel and Primrose. In Count VI, DDS asserts a civil conspiracy claim against Schessel and Primrose. In Count VII, DDS asserts a breach of fiduciary duty claim against Schessel. In Count VIII, DDS asserts a fraud claim against Schessel regarding his alleged failure to disclose the details surrounding the termination of his prior employment with Continuum and his involvement in the fraudulent scheme while employed by Continuum. In Count IX, DDS asserts a claim against Schessel for breach of paragraph 9.1 of the 2003 Employment Agreement. In Count X, DDS asserts a claim against Schessel for failure to repay $165,000 under the promissory notes he executed.

**Schessel and Primrose's Counterclaims Against DDS and FSS**

In response to Plaintiffs' claims, Schessel and Primrose asserted ten counterclaims, six of which remain[10] (Doc. No. 89, 165, 472): In Count I, Primrose asserts a tortious interference claim against DDS and FSS regarding FTI.[11] In Count IV, Schessel asserts a breach of loyalty claim against FSS, as manager of DDS. In Count V, Schessel asserts a claim for declaratory relief against DDS and FSS regarding the validity of the purported 2011 Amendment to the DDS Operating Agreement. In Count VI, Schessel asserts an alternative claim against DDS for breach of the purported 2011 Amendment to the DDS Operating Agreement. In Count VII, Schessel asserts a claim against FSS for breach of paragraph 4.5 of the 2003 Operating Agreement. In

---

[10]Defendants have dropped their defamation counterclaim (Count II) in their response to Plaintiffs' motion for summary judgment. (Doc. No. 472, p. 14). As a result, the Court grants Plaintiffs summary judgment on the defamation counterclaim.

[11]In their response to Plaintiffs' motion for summary judgment, Defendants have dropped their tortious interference counterclaim (Count I) to the extent that it was based on interference with ROI. (Doc. No. 472, p. 12). As a result, the Court grants Plaintiffs summary judgment on this portion of the tortious interference counterclaim.

Count IX, Schessel asserts an unpaid wages claim against DDS.

**III. Schessel's Motion for Summary Judgment**

Schessel moves for summary judgment on five of the claims asserted against him: (1) violation of the Computer Fraud and Abuse Act, (2) enforcement of the RCA, (3) breach of fiduciary duty, (4) fraud, and (5) breach of paragraph 9.1 of the 2003 Employment Agreement.[12] Additionally, Schessel moves for summary judgment on his counterclaim for declaratory relief regarding the purported 2011 Amendment to the Operating Agreement. Accordingly, the Court will analyze each claim.

**A. Computer Fraud and Abuse Act**

In Count I, DDS and FSS assert a claim for violation of the Computer Fraud and Abuse Act ("CFAA") against Schessel and Primrose.[13] Plaintiffs contend that Schessel violated the CFAA by doing the following:

- intentionally accessing a computer without authorization or by exceeding authorized access and thereby obtaining confidential information (in violation of 18 U.S.C. § 1030(a)(2)(C));
- knowingly and with the intent to defraud, accessing a protected computer without authorization, or exceeding authorized access, and by means of such conduct furthering the intended fraud and obtaining anything of value (in violation of § 1030(a)(4));
- knowingly causing the transmission of a command, and as a result, intentionally

[12]Schessel also moves for summary judgment on other claims by stating that he is incorporating Primrose's arguments into his motion by reference. (Doc. No. 486, p. 26). The Court will analyze such claims when analyzing Primrose's motion for summary judgment.

[13]The relevant provisions of the CFAA applicable to this case reference "protected computers," which includes computers used in or affecting interstate or foreign commerce or communication. 18 U.S.C. § 1030(e)(2)(B). The parties do not dispute that the computers at issue in this case are protected computers.

causing damage without authorization to a protected computer (in violation of § 1030(a)(5)(A)); and/or

- intentionally accessing a protected computer without authorization, and as a result, causing damage and loss (in violation of § 1030(a)(5)(C)).

Plaintiffs have identified six instances in which they contend that Schessel violated the CFAA: (1) when Schessel connected to FSS's and DDS's server and started to download 67 files from his hotel room on May 7-8, 2012; (2) when Schessel had Stacy Gallagher use his company-issued laptop and log him into FSS's and DDS's CAdRe servers on May 9, 2012; (3) when Schessel had Gallagher use his company-issued laptop and log him into FSS's and DDS's CAdRe servers on May 31, 2012; (4) when Schessel used the laptop that he kept after his termination and continued to access confidential company information; (5) when Schessel allegedly used another employee's credentials (Phil Maneri) and accessed DDS's and FSS's software and ran reports on January 23, 2013; and (6) when Schessel deleted company emails that had attachments that contained proprietary information. Accordingly, the Court will analyze each identified instance under the CFAA.

**1. May 7-8, 2012 Hotel Download of Files**

Plaintiffs contend that Schessel violated the CFAA when he connected to FSS's and DDS's server and started to download 67 files from his hotel room on May 7-8, 2012. In support of this contention, Plaintiffs point out that one of the files downloaded on May 7, 2012 was a file with a name that includes "OSF," which is a DDS customer. Thereafter, on June 18th and 25th of 2012, Brad Thompson and Emily Brown (the aliases used by Schessel and his wife) sent emails to Darryl Long of OSF regarding an agreement for work by a Primrose entity. As such, Plaintiffs contend that Schessel's download on May 7th must have been for the improper

purpose of soliciting OSF's business for a competitor. Plaintiffs base that contention on the fact that Long stated that he had heard of Primrose for a few months prior to those June emails. (Doc. No. 476-2, depo. p. 31).

The Court is not willing to make the leap that the May 7th and 8th downloads were for an improper purpose of soliciting OSF. On May 7th and 8th, Schessel had the authority to access DDS's and FSS's computers as part of his employment with both companies. Schessel was president of both DDS and FSS, and he was also treated by everyone involved as being a 1/3 owner of DDS. While Plaintiffs contend that Schessel's access was only authorized to the extent that it was for the benefit of DDS and/or FSS (and therefore, he exceeded his authority when he accessed files for the improper purpose of soliciting OSF's business for a competitor), there is no evidence before the Court that Schessel's access on May 7th and 8th was for such an improper purpose. Instead, Plaintiffs ask the Court to *assume* that an improper purpose existed for the specific access on May 7th and 8th simply because Schessel solicited OSF for a competitor via email in June. The Court declines Plaintiffs' invitation to find a genuine issue of material fact regarding a CFAA violation for Schessel's download on May 7th and 8th. Accordingly, Schessel is granted summary judgment on Plaintiff's CFAA claim to the extent that it is based on his download on May 7th and 8th.

**<u>2. May 9th and May 30th Incidents - Gallagher Logging In Schessel</u>**

Next, Plaintiffs contend that Schessel violated the CFAA when he had Gallagher use his company-issued laptop and log him into FSS's and DDS's CAdRe servers on May 9, 2012 and May 31, 2012. There is a genuine issue of material fact regarding whether these incidents were CFAA violations. To begin with, the parties dispute whether Dobiesz authorized Schessel to

have Gallagher log him in; if Dobiesz did authorize Gallagher, then Schessel's access via Gallagher would have been authorized access that did not violate the CFAA. Furthermore, the parties have not sufficiently briefed the issue of whether Schessel could violate the CFAA by accessing a computer that was owned, at least in part, by a company (DDS) that he contends that he was an owner of at the time of access.[14] Finally, the parties dispute whether Schessel was, in fact, an owner at the time of his access, because they dispute whether he met the conditions set forth in the Subscription Agreement. Accordingly, the Court denies Schessel's motion for summary judgment on Plaintiffs' CFAA claim to the extent that it is based on the May 9th and 30th access.

**3. Post-Termination Use of Laptop for Continued Access**

Next, Plaintiffs contend that Schessel violated the CFAA when he used the laptop that he kept after his termination and continued to access confidential company information. During their depositions of Schessel, Plaintiffs asked Schessel about emails and documents Schessel sent after June 1, 2012 that were allegedly based on PowerPoint presentations and other confidential information belonging to DDS and/or FSS. However, Schessel's testimony is unclear regarding what information he accessed, when he accessed the information, and who the information belonged to. As such, genuine issues of material fact exist regarding whether Schessel did engage in unauthorized access after his termination such that he violated the CFAA. Accordingly, the Court denies Schessel's motion for summary judgment on Plaintiffs' CFAA claim to the extent that it is based on post-termination use of the laptop.

[14]The parties are directed to brief this issue and include such briefing in their joint pretrial statement.

**4. Alleged Use of Phil Maneri's Credentials**

Next, Plaintiffs contend that Schessel violated the CFAA when he allegedly used Phil Maneri's credentials and accessed DDS's and FSS's software and ran reports on January 23, 2013. Plaintiffs base this contention on two things: (1) Plaintiffs contend that Maneri's credentials were used at 11:36 p.m. from a Marriott hotel (and not from the Montefiore Hospital headquarters where Maneri worked); and (2) Schessel sent an email to his brother, Larry Schessel, on October 15, 2012 stating: "In terms of Phil, he has nothing to do with anything other than we were setting up a goto meeting with him so he could get us on the latest dds application—me and Todd could then take it over and review where dds was in terms of development." (Doc. No. 476-11).

Plaintiffs' contention is flawed. To begin with, Plaintiffs rely on Steve Platti's declaration to show that Maneri's credentials were used to access DDS's and FSS's software from a Marriott hotel room. (Doc. No. 469, ¶ 20). However, Plaintiffs do not explain how Platti could know that Maneri accessed the software from a hotel. Instead, Platti includes a computer printout as an exhibit to his declaration, which shows that Maneri gained access at 11:36 p.m., but it does not indicate where Maneri was when he gained such access. (Do. No. 469, Ex. E). Furthermore, even assuming that Platti somehow had first-hand knowledge that Maneri's credentials were used to access DDS's and FSS's software from a Marriott hotel room, Plaintiffs are merely assuming that Schessel was in the hotel room using Maneri's credentials to access the software. Plaintiffs base that assumption on the fact that three months earlier, Schessel told Larry Schessel that Maneri was going to help them access DDS's software. There is no evidence that Maneri, in fact, allowed Schessel to use his credentials to access the DDS software on

January 23, 2013. As such, the Court declines Plaintiffs' invitation to find a genuine issue of material fact regarding a CFAA violation for the access on January 23rd. Accordingly, Schessel is granted summary judgment on Plaintiff's CFAA claim to the extent that it is based on his alleged access using Maneri's credentials on January 23rd.

**5. Deletion of Company Emails**

Next, Plaintiffs contend that Schessel violated the CFAA when he deleted company emails that had attachments that contained proprietary information. Plaintiffs base this claim on two things. First, Schessel's admitted that he had "potentially" altered information on his laptop after July 1, 2012, because he did not realize that the laptop he retained after his termination belonged to DDS. Second, Platti has testified that his review of the email system shows "gaps, months' worth of emails being deleted." (Doc. No. 444-16, depo. p. 166). Platti specifically identified a June 18, 2012 email as being deleted. (Doc. No. 444-16, depo. p. 165). Given this evidence, the Court finds that genuine issues of material fact exist regarding whether Schessel did delete emails containing proprietary information in violation of the CFAA. If there are other alleged deletions, it is unclear when any additional deletions occurred, and the timing of the deletions (i.e., whether it occurred before or after Schessel's termination) would likely affect whether a CFAA violation occurred. Accordingly, the Court denies Schessel's motion for summary judgment on Plaintiffs' CFAA claim to the extent that it is based on the deletion of emails.

**B. Enforcement of the RCA**

In Count III, DDS asserts a claim to enforce the RCA against Schessel. Specifically, in Count III, DDS alleges that Schessel breached the RCA in two ways: (1) by

enticing/inducing/influencing and/or attempting to entice/induce/influence any person employed by DDS to leave DDS for the purpose of engaging in a business that competes with DDS; and (2) by disclosing and/or exploiting for Schessel's own benefit the confidential information of DDS. Accordingly, the Court will analyze each alleged breach.

**1. Enticing, Inducing, and/or Influencing DDS's Employees**

With respect to DDS's contention that Schessel breached the RCA by enticing/inducing/influencing and/or attempting to entice/induce/influence any person employed by DDS to leave DDS for the purpose of engaging in a business that competes with DDS, DDS points to the following evidence: First, DDS contends that Primrose competes with DDS. Second, DDS identifies the following three DDS employees that Schessel allegedly enticed/induced/influenced and/or attempted to entice/induce/influence to leave DDS and work for Primrose: Todd Bennett, John Decker, and Richard Croy. (Doc. No. 444-10). Schessel disputes DDS's evidence. (Doc. No. S-511, depo. p. 118-23; Doc. No. 444-17, depo. p. 514).

In moving for summary judgment, Schessel makes three arguments: (1) the RCA is not enforceable after January 3, 2005;[15] (2) his conduct cannot be characterized as enticing, inducing, or influencing DDS's employees; and (3) DDS cannot obtain any relief for Schessel's unsuccessful attempts. Accordingly, the Court will analyze each argument.

**a. Enforceability**

Schessel first argues that the RCA is not enforceable after January 3, 2005—the date on

[15]This argument applies to both alleged breaches of the RCA—regarding (1) enticing/inducing/influencing DDS employees and (2) exploiting DDS's confidential information. The Court's analysis with regard to the first alleged breach (enticing/inducing/influencing DDS employees) applies equally to the second alleged breach (exploiting DDS's confidential information).

which the separate Employment Agreement expired by its own terms. In making this argument, Schessel relies on the case of Sanz v. R.T. Aerospace Corp., 650 So. 2d 1057 (Fla. 3d DCA 1995), and his contention that the RCA and Employment Agreement should be construed together as a single document because they are part of the same transaction. The Court is not persuaded by Schessel's argument.

In Sanz, the employee entered into a three-year employment agreement that contained restrictive covenants that ran "during the existence of his employment and for a period of twenty-four (24) months immediately following the termination of his employment." Id. at 1058-59. After his three-year employment term ended, the employee continued working for the employer. See id. at 1059. When the employee later terminated his employment, his employer attempted to enforce the restrictive covenants. See id. The court, however, found that the restrictive covenants could not be enforced, because the three-year employment agreement had been fully performed and had expired by its own terms. See id. The court stated that the restrictive covenants would be implicated only if the employee's employment had been terminated during the three-year employment term. See id. Furthermore, the court stated that—despite the fact that the restrictive covenants portion of the employment agreement specifically stated that, regarding the restrictive covenants, the employee "independently covenants and agrees, which covenants shall be independent of all other covenants"—the covenants did not survive the expiration of the employment agreement "in the absence of an express provision to that effect." Id. at 1059.

Based on Sanz, Schessel contends that the RCA cannot be enforced after the two-year term of the 2003 Employment Agreement expired. However, the RCA in the instant case is a

separate agreement entered into by Schessel and DDS, and as such, Sanz is not directly on point, given that the restrictive covenants were contained within the employment agreement in Sanz. Therefore, since Schessel has not pointed the Court to case law regarding enforcement of a restrictive covenant agreement that was contained in a document separate from the employment agreement, the Court is not convinced that the RCA cannot be enforced. Should Schessel find such a case, he is directed to include it in the parties' pretrial statement.

**b. Enticing, Inducing, or Influencing**

Next, Schessel argues that he did not breach the RCA, because his conduct cannot be characterized as enticing, inducing, or influencing DDS's employees. Instead, he argues that DDS contends that he solicited DDS's employees, but "soliciting" is not the same as enticing, inducing, or influencing. In support of this argument, Schessel points to a different provision in the RCA in which DDS specifically uses the word "solicit," and as such, Schessel argues that DDS's use of the words entice, induce, or influence in the provision at issue must be an intentional effort to prohibit conduct that is different than soliciting (otherwise, DDS would have included "solicit" among the prohibited conduct in the provision at issue). The Court is not persuaded by this argument and instead concludes that an issue of fact remains regarding whether Schessel enticed, induced, or influenced DDS's employees.

**c. Unsuccessful Attempts**

Next, Schessel argues that DDS cannot obtain any relief for Schessel's unsuccessful attempts to entice, induce, or influence Decker and Croy to leave DDS's employment. Given that Count III seeks injunctive relief for Schessel's breaches of the RCA, the Court agrees that no injunctive relief is warranted for Schessel's alleged past, unsuccessful attempts to entice,

induce, or influence Decker and Croy to leave DDS's employment. Accordingly, to the extent that Count III is based on such unsuccessful conduct, the Court grants Schessel's motion for summary judgment on that count.

**2. Exploiting DDS's Confidential Information**

With respect to DDS's contention that Schessel breached the RCA by disclosing and/or exploiting for Schessel's own benefit the confidential information of DDS, DDS contends that Schessel copied and used the CAdRe software for his own benefit (and for the benefit of Primrose). Schessel disputes this allegation. As such, the Court concludes that a genuine issue of material fact exists regarding this alleged breach, and as such, summary judgment judgement is denied.

**C. Breach of Fiduciary Duty**

In Count VII, DDS asserts a breach of fiduciary duty claim against Schessel. Specifically, DDS alleges that Schessel owed DDS duties of loyalty and due care, which he breached "by intentionally, willfully and maliciously refusing to perform the duties assigned to him as president and as an employee of DDS, including, refusing to attend meetings of DDS and report to work at the offices of DDS, and by refusing to follow the policies and directives established by DDS." (Doc. No. 419, ¶ 79).

Schessel moves for summary judgment on this claim, arguing that refusing to perform the duties assigned to him may be grounds for termination, but such is not a breach of fiduciary duty. In response, DDS argues that Schessel breached his fiduciary duty to DDS by failing to fully disclose, when repeatedly asked by Dobiesz during his employment with DDS, his involvement

in the fraudulent scheme while employed by Continuum and the tax evasion charge. While failing to disclose certain information when specifically asked in order to protect himself and simultaneously putting DDS in danger by employing a person with a fraudulent background may be a breach of fiduciary duty, such conduct is not alleged as the breach of fiduciary duty within Count VII of the third amended complaint. (Doc. No. 419). Instead, the breach alleged in Count VII is simply Schessel's refusal to perform the duties assigned to him as president and as an employee of DDS. As such, the Court concludes that summary judgment on Count VII should be granted.

**D. Fraud**

In Count VIII, DDS asserts a fraud claim against Schessel regarding his alleged failure to disclose the details surrounding the termination of his prior employment with Continuum and his involvement in the fraudulent scheme while employed by Continuum. In the summer of 2003, Schessel was charged tax evasion for his failure to recognize income he received from fraudulent activities he was engaged in while employed at Continuum. When Schessel pled guilty to the tax evasion charge, he acknowledged his role in the fraudulent activity.

Plaintiffs contend that Schessel committed fraud by failing to disclose: (1) his involvement in the fraudulent activity, and (2) that he was fired by Continuum for his role in the fraudulent activity. To the extent that Plaintiffs' claim is based on Schessel's failure to disclose that he was fired by Continuum for his role in the fraudulent activity, the claim fails, because the evidence before the Court shows that Schessel was not fired by Continuum. The only contrary evidence comes from Schessel's friend, Jane Girling.

When asked what she knew about what happened at Continuum, Girling responded, "I

know that a whole group of people at Continuum were brought up on charges and there was a whole big to do, and [Schessel] was part of that group that—he ended up getting fired with that whole group." (Doc. No. 476-18, depo. p. 24). Additionally, Girling stated, "It was a big . . . it was in the paper. I mean, everybody knew what was going on." (Doc. No. 476-18, depo. p. 25). However, there is no evidence that Girling had first-hand knowledge of Schessel's alleged termination, and as such, her testimony that Schessel was fired is based on hearsay. Both Schessel and the person that he reported to at Continuum have stated that Schessel was not fired from Continuum. Furthermore, there is no evidence that Continuum even knew about Schessel's fraudulent conduct prior to his leaving Continuum in 2000. Accordingly, the Court grants Schessel's motion for summary judgment to the extent that Plaintiffs' fraud claim is based on the contention that Schessel failed to disclose that he was fired by Continuum for his role in the fraudulent activity.

Plaintiffs also contend that Schessel fraudulently failed to disclose his involvement with the fraudulent activity and the tax evasion charge and guilty plea, when asked by Dobiesz on five occasions whether he (Schessel) had ever done anything that could embarrass or reflect adversely on the integrity of DDS.[16] There is a genuine issue of material fact regarding what Schessel disclosed about his involvement with the fraudulent activity and the tax evasion charge and guilty plea, as well as when any such disclosure by Schessel was made. Accordingly, the

[16]The five occasions on which Dobiesz questioned Schessel were: (1) prior to signing the 2003 Employment Agreement, (2) in May 2004 when Schessel asked Dobiesz for $100,000 to pay his alleged tax debt, (3) on May 18, 2004 when DDS was about to sign a license agreement with McKessen, (4) in November 2008, prior to visiting Cardinal Health, and (5) in a June 13, 2012 email, in which Dobiesz stated that he was being questioned by Cardinal Health regarding what happened at Continuum. (Doc. No. 468, ¶ 16-30).

Court denies Schessel's motion for summary judgment on Plaintiffs' fraud claim to the extent that it is based on the contention that Schessel failed to disclose his involvement with the fraudulent activity and the tax evasion charge and guilty plea when asked by Dobiesz whether he had ever done anything that could embarrass or reflect adversely on the integrity of DDS.

**E. Breach of Paragraph 9.1 of the 2003 Employment Agreement**

In Count IX, DDS asserts a claim against Schessel for breach of paragraph 9.1 of the 2003 Employment Agreement. Paragraph 9.1 of the Employment agreement provides the following:

> [Schessel] agrees that any Inventions (as hereinafter defined) that he, alone or with others, may conceive, develop, make or perfect, in whole or in part, during the term of this Agreement and for a period of one (1) year after any termination of his employment, which ever shall occur last, which relate to the existing scope of [DDS's] business, or that he, alone or with others, may conceive, develop, draw, design, draft, make or perfect, in whole or in part, in the performance of the duties of his employment by [DDS], . . . shall be and hereby is assigned exclusively to [DDS] . . . and shall become the sole property of [DDS] or its nominee. For purposes hereof, the term "Inventions" shall mean . . . ideas, concepts, systems, designs, product toolings, architectures, product composition and formula, programming sequences and codes, works, trade secrets, know-how, [and] intellectual property . . . .

(Doc. No. 419-1, p. 4). In the third amended complaint, DDS alleges that Schessel breached the work made for hire restriction in paragraph 9 of the Employment Agreement "through his impermissible use" of DDS's software.

Schessel moves for summary judgment on this claim, arguing that: (1) his alleged *unauthorized use* of DDS's software (i.e., the Invention under paragraph 9.1) cannot be a breach of this paragraph; and (2) the limitations period has expired on this claim. As explained below, the Court rejects these arguments.

Schessel first argues that his alleged *unauthorized use* of DDS's software is not a breach of paragraph 9.1. Instead, this provision sets forth the ownership of the improvements made to DDS's software by Schessel during his employment. While Schessel's alleged use of the software (by Primrose) may be unauthorized due to the ownership rights set forth in paragraph 9.1, Schessel argues that his alleged use of the software is not a breach of paragraph 9.1.

DDS appears to respond that Schessel has breached paragraph 9.1 by using and *thereby implicitly claiming ownership to* DDS's software. The Court agrees with DDS that such conduct—Schessel using and *thereby implicitly claiming ownership to* DDS's software—would be a breach of paragraph 9.1's ownership provision. As such, the Court rejects Schessel's argument that summary judgment is warranted on this claim because his alleged unauthorized use of the software could not establish a breach of paragraph 9.1.

Schessel next argues that the limitations period to assert this claim has expired. The Court rejected this argument in its December 19, 2013 order denying Schessel's motion to dismiss this claim based on the statute of limitations. (Doc. No. 147, p. 8). For the same reasons, the Court rejects this argument once again. Accordingly, the Court denies Schessel's motion for summary judgment as to Count IX.

**F. Declaratory Relief Regarding 2011 Amendment**

In Count V of their counterclaim, Schessel asserts a claim for declaratory relief against DDS and FSS regarding the validity of the purported 2011 Amendment to the DDS Operating Agreement. The 2011 Amendment provides two things: First, the 2011 Amendment provides that a member can be expelled from DDS without cause by a vote or written consent of DDS members who hold at least a majority of the DDS membership interests. If a member is expelled

without cause, the member is required to surrender his membership interest in DDS in exchange for payment of the book value of the surrendered membership interest. Second, the 2011 Amendment provides that a member can be expelled from DDS with cause by a vote or written consent of DDS members who hold at least a majority of the DDS membership interests. If a member is expelled with cause, the member is required to surrender his membership interest in DDS in exchange for payment of 50% of the book value of the surrendered membership interest. A member can be expelled with cause if the member fails or refuses to carry out the directions of the Manager of DDS (i.e., FSS) or the Chairman of DDS (i.e., Dobiesz).

Pursuant to paragraph 11.2 of the 2003 Operating Agreement, an amendment to the Operating Agreement was required to be in writing and executed by the holders of a majority of the outstanding membership interests in DDS. FSS executed the 2011 Amendment to the Operating Agreement as the holder of a majority of the membership interests in DDS. However, the facts show that FSS was not, in fact, a holder of a majority of the membership interests in DDS on August 30, 2011.[17] Therefore, the 2011 Amendment does not comply with the amendment procedure set forth in paragraph 11.2 of the 2003 Operating Agreement.

To the extent that Plaintiffs intend to argue that there was technical compliance because IHC implicitly consented to the 2011 Amendment due to the fact that Dobiesz was an owner of IHC and Dobiesz signed the 2011 Amendment, the Court rejects the argument. Dobiesz signed the 2011 Amendment as Chairman of DDS and as the Chairman of FSS; he did not expressly sign the 2011 Amendment on behalf of IHC.

Furthermore, even if FSS was a holder of a majority of the membership interests in DDS

[17]Instead, FSS and IHC were each 1/3 owners of DDS.

and could amend the Operating Agreement, the Court agrees with Schessel that enforcement of the provisions at issue in the 2011 Amendment (requiring the payment of book value, instead of fair value, to the expelled member) would not be equitable. "Equity abhors forfeiture, and a party entitled to a forfeiture may be estopped from asserting that right, if the result would be unconscionable." Torres v. K-Site 500 Associates, 632 So. 2d 110, 112 (3d DCA 1994)(citations omitted).

Plaintiffs fail to cite any case law showing that the provisions at issue in the 2011 Amendment could be enforced against Schessel. Instead, Plaintiffs cite to Florida Statute § 608.4211(5), which provides in relevant part, that an "operating agreement of a limited liability company [such as DDS] may provide that the interest of any member who fails to make any contribution that the member is obligated to make shall be subject to specified penalties[, such as] . . . the forfeiture of the defaulting member's membership interest." Paragraph 6.1 of the Operating Agreement provides that each member shall make the capital contribution that is set forth in Exhibit B, and Exhibit B provides that Schessel's capital contribution is described in the Subscription Agreement. Furthermore, paragraph 3a of the Subscription Agreement provides four conditions that must be met before Schessel's membership units are deemed issued to him. While these documents may support the forfeiture of Schessel's membership interest in DDS due to non-compliance with the Subscription Agreement, these documents and § 608.4211(5) do not support Plaintiffs' position that Schessel could be expelled (for reasons other than compliance with the Subscription Agreement) and would forfeit the fair market value of 100% of his membership interest.

Accordingly, the Court concludes that the 2011 Amendment was not done in compliance

with paragraph 11.2 of the 2003 Operating Agreement. Therefore, the Court grants Schessel summary judgment on his declaratory judgment claim. However, the Court notes that a genuine issue of material fact still exists regarding whether Schessel complied with the conditions set forth in paragraph 3a of the Subscription Agreement.

## IV. Primrose's Motion for Summary Judgment

Primrose moves for summary judgment on five of the claims asserted against it: (1) violation of the CFAA, (2) misappropriation of trade secrets, (3) civil theft, (4) tortious interference, and (5) civil conspiracy.[18] Accordingly, the Court will analyze each claim.

### A. Computer Fraud and Abuse Act

In Count I, DDS and FSS assert a claim for violation of the CFAA against Schessel and Primrose. Primrose moves for summary judgment to the extent that the CFAA violations occurred prior to October 4, 2012—the date that Primrose's certificate of formation was filed with the Secretary of State of Delaware.[19] Thus, argues Primrose, it cannot be held liable for any CFAA violations that occurred before it came into existence.

Plaintiffs fail to respond with any case law showing that such liability is possible. As a result, the Court grants Primrose's motion for summary judgment on the CFAA claim to the extent that the CFAA violations occurred prior to October 4, 2012.

---

[18]These claims were also brought against Schessel, and Schessel joins in Primrose's arguments as to the claims of (1) misappropriation of trade secrets, (2) civil theft, (3) tortious interference, and (4) civil conspiracy. (Doc. No. 486, p. 26). Therefore, the Court's rulings on those four claims apply to both Schessel and Primrose.

[19]Primrose joined in Schessel's motion for summary judgment as to the CFAA claim, and the Court's rulings regarding Schessel's motion apply to Primrose.

**B. Misappropriation of Trade Secrets**

In Count II, DDS, FSS, and FSS-Corp. assert a misappropriation of trade secrets claim under Florida's Uniform Trade Secrets Act ("FUTSA") against Schessel and Primrose. A trade secret is defined under FUTSA in the following way:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

Plaintiffs allege that Defendants misappropriated the following trade secrets: (1) their proprietary software, and (2) their confidential data (which the proprietary software has "enriched" via a process in which the data is cleansed, mapped, normalized, aliased, classified, equivalenced, cross-referenced, blinded, aggregated, and commingled) that is stored within their global catalog within their proprietary software.[20] Defendants move for summary judgment, arguing that: (1) Plaintiffs have not sufficiently identified the trade secrets at issue; and (2) Defendants did not misappropriate Plaintiffs' computer code or software functionality. As explained below, the Court concludes that summary judgment is not warranted on this claim.

Defendants first argue that Plaintiffs have not sufficiently identified the trade secrets at issue. The Court rejects this argument, because Plaintiffs have identified the following trade secrets: (1) their proprietary software, and (2) their confidential data that is stored within their

[20]Plaintiffs agree that their customers and customer data are not trade secrets.

global catalog within their proprietary software. Furthermore, Plaintiffs disclosed their data normalization and mapping processes to Defendants for their review by producing the software, source code, and databases that implement these processes. (Doc. No. 469, ¶ 21). Accordingly, summary judgment is not warranted on this basis.

Next, Defendants argue that the evidence shows that they did not misappropriate Plaintiffs' computer code or software functionality. However, the evidence on this issue is disputed, and as such, summary judgment is not warranted on this basis.

**C. Civil Theft**

In Count IV, DDS, FSS, and FSS-Corp. assert a civil theft claim relating to Defendants' alleged theft of Plaintiffs' trade secrets, pursuant to Florida Statute § 772.11. Defendants move to dismiss this claim, arguing that: (1) because the misappropriation of trade secrets claim fails, this theft claim fails; (2) Plaintiffs failed to comply with their required pre-suit notice obligations; (3) Plaintiffs cannot show that Defendants deprived them of a right to, or a benefit from, their property; and (4) Plaintiffs cannot show that FSS-Corp. suffered any damages. As explained below, the Court rejects these arguments.

**1. Trade Secrets Claim**

First, Defendants argue that they are entitled to summary judgment on the civil theft claim, because it is based on the theft of trade secrets, and Defendants have shown that Plaintiffs' claim for misappropriation of trade secrets fails. However, the Court denied Defendants' motion as to the misappropriation of trade secrets claim, and as such, this argument fails.

**2. Pre-Suit Notice Requirements**

Next, Defendants argue that they are entitled to summary judgment on the civil theft claim, because Plaintiffs failed to comply with their required pre-suit notice obligations. Specifically, Florida Statute § 772.11 provides the following:

> Before filing an action for damages [for civil theft under § 772.11], the person claiming injury must make a written demand for $200 or the treble damage amount of the person liable for damages under this section. If the person to whom a written demand is made complies with such demand within 30 days after receipt of the demand, that person shall be given a written release from further civil liability for the specific act of theft or exploitation by the person making the written demand.

Fla. Stat. § 772.11(1).

Defendants contend that Plaintiffs failed to comply with the pre-suit notice requirements in four ways: (1) Plaintiffs failed to make a written demand on either defendant; (2) to the extent that the Court finds that a written demand was made, the demand was only made to Schessel; (3) to the extent that the Court finds that a written demand was made, the demand referred to an amount stolen—$10 million—that has no basis in fact; and (4) to the extent that the Court finds that a written demand was made, the demand was made on behalf of Plaintiffs and Dobiesz, yet Dobiesz is not a plaintiff in this case. As explained below, the Court rejects these arguments.

Defendants first argue that Plaintiffs failed to make a written demand on either defendant. Instead, they contend that the purported pre-suit demand letter was first produced in discovery a year after this suit was filed. (Doc. No. 445-9, ¶ 9). The return receipt indicates that the demand letter was sent via certified mail, but it does not contain a signature confirming delivery. (Doc. No. 445-11).

The Court accepts Defendants' contention that Plaintiffs did not strictly comply with the

pre-suit notice provision, as the evidence is unclear that the letter was received by Schessel. The purported pre-suit demand letter is dated November 14, 2012 (two days before the date this lawsuit was filed), is addressed to Marc Schessel only, and indicates that it was sent in reference to this lawsuit (specifically naming both defendants). (Doc. No. 445-11).

However, it is undisputed that this letter was produced during discovery and approximately one year before the third amended complaint (Doc. No. 419) was filed. While Defendants denied in their answer the allegation that written demand was made (Doc. No. 419, ¶ 65; Doc. No. 449, 450), they did not assert the failure to comply with the pre-suit notice requirement as an affirmative defense or in their motions to dismiss (Doc. No. 449, 450, 56, 147). Given the specific procedural background in this case, the Court concludes that this failure to strictly comply with the pre-suit notice requirement was harmless and was waived, and as such, it does not entitle Defendants to summary judgment on this claim. See Pushko v. Klebener, 2010 WL 3910228, at *4-5 (11th Cir. Oct. 7, 2010)(affirming rejection of the defendants' argument that they were entitled to a directed verdict on the civil theft claim against them because the plaintiffs did not strictly comply with § 772.11, noting that the defendants failed to raise the issue as an affirmative defense or move for dismissal on that basis). While the Court could require Plaintiffs to now send a demand letter to both defendants that strictly complies with the notice requirements, to do so would accomplish nothing and simply elevate form over substance given Defendants' clear notice of the existence of this claim. Instead, the Court considers the production of the letter during discovery to be sufficient, under the specific

facts of this case, to comply with the notice requirement in § 772.11 as to both defendants.[21]

Finally, the Court rejects Defendants' contention that the written demand was defective because it sought $10 million and was made on behalf of Dobiesz. These features do not make the demand insufficient.

**3. Deprivation of a Right, or a Benefit from, the Property**

Next, Defendants argue that they are entitled to summary judgment on the civil theft claim, because Plaintiffs cannot show that Defendants deprived them of a right to, or a benefit from, their property. Defendants, however, fail to acknowledge that Florida defines theft as ***either***: (1) depriving someone of a right to the property or a benefit from the property; or (2) appropriating the property to his own use or to the use of any person not entitled to the use of the property. Fla. Stat. § 812.014(1). Plaintiffs have shown that a genuine issue of material fact exists regarding whether Defendants have appropriated Plaintiffs' trade secrets for their own use. Accordingly, summary judgment is not warranted on this basis.

**4. FSS-Corp.'s Damages**

Next, Defendants argue that they are entitled to summary judgment on the civil theft claim to the extent that it is asserted by FSS-Corp., because Plaintiffs cannot show that FSS-Corp. suffered any damages. In response, Plaintiffs simply state that FSS-Corp. owns the software that was allegedly stolen. However, mere ownership of the stolen property is not

[21]As stated by the court in the case of In re Tadlock, 2010 WL 8320065, at *5 (Bankr. M.D. Fla. Sept. 1, 2010): "[I]t appears that the purpose of the demand requirement is to provide an opportunity for, and thereby encourage, settlement negotiations prior to the commencement of litigation. Consequently, it is generally held that plaintiffs who have not complied with the demand requirement should be allowed to cure the omission, provided the cause of action is not barred by the statute of limitations."

sufficient to support a civil theft claim for damages; instead, FSS-Corp. must show that it suffered damages from the theft. See Winters v. Mulholland, 33 So. 3d 54, 57 (Fla. 2d DCA 2010)(reversing civil theft judgment because the plaintiff did not show that he suffered any damages from the theft). FSS-Corp. has not shown that it has suffered any damages from the alleged theft, and as such, Defendants are entitled to summary judgment to the extent that FSS-Corp. asserts the civil theft claim. This claim remains to the extent that it is asserted by DDS and FSS.

**D. Tortious Interference**

In Count V, DDS asserts a tortious interference claim against Schessel and Primrose regarding the following six DDS customers: (1) Geisinger, (2) FTI, (3) Mt. Sinai, (4) NorthShore-LIJ, (5) CentraState, and (6) BayCare.[22] In order to establish a claim for tortious interference, DDS must show: (1) the existence of a business relationship; (2) Defendants' knowledge of the business relationship; (3) Defendants' intentional and unjustified interference with the business relationship; and (4) damage to DDS as a result of the interference. See Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1995)(citation omitted).

Not all interference will support this claim. As explained by one court:

> The general rule is that an action for tortious interference will not lie where a party tortiously interferes with a contract terminable at will. This is so because when a contract is terminable at will there is only an expectancy that the relationship will continue. In such a situation, a competitor has a privilege of interference in order to acquire the business for himself. If a competitor proves that the interference was

---

[22]Primrose moved for summary judgment to the extent that this claim was also based on a seventh customer, ROI. However, Plaintiffs did not respond to Primrose's arguments that it did not tortiously interfere with ROI, and as a result, the Court presumes that Plaintiffs' tortious interference claim does not implicate ROI.

lawful competition he will not be found to have committed the tort.

Greenberg v. Mount Sinai Medical Center of Greater Miami, Inc., 629 So. 2d 252, 255 (Fla. 3d DCA 1994)(internal citations omitted).

In order to establish the competition privilege, Defendants must show that they did not employ improper means to interfere with the business relationships between DDS and its customers identified above. See BlueSky Greenland Environmental Solutions, LLC v. 21st Century Planet Funds, LLC, 985 F. Supp.2d 1356, 1367 (S.D. Fla. 2013). Ultimately, the determination of whether the interference was done by improper means "requires a commonsense consideration of whether the conduct was 'sanctioned by the rules of the game' and what is 'right and just' under the circumstances." Id. (citations omitted). With this framework in mind, the Court analyzes DDS's tortious interference claim with respect to each customer identified above.

**1. Geisinger**

DDS contends that Defendants tortiously interfered with its business relationship with Geisinger, arguing that Defendants caused Geisinger to terminate its contract with DDS. Defendants respond that this claim fails because as of the April 2014 deposition of Geisinger's corporate representative, Geisinger still had a month-to-month contract with DDS and had been paying DDS's monthly invoices for the same amount as before the alleged interference. (Doc. No. 445-19, depo. p. 214). Thus, DDS cannot show that its has been damaged.

DDS argues that Geisinger contracted with Primrose to pay less for the same services that DDS provided, and Geisinger intends to drop DDS once it was fully using Primrose's software.

However, there is no evidence that Geisinger ever ended its relationship with DDS. Furthermore, the hearsay evidence that DDS relies on for its contention that Geisinger intends to end its relationship with DDS is an email from October of 2012, in which Geisinger states that it intended to go "full Primrose in Dec." (Doc. No. 475-7). To the extent that such email evidenced Geisinger's intent to end its relationship with DDS in *December of 2012*, there is no evidence before the Court that such occurred. Accordingly, the Court grants Primrose's motion for summary judgment on the tortious interference claim against both defendants to the extent that it relates to Geisinger.

**2. FTI**

Next, DDS contends that Defendants tortiously interfered with its business relationship with FTI. Defendants move for summary judgment, arguing that: (1) there was no business relationship between DDS and FTI, and (2) Primrose could not have committed tortious interference prior to October 4, 2012—the date it came into existence.

DDS responds by arguing that a business relationship did, in fact, exist and pointing to a consulting agreement between DDS and FTI. (Doc. No. 475-11). Additionally, DDS points to a November 2012 license agreement between Primrose and FTI .

The parties do not provide many facts regarding this claim, such as when the alleged tortious interference occurred and whether the consulting agreement between DDS and FTI was still in effect at that time. Accordingly, the Court concludes that genuine issues of material fact that exist that preclude summary judgment on this claim. As such, the Court denies Primrose's motion for summary judgment on the tortious interference claim to the extent that it relates to FTI.

**3. Mt. Sinai**

Next, DDS contends that Defendants tortiously interfered with its business relationship with Mt. Sinai. Primrose argues that to the extent that DDS contends that the tortious interference occurred in June of 2012, it could not be held liable because Primrose did not exist at that time. In response, DDS concedes that Primrose is not liable for the alleged interference by Schessel with DDS's relationship with Mt. Sinai. Accordingly, the Court grants Primrose's motion for summary judgment on the tortious interference claim to the extent that it relates to Mt. Sinai. This claim remains as to Schessel's alleged tortious interference with Mt. Sinai.

**4. NorthShore-LIJ**

Next, DDS contends that Defendants tortiously interfered with its business relationship with NorthShore-LIJ by improperly copying DDS's software and then using the improperly copied software to solicit NorthShore-LIJ and gain it as a customer at the expense of DDS. Genuine issues of material fact exist regarding the origin of Primrose's software. Accordingly, the Court denies Primrose's motion for summary judgment on the tortious interference claim to the extent that it relates to NorthShore-LIJ.

**5. CentraState**

Next, DDS contends that Defendants tortiously interfered with its business relationship with CentraState. Specifically, DDS contends that CentraState intended to end its relationship with DDS once it could obtain the same services from Primrose.

However, the CentraState corporate representative stated in her deposition that CentraState was having a "huge" problem with DDS's product and that CentraState "was never

even offered assistance from DDS." (Do. No. 445-16, depo. p. 45). When CentraState's contract with DDS was set to expire in April of 2014, CentraState did not renew its contract. (Doc. No. 445-16, depo. p. 309, 316-17). Instead, CentraState requested a month-to-month contract with DDS, to which DDS did not respond, and as a result, CentraState did not renew its contract with DDS. (Doc. No. 445-16, depo. p. 309, 313-14).

While the evidence reveals that CentraState chose Primrose after its contract ended with DDS, there is no evidence that CentraState would have continued its relationship with DDS in the absence of Primrose. Accordingly, the Court grants Primrose's motion for summary judgment on the tortious interference claim against both defendants to the extent that it relates to CentraState.

**6. BayCare**

Next, DDS contends that Defendants tortiously interfered with its business relationship with BayCare by improperly copying DDS's software and then using the improperly copied software to solicit BayCare and gain it as a customer at the expense of DDS. Genuine issues of material fact exist regarding the origin of Primrose's software. Accordingly, the Court denies Primrose's motion for summary judgment on the tortious interference claim to the extent that it relates to BayCare.

**E. Civil Conspiracy**

In Count VI, DDS asserts a civil conspiracy claim against Schessel and Primrose for their alleged tortious interference with the DDS customers identified above. Primrose argues that the conspiracy claim fails to the extent that the underlying tortious interference claim fails. The Court agrees. As such, the Court grants Defendants summary judgment on the civil conspiracy

claim to the extent that it relates to the tortious interference with Geisinger and CentraState.

Additionally, since the Court granted Primrose summary judgment on the tortious interference claim to the extent that it relates to Mt. Sinai (because Primrose did not exist at the time of the alleged tortious interference), Primrose could not have conspired with Schessel to tortiously interfere for the same reason. As such, the Court grants both defendants summary judgment on the civil conspiracy claim to the extent that it relates to the tortious interference with Mt. Sinai.

## V. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on several of Defendants' affirmative defenses to Plaintiffs' claims, as well as on most of Defendants' counterclaims. Accordingly, the Court addresses Plaintiffs' arguments below.

### A. Affirmative Defenses

Plaintiffs move for summary judgment on ten of Defendants' affirmative defenses to Plaintiffs' claims.[23] As such, the Court analyzes each of the challenged affirmatives defenses.

#### 1. Failure to State a Claim

Plaintiffs challenge Defendants' first affirmative defense that the complaint fails to state a claim. While Plaintiffs are correct that this is a denial rather than a true affirmative defense, the assertion of this defense (which no longer has any bearing in this case) has not prejudiced Plaintiffs, and the Court questions why Plaintiffs would waste this Court's limited judicial resources to point out something that does not affect the outcome of this case.

[23]The affirmative defenses are contained in documents 449 and 450.

**2. Schessel's Alleged Ownership of DDS**

In their second affirmative defense, Defendants assert that Schessel has been the owner of DDS, and as an owner, he had the right and permission to access DDS's computers, software, and data. Plaintiffs contend that this affirmative defense fails, because FSS is the manager of DDS, and Florida law provides that any matter relating to the business of the limited liability company may be exclusively decided by the manager unless the operating agreement or articles of organization provide otherwise. Fla. Stat. § 608.422(4).

This affirmative defense relates to Plaintiffs' CFAA claim. Plaintiffs, however, have failed to cite any case law that supports their contention that an owner of a limited liability company does not have the right and permission, via their status as an owner, to access the limited liability company's computers such that their access can be considered a violation of the CFAA. If Plaintiffs find such case law, they should include it in their pretrial statement; otherwise, the Court denies Plaintiffs' motion for summary judgment on this affirmative defense.

**3. Mitigation of Damages**

In their twelfth affirmative defense, Defendants allege that Plaintiffs' claims are barred by their failure to mitigate damages and by the doctrine of avoidable consequences. Plaintiffs argue that summary judgment should be granted as to this affirmative defense, because Defendants do not identify any actions that Plaintiffs could have taken to avoid the damages that they suffered. In response, Defendants identify actions that Plaintiffs could have taken. As such, the Court concludes that summary judgment on this affirmative defense is not warranted.

**4. Estoppel**

In their nineteenth affirmative defense, Defendants allege that Plaintiffs' claims are

barred by estoppel. Plaintiffs argue that summary judgment should be granted as to this affirmative defense, because Defendants do not identify any representations that Defendants relied on to their detriment. In response, Defendants identify the representations that they relied on, which they contend support estoppel. As such, the Court concludes that summary judgment on this affirmative defense is not warranted.[24]

**5. Prior Material Breach**

In their twentieth affirmative defense, Defendants allege that Plaintiffs' breach of contract claims are barred by their own prior material breaches. Plaintiffs argue that summary judgment should be granted as to this affirmative defense, because there is no evidence of a prior breach by Plaintiffs. In response, Defendants point to evidence that Plaintiffs materially breached the 2003 Employment Agreement by failing to pay Schessel the required $200,000 annual salary and reimburse him for all of his expenses in 2003.[25] (Doc. No. 472-4, ¶ 10). As such, the Court concludes that summary judgment on this affirmative defense is not warranted.

**6. Hindrance of Schessel's Performance**

In their twenty-first affirmative defense, Defendants allege that Plaintiffs' breach of contract claims are barred by their hindrance of Schessel's performance, by refusing to reimburse his travel expenses and cutting off his access to DDS's computers. The breach of contract claims asserted against Schessel relate to his alleged breach of: (1) paragraph 9.1 of the

[24]However, to the extent that Defendants' estoppel affirmative defense is based, in part, on the theory that the two-year term set forth in the Employment Agreement estopps Plaintiffs from pursuing their breach of employment agreement claim, the Court rejects this argument.

[25]Furthermore, Defendants allege that this breach was also a breach of the RCA, which provided that Schessel's covenants were given in consideration of the benefits of employment with DDS.

Employment Agreement (i.e., the work-made-for-hire provision); (2) the RCA by soliciting employees and using DDS's confidential information; and (3) the promissory notes by failing to repay them.

Plaintiffs argue that summary judgment should be granted as to this affirmative defense, because even assuming that Plaintiffs refused to reimburse Schessel's travel expenses and cut off his access to DDS's computers, such would not have affected Schessel's ability to perform under those contracts. The Court agrees with Plaintiffs and concludes that summary judgment is warranted on this affirmative defense.

**7. Agreements Barring Fraud Claim**

In their twenty-fifth and twenty-sixth affirmative defenses, Defendants allege that Plaintiffs' fraud claim is barred by the language in the Operating Agreement and Subscription Agreement (specifically, the merger and integration clauses). Plaintiffs argue that summary judgment should be granted as to these affirmative defenses, because these agreements are not implicated by the fraud claim. Defendants respond that the agreements represented the parties' full understanding of all relevant facts, and the failure to include an assertion regarding Schessel's background bars Plaintiffs' fraud claim.

The Court rejects Schessel's argument and agrees with Plaintiffs. The fraud claim remains to the extent that Schessel failed to disclose his involvement with the alleged fraudulent activity while employed by Continuum when specifically asked by Dobiesz whether Schessel had been involved in anything that could embarrass or adversely affect the integrity of DDS. The merger and integration clauses contained within the Operating Agreement and Subscription Agreement do not undermine Plaintiffs' remaining fraud claim. Accordingly, the Court

concludes that summary judgment is warranted on these two affirmative defenses.

**8. Statute of Limitations**

In their twenty-seventh affirmative defense, Defendants allege that the claim for breach of paragraph 9.1 of the 2003 Employment Agreement (i.e., the work-made-for-hire provision) is time-barred. The Court has already rejected this argument, and as a result, the Court agrees with Plaintiffs that summary judgment is warranted on this affirmative defense.

**9. Estoppel**

In their twenty-ninth affirmative defense, Defendants allege that DDS is estopped from enforcing paragraph 9.1 of the 2003 Employment Agreement (i.e., the work-made-for-hire provision). Plaintiffs move for summary judgment on this affirmative defense, arguing that Defendants have not shown that estoppel is warranted with respect to their claim for breach of paragraph 9.1 of the 2003 Employment Agreement. Defendants' response is vague and completely lacking of any explanation. As a result, the Court concludes that summary judgment is warranted on this affirmative defense.

**B. Counterclaims**

Plaintiffs move for summary judgment on most of Defendants' counterclaims. As such, the Court will analyze each of the challenged counterclaims.

**1. Tortious Interference**

In Count I of their counterclaims, Primrose asserts a tortious interference claim against DDS and FSS regarding FTI. In support of this count, Defendants argue that Plaintiffs interfered with Primrose's relationship with FTI (who was in talks with Primrose to form a new company together) when Dobiesz interfered with, and successfully quashed, their deal. To do so, Dobiesz

allegedly told FTI that Schessel was subject to a covenant not to compete. However, this Court has held in a prior order on Defendants' motion to dismiss that the covenant not to compete did not bar Schessel from competing with DDS. (Doc. No. 56, p. 12). As a result, Defendants contend that Plaintiffs tortiously interfered with Primrose's relationship with FTI by lying about Schessel being subject to a non-compete agreement.

Plaintiffs move for summary judgment on this claim, arguing that it is not tortious interference to engage in competition. The Court agrees that the competition privilege allows competition not to be characterized as tortious interference as long as Plaintiffs did not employ improper means to interfere with the business relationship between Primrose and FTI. See BlueSky, 985 F. Supp.2d at 1367 (S.D. Fla. 2013). In this case, Defendants argue that Plaintiffs used improper means by lying about the non-compete agreement, given that the Court has held that it did not bar Schessel from competing with DDS. The flaw in Defendants' argument is that there is no evidence that Plaintiffs and/or Dobiesz knew that the statement that Schessel was subject to a non-compete agreement was false when the statement was made to FTI. In fact, Schessel did not even appear to notice the basis for the Court's conclusion that the covenant not to compete did not bar Schessel from competing with DDS. Instead, the Court brought the poor drafting of the non-competition provision to the parties' attention by stating:

> Plaintiffs contend that Schessel violated the restrictive covenants by improperly competing with DDS. Defendants argue that this portion of the claim must be dismissed, and the Court agrees, but for a different reason than that suggested by Defendants. The provision at issue states that for a period of 36 months after termination of Schessel's employment with DDS, "neither [Schessel] or any affiliate of [Schessel] . . . will not . . . directly or indirectly, own, manage, operate, control, invest or acquire an interest in, or otherwise engage or participate in . . . any business which competes with [DDS's business]." (Doc. No. 28, Ex. D & E). Because this provision contains

> a double negative—stating that ***neither*** Schessel or Schessel's affiliate ***will not*** compete with DDS—this provision does not prohibit Schessel from competing with DDS. Therefore, the Court dismisses DDS's claim in Count III to the extent that it is based on Plaintiffs' contention that Schessel improperly competed with DDS.

(Doc. No. 56, p. 12).

Thus, it appears that prior to the Court's order, neither party realized that the covenant not to compete was drafted in such a way as to not prevent Schessel from competing with DDS. As a result, there is no basis for concluding that Dobiesz intentionally lied to FTI about Schessel being subject to a non-competition agreement. Therefore, there is no evidence that Plaintiffs employed improper means to compete with Primrose, and summary judgment for Plaintiffs is warranted on the tortious interference counterclaim.

**2. Breach of Loyalty**

In Count IV of their counterclaims, Schessel asserts a breach of loyalty claim, pursuant to Florida Statute § 608.4225, against FSS (as the manager of DDS). Specifically, Defendants allege that FSS breached its duty of loyalty by: (1) taking money and profits that DDS owed to Schessel and diverting it to Dobiesz; (2) causing DDS to employ Dobiesz's family members (his wife and son) and paying them more than the value of their services; (3) causing DDS to enter into contracts with entities owned directly or indirectly by Dobiesz and paying those entities money without receiving reasonably equivalent value in return; (4) failing to act in good faith and to deal fairly with Schessel; and (5) purporting to amend the Operating Agreement without Schessel's consent and then expelling Schessel as an owner without a legal basis to do so.

Plaintiffs move for summary judgment on this claim, arguing: (1) FSS did not owe a duty of loyalty to Schessel, because he was never a member of DDS due to his failure to fulfill the

conditions set forth in the Subscription Agreement; and (2) Schessel failed to show that FSS breached a duty of loyalty by: (a) diverting money to Dobiesz; (b) employing Dobiesz's family members; (c) entering into contracts with entities owned by Dobiesz; and (d) failing to act in good faith and to deal fairly with Schessel. Accordingly, the Court will address each argument.

**a. Schessel's Membership in DDS**

Plaintiffs move for summary judgment on the breach of loyalty claim, arguing that FSS did not owe Schessel such a duty of loyalty, because Schessel never became a member of DDS due to his failure to fulfill the conditions set forth in the Subscription Agreement. The Subscription Agreement provides the following conditions on Schessel's purchase of 1/3 of the membership units in DDS:

> The consideration which must be fully and finally paid, performed and delivered by [Schessel] in order to receive the [DDS Membership] Units (prior to which the Units shall be deemed not issued) shall be the following:
>
> 1. Receipt by [FSS] of all Fees and reimbursements of costs under the License Agreement with [DDS].
> 2. Payment of approximately $85,000 of [FSS's] start up expenses (to be paid from distributions to [Schessel]).
> 3. Assignment to [DDS] of all contracts and contract opportunities related to the business of [DDS] by [Schessel] and his affiliates (including, specifically but not exclusively Innovative Supply Strategies, Inc.).
> 4. Operations of [DDS] for two years within the Budgets attached as Exhibit B to this Agreement.

(Doc. No. 419-2, p. 3).

Plaintiffs contend that the evidence shows that Schessel did not fulfill these conditions. However, as explained below, the Court concludes that a genuine issue of material fact exists as to whether Schessel fulfilled the conditions set forth in the Subscription Agreement.

Plaintiffs contend that Schessel did not meet the first requirement that FSS receive the

required fees and reimbursements. However, this is a fact in dispute.

Next, Plaintiffs contend that Schessel did not meet the second requirement that he pay the start-up expenses from his distributions. However, Schessel contends that DDS made a profit of more than $900,000 in 2003, which provided the necessary funds to comply with this requirement. (Doc. No. 472-10, ¶ 6, 7).

Next, Plaintiffs contend that Schessel did not meet the third requirement that he assign all contracts and contract opportunities to DDS, because he did not assign certain intellectual property rights to DDS. However, the Subscription Agreement provides that there is an "Exhibit A" attached to the Subscription Agreement that lists all of the "contracts, customers and contract/customer opportunities" relating to the healthcare/supply chain material management business of DDS, which are "unconditionally and fully assigned" to DDS by Schessel and ISS. (Doc. No. 419-2, p. 2). Exhibit A to the Subscription Agreement is titled "Budgets of the Company." Additionally, there is an Exhibit B to the Subscription Agreement, which is titled "Contracts, Customers and Contract/Customer Opportunities," but that exhibit is blank beyond its title. The Court rejects Plaintiffs' argument that intellectual property rights are contracts and contract opportunities contemplated in this requirement. Instead, that requirement contemplates the assignment of customer contracts and contract opportunities that Schessel and ISS had. As such, the Court concludes that there is no evidence that Schessel did not comply with this third requirement.

Next, Plaintiffs contend that Schessel did not meet the fourth requirement of operating within the budgets. However, there is a dispute regarding whether any budgets were even attached to the Subscription Agreement.

Accordingly, genuine issues of material fact exist as to whether Schessel fulfilled the conditions set forth in the Subscription Agreement. As such, summary judgment is not warranted on this basis.

**b. Alleged Breaches**

Next, Plaintiffs move for summary judgment arguing that Schessel fails to show that FSS: (1) diverted money to Dobiesz; (2) employed Dobiesz's wife and son and paid them more than the value of the services that they provided; and (3) entered into contracts with entities owned by Dobiesz and paid those entities money without receiving reasonably equivalent value in return. The Court finds that genuine issues of material fact exist with regard to this alleged conduct.

Additionally, Plaintiffs move for summary judgment on the breach of loyalty claim, arguing that the failure to act in good faith and to deal fairly with Schessel is not a breach of the duty of loyalty under Florida Statute § 608.4225. Specifically, Plaintiffs argue that § 608.4225 does not require a manager to act in good faith and to deal fairly with its members. The Court rejects this argument, because § 608.4225(1)(c) provides that each manager "shall discharge the duties to the limited liability company and its members under this chapter or under the articles of organization or operating agreement and exercise any rights consistent with the obligation of good faith and fair dealing." Accordingly, the Court concludes that summary judgment on the breach of loyalty counterclaim is not warranted.

**3. The 2011 Amendment**

In Count V of the counterclaims, Schessel asserts a claim for declaratory relief against DDS and FSS regarding the validity of the purported 2011 Amendment to the DDS Operating

Agreement. The Court has already granted Schessel's motion for summary judgment that this amendment was not done in compliance with paragraph 11.2 of the 2003 Operating Agreement. As such, Plaintiffs are not entitled to summary judgment on the declaratory judgment counterclaim.

Because the Court has found that the 2011 Amendment was not properly done, there can be no breach of the 2011 Amendment (as claimed in Count VI—the alternative counterclaim for breach of the 2011 Amendment). As such, Plaintiffs are entitled to summary judgment that there was no breach of the purported 2011 Amendment.

**4. Breach of Paragraph 4.5 of the Operating Agreement**

In Count VII of the counterclaims, Schessel asserts a claim against FSS for breach of paragraph 4.5 of the 2003 Operating Agreement. Paragraph 4.5 provides the standards for FSS's management of DDS:

> The Manager [FSS] shall perform . . . its duties in good faith, in a manner . . . it reasonably believes to be in the best interest of [DDS] and with such care as an ordinary prudent person in a similar position would use under similar circumstances. . . . The Manager shall not be liable to . . . any Member for any loss or damage sustained by . . . any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

(Doc. No. 419-3, p. 4).

Schessel alleges that FSS breached this provision by failing to manage DDS's money in good faith and with such care as an ordinary prudent person in a similar position would use under similar circumstances. Plaintiffs move for summary judgment on this claim, arguing that Schessel never became a member of DDS due to his failure to fulfill the conditions set forth in the Subscription Agreement. However, as previously stated, the Court concludes that whether

Schessel became a member of DDS is a disputed issue of fact, and as such, summary judgment on this counterclaim is not warranted.

**<u>VI. Claims Remaining for Trial</u>**

Based on the rulings above, the following claims and counterclaims remain for trial. The following nine claims of Plaintiffs remain for trial:

- Violation of the CFAA (Count I) by FSS and DDS: This claim remains against Schessel to the extent it is based on: (i) his May 9th and 30th access; (ii) his post-termination use of the laptop; and (iii) his deletion of emails. This claim also remains against Primrose to the extent that it is based on: (i) Schessel's post-termination use of the laptop that occurred on or after October 4, 2012; and (ii) Schessel's deletion of emails that occurred on or after October 4, 2012.
- Misappropriation of trade secrets (Count II) by DDS, FSS, and FSS-Corp. against Schessel and Primrose.
- Enforcement of the RCA (Count III) by DDS against Schessel for: (i) enticing, inducing, or influencing Todd Bennett to leave DDS's employment; and (ii) disclosing and/or exploiting the confidential information of DDS.
- Civil theft (Count IV) by DDS and FSS against Schessel and Primrose.
- Tortious Interference (Count V) by DDS: This claim remains against Schessel to the extent it is based on interference with FTI, Mt. Sinai, NorthShore-LIJ, and BayCare. This claim also remains against Primrose to the extent that it is based on interference with FTI, NorthShore-LIJ, and BayCare.

- Civil conspiracy (Count VI) by DDS against both defendants for interference with FTI, NorthShore-LIJ, and BayCare.
- Fraud (Count VIII) by DDS against Schessel regarding his alleged failure to disclose his involvement with the fraudulent activity while employed at Continuum, as well as the tax evasion charge and guilty plea, when asked by Dobiesz on five occasions whether he had ever done anything that could embarrass or reflect adversely on the integrity of DDS.
- Failure to repay the promissory notes (Count X) by DDS against Schessel.[26]

Additionally, the following three counterclaims of Schessel remain for trial:

- Breach of loyalty (Count IV) against FSS.
- Breach of paragraph 4.5 of the 2003 Operating Agreement (Count VII) against FSS.
- Unpaid wages claim (Count IX) against DDS.[27]

## VII. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Defendant Schessel's Motion for Summary Judgment (Doc. No. 486) is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** as follows:

(a) Schessel is granted summary judgment on Plaintiffs' CFAA claim (Count I) to the extent that it is based on: (i) his download on May 7th and 8th;

---

[26]No one moved for summary judgment on this claim.

[27]No one moved for summary judgment on this claim.

and (ii) his alleged access using Maneri's credentials on January 23rd.

(b) Schessel is granted summary judgment on Plaintiffs' claim to enforce the RCA (Count III) to the extent it is based on the contention that Schessel attempted to entice, induce, or influence Decker and Croy to leave DDS's employment.

(c) Schessel is granted summary judgment on Plaintiffs' breach of fiduciary duty claim (Count VII).

(d) Schessel is granted summary judgment on Plaintiffs' fraud claim (Count VIII) to the extent it is based on the contention that Schessel failed to disclose that he was *fired by Continuum* for his role in the fraudulent activity.

(e) Schessel is granted summary judgment on his declaratory judgment counterclaim (Count V) regarding the invalidity of the 2011 Amendment.

Schessel's motion for summary judgment is **DENIED** as follows:

(a) The Court denies Schessel's motion for summary judgment on Plaintiffs' CFAA claim (Count I) to the extent that it is based on: (i) his May 9th and 30th access; (ii) his post-termination use of the laptop; and (iii) his deletion of emails.

(b) The Court denies Schessel's motion for summary judgment on Plaintiffs' claim to enforce the RCA (Count III) to the extent it is based on the contention that: (i) Schessel enticed, induced, or influenced Todd Bennett to leave DDS's employment; and (ii) Schessel disclosed and/or exploited

the confidential information of DDS.

(c) The Court denies Schessel's motion for summary judgment on Plaintiffs' fraud claim (Count VIII) to the extent that it is based on the contention that Schessel failed to disclose his involvement with the fraudulent activity while employed at Continuum, as well as the tax evasion charge and guilty plea, when asked by Dobiesz on five occasions whether he had ever done anything that could embarrass or reflect adversely on the integrity of DDS.

(d) The Court denies Schessel's motion for summary judgment as to the claim that he breached the work made for hire provision contained in paragraph 9.1 of the Employment Agreement (Count IX).

(2) Defendant Primrose Solutions' Motion for Summary Judgment (Doc. No. 487) is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** as follows:

(a) Primrose is granted summary judgment on Plaintiffs' CFAA claim (Count I) to the extent that it is based on any CFAA violations that occurred prior to October 4, 2012.

(b) Both defendants are granted summary judgment on Plaintiffs' civil theft claim (Count IV) to the extent that the claim is asserted by FSS-Corp.

(c) Both defendants are granted summary judgment on Plaintiffs' tortious interference claim (Count V) to the extent that it relates to Geisinger and CentraState. Additionally, the Court grants summary judgment to

Primrose to the extent that Plaintiffs' tortious interference claim relates to Mt. Sinai.

(d) Both defendants are granted summary judgment on Plaintiffs' civil conspiracy claim (Count VI) to the extent that it relates to Geisinger, CentraState, and Mt. Sinai.

Primrose's motion for summary judgment is **DENIED** as follows:

(a) Plaintiffs' CFAA claim (Count I) remains against Primrose for any CFAA violations that occurred on or after October 4, 2012.

(b) The Court denies Primrose's motion for summary judgment as to Plaintiffs' misappropriation of trade secretes claim against both defendants (Count II).

(c) The Court denies Primrose's motion for summary judgment as to Plaintiffs' civil theft claim against both defendants (Count IV) to the extent that the claim is asserted by DDS and FSS.

(d) The Court denies Primrose's motion for summary judgment as to Plaintiffs' tortious interference claim against both defendants (Count V) to the extent that it relates to FTI, NorthShore-LIJ, and BayCare. Additionally, Plaintiffs' tortious interference claim, as it relates to Mt. Sinai, remains against Schessel.

(e) The Court denies Primrose's motion for summary judgment as to Plaintiffs' civil conspiracy claim against both defendants (Count VI) to the extent that it relates to FTI, NorthShore-LIJ, and BayCare.

(3) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 441) is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** as follows:

(a) Plaintiffs are granted summary judgment on Defendants' twenty-first, twenty-fifth, twenty-sixth, twenty-seventh, and twenty-ninth affirmative defenses. Additionally, the Court grants Plaintiffs summary judgment on the nineteenth affirmative defense to the extent that it is based on the theory that the two-year term set forth in the Employment Agreement estopps Plaintiffs from pursuing their breach of employment agreement claim.

(b) Plaintiffs are granted summary judgment on Primrose's tortious interference counterclaim (Count I).

(c) Plaintiffs are granted summary judgment on Defendants' defamation counterclaim (Count II).

(d) Plaintiffs are granted summary judgment on Defendants' alternative counterclaim for breach of the 2011 Amendment to the Operating Agreement (Count VI).

Plaintiffs' motion for summary judgment is **DENIED** as follows:

(a) The Court denies Plaintiffs' motion for summary judgment as to Defendants first, second, twelfth, and twentieth affirmative defenses. The Court also denies Plaintiffs' motion with respect to the nineteenth affirmative defense to the extent it was not granted above.

(b) The Court denies Plaintiffs' motion for summary judgment as to the

breach of loyalty claim (Count IV).

(c) The Court denies Plaintiffs' motion for summary judgment as to the counterclaim for declaratory relief regarding the purported 2011 Amendment to the DDS Operating Agreement (Count V).

(d) The Court denies Plaintiffs' motion for summary judgment as to the counterclaim for breach of paragraph 4.5 of the 2003 Operating Agreement (Count VII).

**DONE AND ORDERED** at Tampa, Florida, this 1st day of December, 2014.

Copies to:
Counsel of Record

Susan C. Bucklew
SUSAN C. BUCKLEW
United States District Judge